UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>*EX PARTE* APPLICATION OF EURASIAN NATURAL RESOURCES CORPORATION LIMITED PURSUANT TO 28 U.S.C. § 1782 FOR LEAVE TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS,<br><br>                                                Applicant. | Case No. 20 mc. _____ |

## DECLARATION OF NIRANJAN SHANMUGANATHAN

Pursuant to 28 U.S.C. § 1746, I, Niranjan Shanmuganathan, declare under penalty of perjury under the laws of the United States as follows:

1. I am a partner at Taylor Wessing LLP ("Taylor Wessing"), a law firm representing Applicant Eurasian Natural Resources Corporation, Ltd. ("ENRC") in the United Kingdom. I am admitted to the roll of solicitors in England & Wales and I specialize in intellectual property and media law.

2. I submit this declaration in support of ENRC's request for an order pursuant to 28 U.S.C. § 1782 authorizing it to take discovery from Respondent HarperCollins Publishers, LLC ("HarperCollins") in the Southern District of New York. All statements in this Declaration are based upon my personal knowledge and experience, or upon my review of records maintained by Taylor Wessing in the regular course of its representation of ENRC.

### The Parties

3. ENRC is a private limited company incorporated in England with its registered office in London. ENRC is part of a diversified group of companies in the natural resource industry that engage in mining, processing, energy, logistics, and marketing operations.

4. My understanding is that Respondent HarperCollins is an international publishing company. HarperCollins's "Company Profile," published on the "About Us" section of its website, indicates that HarperCollins's headquarters are in New York City. According to the Company Profile, HarperCollins operates in 17 countries and publishes approximately 10,000 new books a year in 16 languages. The Company Profile also states that HarperCollins operates more than 120 imprints (an imprint is a trade name under which works are published). A true and correct copy of the Company Profile is attached hereto as Exhibit 1.

## ENRC's Pending Foreign Proceedings in the U.K.

5. I am aware that ENRC is undertaking four judicial proceedings in the U.K. (the "Ongoing Proceedings"), each arising from, among other things, the allegedly unlawful disclosure of ENRC's confidential and privileged information. The Ongoing Proceedings comprise:

- *Eurasian Natural Res. Corp. v. Mark Hollingsworth*, Claim No. BL-2019-001955 (the "Hollingsworth Proceeding"), wherein ENRC alleges, among other things, that Mark Hollingsworth misappropriated ENRC's confidential and privileged information;

- *Eurasian Natural Res. Corp. v. The Director of the Serious Fraud Office*, Claim No. BL-2019-000613 (the "DSFO Proceeding"), wherein ENRC alleges that the Director of the Serious Fraud Office (the "SFO") committed misfeasance in public office and that the SFO wrongfully obtained confidential and privileged materials through the law firm Dechert LLP ("Dechert") or David Neil Gerrard;

- *Eurasian Natural Res. Corp. v. Dechert LLP and David Neil Gerrard*, Claim No. CL-2017-000583 (the "Dechert Proceeding"), wherein ENRC alleges, among other things, that Dechert and Mr. Gerrard deliberately leaked privileged and confidential documents in breach of their duties to ENRC; and

- *Eurasian Natural Res. Corp. v. Ake-Jean Qajygeldin*, Claim No. BL-2019-001377 ("Qajygeldin Proceeding"), wherein ENRC alleges, among other things, that Ake-Jean Qajygeldin misappropriated and misused ENRC's confidential information.

True and correct copies of the Particulars of Claims for these proceedings, which are similar to civil complaints in the United States, are attached hereto as Exhibits 2–5.

6. In these Particulars of Claims, ENRC alleges, among other things, that improper disclosures of information resulted in the publication of ENRC's confidential information in several articles, including (but not limited to) the following: "Copper giant calls in outsiders to examine corruption claims," published by *The Times* on August 9, 2011; "Mining giant slips into a new hole" and "Fraud office steps in at embattled Footsie mining giant," published by *The Sunday Times* on December 11, 2011; "ENRC internal inquiry raises suspicions," published by *The Financial Times* on March 14, 2013; "Ex-ENRC Africa Boss Interviewed by U.K. Prosecutor in Bribe Case," published by *Bloomberg News* on September 9, 2016; "SFO is stepping up its Kazakh miner probe," published by *Evening Standard* on September 15, 2017; and "ENRC Sues U.K. Fraud Cops as Corruption Charges Loom," published by *Bloomberg News* on March 27, 2019. True and correct copies of these articles are attached hereto as Exhibits 6–12.

7. Press outlets have reported that the SFO recently referred one of its employees to the Metropolitan Police of London for an investigation related to leaks to the press. A copy of an article titled "UK's Fraud Office refers employee to police amid leak allegations," published by *Reuters* on February 20, 2020, is attached hereto as Exhibit 13. This article reports that ENRC has alleged in court documents that the SFO's referral followed its receipt of a cache of seemingly hacked e-mails evidencing contact between an insider source at the SFO and Mr. Hollingsworth. As part of its representation of ENRC, Taylor Wessing has been provided with copies of the e-mails to which these filings refer (the "Leaked E-mails") by another law firm acting for ENRC.

8. In one of the Leaked E-mails, Mr. Hollingsworth writes that he has "been developing a new source at the SFO who is a senior investigator on their big cases and talks to me off-the-record," and summarizes information he learned from this "new source" about "the SFO investigation into ENRC." A true and correct copy of this e-mail, which indicates that it was sent

3

by Mr. Hollingsworth on February 21, 2017, is attached hereto as Exhibit 14.  In another Leaked E-mail, Mr. Hollingsworth writes that "I will try and get Tom Burgis to run the SFO and Belgium story because I know Tom."  A true and correct copy of this e-mail, which indicates that it was sent by Mr. Hollingsworth on September 28, 2017, is attached hereto as Exhibit 15.

9. In another e-mail that Taylor Wessing has obtained as part of its representation of ENRC, Mr. Burgis appears to communicate with Alexander Yearsley regarding ENRC.  A true and correct copy of this e-mail, which indicates that it was sent by Tom Burgis to alexanderyearsley@gmail.com on June 22, 2015, and which bears the subject line "Re: Re: ENRC deaths," is attached hereto as Exhibit 16.

10. I am aware that, in the United States District Court for the Northern District of California, ENRC applied for, and was granted, an order pursuant to Section 1782 authorizing it to take discovery for use in the Dechert Proceeding.  That case is captioned *In re Application of Eurasian Natural Resources Corporation*, 18-mc-80041 (N.D. Cal.).  I have reviewed the court's Order Permitting Discovery in that case, which indicates that ENRC's application sought documents and testimony from Danny Fortson, a reporter for *The Sunday Times*.  A true and correct copy of the Order Permitting Discovery is attached hereto as Exhibit 17.

**A Forthcoming Book May Publish ENRC's Confidential Information**

11. I have reviewed an April 18, 2020 e-mail sent by Mr. Burgis to a public relations agent of ENRC.  In this e-mail, Mr. Burgis states that he is writing a book that will contain information about ENRC, its founders, and its owners.  The e-mail furthermore references earlier inquiries that Mr. Burgis had made to ENRC and its representatives, including one in January 2019.  A true and correct copy of this e-mail is attached hereto as Exhibit 18.

12. Mr. Burgis's April 18, 2020 e-mail attaches a 33-page document containing numerous assertions of fact, which Mr. Burgis asks ENRC to check for accuracy. It is my understanding that ENRC has reviewed this document and believes that it contains very similar and sometimes identical headings, accompanied by very similar and sometimes identical information, as confidential documents at issue in the Ongoing Proceedings. It is my understanding that, based on this review, ENRC believes that Mr. Burgis may have had access to ENRC's confidential and privileged information and plans to publish such information, presented in a distorted way, in his forthcoming book.

13. To my knowledge, ENRC has not seen the contents of Mr. Burgis's book. I have not seen the contents of Mr. Burgis's book.

14. On May 8, 2020, Taylor Wessing sent a detailed letter to Mr. Burgis explaining the provenance of the information that ENRC believes that Mr. Burgis may intend to publish, informing him that the information had been unlawfully obtained, and providing information about the Ongoing Proceedings. This letter clearly informed Mr. Burgis that he is "now bound by a duty of confidence" and that disclosure or publication of the information contained in the document would expose him to legal claims, including a claim for breach of confidence. The letter also stated that ENRC understands that Mr. Burgis has been in contact with Mr. Yearsley, a U.K.-based intermediary and associate of Mr. Hollingsworth. A true and correct copy of this letter is attached hereto as Exhibit 19.

15. On May 27, 2020, after receiving a response from Mr. Burgis arguing that a portion of the information contained in the document could be traced to publicly available sources, Taylor Wessing sent a second letter to Mr. Burgis. The second letter stated that Mr. Burgis's response was incorrect, and in any event, that it failed to address large portions of the confidential

5

information referred to in the document. The second letter expressly reserved all of ENRC's rights. A true and correct copy of this letter is attached hereto as Exhibit 20.

16. I have reviewed an August 21, 2020 e-mail from Mr. Burgis to ENRC. In this e-mail, Mr. Burgis states that he intends to publish an article in *The Financial Times* about ENRC (the "FT Article"). The e-mail requests ENRC's comment on a list of 20 statements, none of which are accompanied by supporting documentation. It is my understanding that ENRC, based on its own review of these statements, believed that the FT Article would insinuate that ENRC was involved in serious criminality, and would otherwise contain false and distorted characterizations of the unlawfully obtained confidential information.

17. On August 27, 2020, Taylor Wessing sent a letter to *The Financial Times*, informing it that the FT Article would be false. By way of example, Taylor Wessing observed that Mr. Burgis's August 21, 2020 e-mail inaccurately quoted and summarized the Dechert Proceeding. Taylor Wessing furthermore cautioned that the FT Article appeared to be intended to generate publicity for Mr. Burgis's forthcoming book, and that Mr. Burgis was operating in cooperation with individuals and entities that lack credibility or independence, including several defendants in the Ongoing Proceedings—particularly, Mr. Gerrard, Dechert, and Mr. Hollingsworth—and others, including Milltown Partners. A true and correct copy of this letter is attached hereto as Exhibit 21.

18. On September 1, 2020, after receiving a response from *The Financial Times*, Taylor Wessing sent back a reply letter. In this letter, Taylor Wessing cautioned that the basis of the FT Article appeared to be ERNC's confidential information—distorted therein in the form of false statements against ENRC—and drew *The Financial Times'* attention to the Ongoing Proceedings in which ENRC alleges that Mr. Burgis, Mr. Gerrard, Dechert, and Mr. Hollingsworth unlawfully

breached ENRC's confidence by obtaining, misusing, and distorting ENRC's confidential information. This letter also drew *The Financial Times'* attention to the Leaked Emails which suggest that Mr. Hollingsworth (whom ENRC believes is a source of Mr. Burgis's) was involved in unlawful information-gathering activities and had been provided with information by an insider at the SFO, as well as some of the information he obtained in breach of confidence. This letter also expressed ENRC's belief that Mr. Burgis is involved in a PR campaign, together with others, against ENRC. A true and correct copy of this letter is attached hereto as Exhibit 22.

19. I have reviewed an article authored by Mr. Burgis and published by *The Financial Times* on September 2, 2020, entitled "FBI investigates deaths of mining executives in UK corruption probe: James Bethel and Gerrit Strydom were seen as witnesses in SFO inquiry into ENRC." The article makes allegations purportedly derived from Mr. Burgis's forthcoming book.

20. It is my understanding that Mr. Burgis's forthcoming book is titled *Kleptopia: How Dirty Money Is Conquering the World*. HarperCollins's website indicates that a book bearing this title, authored by Mr. Burgis, is scheduled to be published in the United States on September 8, 2020, by an American imprint of HarperCollins called "Harper." A true and correct copy of HarperCollins's webpage for the book is attached hereto as Exhibit 23. Other prominent bookseller and book enthusiast websites, including Amazon.com and Goodreads.com, also indicate that this book will be published on September 8, 2020 by HarperCollins's American imprint, Harper. True and correct copies of Amazon.com and Goodreads.com websites for the book are attached hereto as Exhibits 24 and 25, respectively.

21. The website for Waterstones Booksellers Limited ("Waterstones") indicates that Mr. Burgis's book is scheduled to be published in the United Kingdom on September 3, 2020. A true and correct copy of Waterstones' webpage for the book is attached hereto as Exhibit 26.

**ENRC Is Preparing to Bring Litigation in England for Breach of Confidence**

22. It is my understanding that, for the reasons set forth above, ENRC believes that Mr. Burgis's forthcoming book contains confidential and privileged information belonging to ENRC. Accordingly, ENRC is preparing to initiate a judicial action against Mr. Burgis in the High Court of England and Wales in London for the tort of breach of confidence (the "Burgis Proceeding" and, together with the Ongoing Proceedings, the "Foreign Proceedings").

23. The tort of breach of confidence is well established in English law. It affords an equitable claim against any person who has misused confidential information that was communicated or became known in circumstances entailing an obligation of confidence. Breach of confidence is a free-standing claim, which does not require a contract between the parties or wrongdoing on the part of the defendant in obtaining any of the confidential information.

24. To prevail on a breach of confidence claim, a plaintiff must demonstrate that: (1) the information at issue has the necessary quality of confidence; (2) the information was provided to the defendant in circumstances that imparted an obligation of confidence, including circumstances where the defendant knows that the information was obtained unlawfully; and (3) the defendant misused the confidential information, causing damages. These elements were set forth clearly in the seminal case of *Coco v. A.N. Clark Engineers Ltd.*, a true and correct copy of which is attached hereto as Exhibit 27, in which the High Court of Justice of England and Wales stated that:

> [T]hree elements are normally required if, apart from contract, a case of breach of confidence is to succeed. First, the information itself . . . must have the necessary quality of confidence about it. Secondly, that information must have been imparted in circumstances importing an obligation of confidence. Thirdly, there must be an unauthorised use of that information to the detriment of the party communicating it.

*Id.* at 47:12–18 (internal quotation marks omitted).  If a plaintiff establishes that the information at issue is confidential, the defendant may raise a public interest defense, in which case an English court will undertake a balancing exercise to establish whether the public interest in the information outweighs the duty of confidence and whether, in all the circumstances, it is in the public interest that the duty of confidence should be breached pursuant to English law.

25. A wide range of remedies are available for breaches of confidence.  These include compensatory damages, an account of profits, and injunctive relief (including orders for the return of wrongfully obtained information).

26. In the present circumstances, ENRC has a viable claim for breach of confidence against Mr. Burgis.  First, ENRC believes that some of the information contained in Mr. Burgis's book is sensitive information that was maintained under secrecy, and therefore has the necessary quality of confidence.  Second, there is reason to believe that such information was obtained under circumstances imparting a duty of confidence, as ENRC alleges in the Ongoing Proceedings that similar information was unlawfully obtained from ENRC, sold on the black market, exchanged by journalists such as Mr. Hollingsworth as well as others, unlawfully disclosed by individuals working for the SFO, and disclosed by previous legal advisers in breach of contractual and fiduciary duties of confidence.  Third, if Mr. Burgis were to publish such information in violation of the duty of confidence, as ENRC believes that he will, that publication would constitute misuse of such information and likely cause monetary and reputational damage to ENRC.

27. I understand that ENRC does not intend to name HarperCollins as a defendant in the Burgis Proceeding.  ENRC has reserved its rights against HarperCollins Publishers Limited, which I understand to be headquartered in the U.K.

**ENRC Seeks Discovery in Aid of the Burgis Proceeding**

28.     I have reviewed the subpoena proposed to be served on HarperCollins, attached as Exhibit A to the Declaration of Duane L. Loft (the "Subpoena"). The Subpoena is crafted based on a good faith belief that Respondents—in connection with its pre-publication due diligence and fact checking of Mr. Burgis's forthcoming book, Mr. Burgis's own due diligence and fact checking, and/or by other means—came into possession of documents and information relevant to the Foreign Proceedings. The Subpoena also seeks information related to Mr. Burgis's compensation in connection with the forthcoming book.

29.     The requested discovery is directly relevant to the Burgis Proceeding, and will aid the foreign court with regard to each element of ENRC's burden in that case. The Subpoena requests all documents received in connection with Mr. Burgis's book, potentially including ENRC's internal documents. Production of such documents would demonstrate that the materials used for Mr. Burgis's book were the same materials held in confidence by ENRC, and therefore that Mr. Burgis relied on such documents. If any such documents bear indicia of confidentiality—for example, a stamp indicating that the documents are confidential or for internal use only—they would further demonstrate that the recipient of such documents understood that their receipt imparted a duty of confidentiality.

30.     Moreover, the Subpoena requests information regarding Mr. Burgis's compensation in connection with publication and sale of the book, which will be useful for establishing and measuring damages against Mr. Burgis in the Burgis Proceeding.

31.     For many of the same reasons, the documents and testimony sought in the Subpoena may aid ENRC's case in the Ongoing Proceedings by establishing the scope of the wrongful disclosure of ENRC's confidential information by the defendants in those actions. For example, as set forth above, ENRC believes that Mr. Burgis received confidential information from Mr.

Hollingsworth, or from Mr. Yearsley, who received that information from Mr. Hollingsworth, who received the information from Mr. Trevelyan or from other sources. The evidence obtained in response to the Subpoena may therefore be used in the Hollingsworth Proceeding to show that Mr. Hollingsworth's tortious conduct resulted in the publication of the wrongfully obtained information on a much larger scale than previously known. The evidence relating to compensation of Mr. Burgis will also help to establish the extent of damages in the Ongoing Proceedings, including damages that may result from the publication of Mr. Burgis's book.

32. ENRC will have ample opportunity to use the requested discovery in the Foreign Proceedings. None of the Foreign Proceedings have matured past the disclosure stage, and thus ENRC would be able to use the requested discovery to prepare witnesses, craft questions, and present its case. As to the Burgis Proceeding, which has not yet been initiated, ENRC could additionally rely on the requested discovery to draft its Particulars of Claim.

**English Courts Are Receptive to Evidence Obtained through Section 1782**

33. I am not aware of any reason why the courts of England and Wales would not be receptive to the judicial assistance requested in ENRC's Section 1782 Application.

34. Courts in England and Wales have signaled their receptiveness to evidence obtained through Section 1782. For example, in *South Carolina Co. v Assurantie N.V.*, a true and correct copy of which is attached hereto as Exhibit 28, the House of Lords rejected a finding by the Court of Appeal that the use of information obtained from a Section 1782 application was inherently objectionable and abusive because it interfered with the court's control of its own procedure. The House of Lords held that it did not consider that a party to English proceedings,

> by seeking to exercise a right potentially available to them under the Federal law of the United States [i.e., seeking discovery through a 1782 application], have in any way departed from, or interfered with, the procedure of the English court.

11

> All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe they need in order to prepared and present their case.

*Id.* at 42.

35. A similar decision was reached in *Nokia Corporation v. Interdigital Technology Corp.*, a true and correct copy of which is attached hereto as Exhibit 29. There, the court denied a request to restrain a party from making a Section 1782 application in the United States and stated that "it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings." *Id.* at 8. The court further stated that "the English court should not seek to circumscribe the discretion possessed by the [United States] district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand. It is legitimate for the requesting party to use the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary after appropriate amendment." *Id.*

36. Without prejudice to making further legal argument and based on the facts of this case, the requested discovery is necessary in the interests of justice and is not a disproportionate restriction on freedom of expression under Article 10 of the European Convention of Human Rights and, therefore, does not circumvent proof-gathering restrictions or other laws of England because:

    a. The identity of the potential sources are already known to ENRC and are named in the narrowly drafted subpoena;

b. The identity of the Respondent as publisher of the book is already a matter of public record;

c. Many, if not all, of these sources are already in the spotlight as they are being sued by ENRC pursuant to the Ongoing Proceedings which are taking place in public, with allegations having been made on both sides in court pleadings in the public domain, and which have been reported on by the media;

d. What has or has not allegedly been disclosed to Mr. Burgis by these sources is important to ENRC's contemplated claims against not only Mr. Burgis, but also in relation to the Ongoing Proceedings, and determining questions of damages;

e. The fact that a source might not be happy to have information revealed does not, of itself, give the information great weight;

f. ENRC believes that Mr. Burgis has obtained its confidential information in breach of contractual, common law, and fiduciary duties of confidence owed by, for example, a former contractor, those working for any investigative authority, and past legal advisors.  These are serious breaches of confidence and there is a strong public interest in maintaining a party's ability to protect its own confidential information in these circumstances and in relation to these classes of defendants and such wrongful conduct should be deterred;

g. The circumstances of this case, as related to the Ongoing Proceedings, as set out above make this an exceptional case;

h. Article 10 of the European Convention of Human Rights and the statutory privileged afforded under section 10 of the Contempt of Court Act (1981) are qualified rights and protections, which are outweighed in this case by ENRC's

rights to pursue its legitimate civil claims against various defendants and wrongdoers in the public interest; and

i. This application is necessary as ENRC should be enabled to exercise important legal rights and to protect itself from serious legal wrongs.

\* \* \* \* \*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 2, 2020
London, England

_N. S_____

Niranjan Shanmuganathan