# Exhibit 3

17 May 2018

**Claim No: CL-2017-000583**

CL-2017-000583

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (QBD)**

**BETWEEN:**

**EURASIAN NATURAL RESOURCES**

**CORPORATION LIMITED**

**Claimant**

**-and-**

**(1) DECHERT LLP**

**(2) DAVID NEIL GERRARD**

**Defendants**

————————————————

**AMENDED PARTICULARS OF CLAIM**

————————————————

**SUMMARY**

1. This claim arises from the Claimant's ("ENRC") retainer of the First Defendant, Dechert LLP ("Dechert"), to advise on and conduct certain internal investigations on ENRC's behalf, and from August 2011 to advise on and conduct ENRC's engagement with the Serious Fraud Office ("SFO") (the "Retainer").

2. Dechert, acting principally by the Second Defendant, its partner and member known as Neil Gerrard, acted during the Retainer negligently, in breach of contract and/or in breach of its fiduciary duties. Such acts also constituted breaches by Mr Gerrard of tortious and fiduciary duties owed by him to ENRC. Dechert's and Mr Gerrard's breaches of duty have caused loss and damage to ENRC.

3. ENRC originally retained Mr Gerrard in December 2010 when he was a partner of and member in DLA Piper UK LLP ("DLA"), to conduct a discrete internal investigation into specific matters concerning a Kazakhstan subsidiary of ENRC, Sokolov-Sarbay Mining Production Association ("SSGPO").

4. In April 2011, Mr Gerrard became a partner of and member in Dechert and the Retainer moved with him. The Retainer later expanded to include advice on engagement with the SFO following contact from the SFO on 10 August 2011.

5. In broad summary, Mr Gerrard's advice (upon which ENRC relied) was that:

   5.1. it was necessary for ENRC to engage Dechert to conduct detailed, deep and wide-ranging investigations into all issues that he identified and would identify;

   5.2. it was in ENRC's interests to retain Dechert to engage with the SFO on ENRC's behalf in order to take advantage of Mr Gerrard's purported knowledge of and special relationship with the SFO; and

   5.3. ENRC should enter into a process of voluntary disclosure of any and all possible wrongdoing (whether substantiated or not) to the SFO.

6. Led by Mr Gerrard, the process of engagement between Dechert acting for ENRC and the SFO was informal, uncontrolled and unstructured. The investigations were expanded from Kazakhstan to include ENRC's African operations. Mr Gerrard made a series of potentially incriminating and damaging disclosures to the SFO ostensibly on behalf of ENRC. In some instances such disclosures were made pursuant to ENRC's reliance upon wrong advice given by Dechert that such disclosures were required in ENRC's interests; and in other instances they were made without authority or consent from ENRC and/or contrary to ENRC's instructions. Further, Dechert failed to complete or otherwise bring to a conclusion its Kazakhstan and/or African investigations within any reasonable time or at all, and communicated to the SFO (falsely and contrary to ENRC's interests) that ENRC itself was to blame for these failures by Dechert. The Retainer was terminated in March 2013.

7. Mr Gerrard's wrong advice and reckless conduct had the result of massively increasing the quantity of work that Dechert performed as against that which any competent solicitor would have performed in its place. It also caused ENRC to incur substantial fees in instructing third party law firms and other professional advisers whose work should not have been required and caused extensive unnecessary disruption to ENRC's business.

8. For the reasons set out more fully below, in the circumstances it is to be inferred that Mr Gerrard gave the advice which he did and acted in the way which he did, at the very least, in reckless disregard of his duties in order grossly to inflate the bills which Dechert charged to ENRC. Given Mr Gerrard's apparently specialist knowledge and extensive experience, his breaches of duty were so numerous, so serious and so sustained that they are most unlikely to have arisen from mere error of judgement. ENRC relies in particular on Mr Gerrard's deliberate leaking of privileged and confidential documents to the press, his covert, repeated and damaging disclosures to the SFO, his frequent, exaggerated and strategically deployed threats that the SFO would raid ENRC, his unwarranted and calculated attacks on ENRC's other professional advisors, and the ballooning of the investigations beyond all proportion and not in the interests of ENRC.

9. Mr Gerrard's approach is illustrated by the following remark made orally by Mr Gerrard in or around August 2011 at a lunch meeting at the Chelsea Brasserie, Sloane Square attended by Cameron Findlay of Bridge2 and Rob Trevelyan of Cyntel (both IT consultants instructed by ENRC to assist in the investigation on the recommendation of Mr Gerrard). Certain fee earners who had worked with Mr Gerrard at DLA had recently left DLA to join him at Dechert. As a result, Mr Gerrard was better placed to increase the volume of work done and fees charged under the Retainer. In this context, Mr Gerrard said, "right boys, I'm in rape mode", and explained that he was aiming to get a target number of millions of pounds in fees from ENRC.

10. ENRC instructed Dechert because it needed expert legal assistance delivered in an efficient and professional manner. Mr Gerrard's work had none of those qualities; his advice was frequently wrong, his investigations were inefficient and his approach was unprofessional (including, for example, his often aggressive and foul mouthed treatment of others, and his sometimes inappropriate conduct). Mr Gerrard not only failed to assist ENRC, he caused ENRC (at huge expense) to be in a far worse position, vis-à-vis the

SFO, than if he had never been instructed. ENRC cannot quantify the financial impact of the grave disadvantage caused by Mr Gerrard's actions and presently confines its claim to the following financial losses.

11. During the Retainer, Dechert billed ENRC over £16 million (including disbursements and VAT), which represents loss and damage caused by Dechert's and Mr Gerrard's breaches of duty. There was systematic and gross overcharging on Dechert's part. ENRC paid very substantial fees to third party law firms and other third party professional advisers that ENRC had to engage to advise and assist on matters arising out of Dechert's wrongful conduct of its investigation. ENRC's investigations, undertaken in reliance upon Mr Gerrard's advice, were disproportionate and more expensive and disruptive than necessary, causing loss and damage.

**PARTIES**

12. ENRC, formerly Eurasian Natural Resources Corporation Plc, was at all material times the parent company of a diversified natural resources group with inter alia extensive mining operations. ENRC has its origins in a number of mining companies based in Kazakhstan. It also has indirect subsidiaries which operate in Africa. It was listed on the London Stock Exchange from 12 December 2007, became a member of the FTSE 100 on 12 March 2008, and was de-listed on 25 November 2013.

13. Dechert is a limited liability partnership which was retained by ENRC to provide legal advice on or around 27 April 2011 until 27 March 2013. Dechert is vicariously liable for all the relevant acts and omissions of all persons at Dechert acting on the Retainer.

14. Mr Gerrard had principal conduct of the matter on behalf of Dechert. Mr Gerrard, a former police officer, had been a solicitor for over 20 years and appeared to have extensive relevant experience. During the Retainer, he was shortlisted for appointment as the new Director of the SFO (but claimed to have declined the appointment on grounds that the remuneration was insufficient).

15. Dechert held itself out as having specialist expertise in corporate crime, corporate internal investigations and SFO investigations and prosecutions. Further, Mr Gerrard held himself

out (and therefore Dechert held itself out) as having: (a) a uniquely close relationship with the SFO; (b) the confidence of the SFO; and (c) uniquely detailed and reliable knowledge of how the SFO conducted its investigations and how it would react to the conduct of a company under investigation or potential investigation.

## BACKGROUND

### Role of the SFO

16. The legal and regulatory context in which DLA, and later Dechert, were instructed by ENRC included the following.

<u>SFO powers and jurisdiction</u>

17. The SFO's purpose was, at all material times, to protect society by investigating and, if appropriate prosecuting, those who commit serious or complex fraud, bribery and corruption and pursuing the proceeds of their crime.

18. The law on fraud, both common law and statute, was not subject to any or any significant change during the relevant period. A corporate body could only be successfully prosecuted for fraud offences if it could be proven to the criminal standard that a directing mind of the corporate body was guilty of the substantive offence in question.

19. The law on bribery did change significantly during the relevant period:

    19.1. Before 1 July 2011, the SFO had the power to institute proceedings in relation to a range of offences including those under the Prevention of Corruption Acts 1889 to 1916 and the common law offence of bribery. A corporate body could only be successfully prosecuted for bribery and corruption offences occurring before the commencement of the BA if it could be shown that a directing mind of the corporate body had the necessary corrupt intent.

    19.2. After 1 July 2011, the Bribery Act 2010 (the "BA") came into force and significantly enhanced the statutory offences at the SFO's disposal. The BA did not have retrospective effect. Pursuant to s.10 BA, the SFO had the power to

institute proceedings in relation to offences under the BA, in particular the offences of bribery (s.1 BA), being bribed (s.2 BA), the bribery of foreign public officials (s.6 BA) and the failure of a commercial organisation to prevent bribery on its behalf (s.7 BA). S.7 BA introduced a strict liability offence where a relevant commercial organisation fails to prevent a person associated with it committing a substantive bribery offence pursuant to s. 1, 2 or 6 BA. It is a defence under s.7 BA for the commercial organisation to prove that it had adequate procedures in place which were designed to prevent persons associated with it from undertaking such conduct.

20. At all material times, the SFO had jurisdiction over England, Wales and Northern Ireland. As regards fraud offences, the SFO's jurisdiction was ordinarily limited to acts done in the UK, save where it could be proven that an offence committed outside the UK had a substantial connection with the UK. As regards bribery and corruption offences, the extent to which the SFO had jurisdiction over such offences committed outside the UK changed during the relevant period.

20.1. Before 1 July 2011, there were only a limited number of relevant offences with extra-territorial effect, including the following. Pursuant to s.109 of the Anti-terrorism, Crime and Security Act 2001, certain "corruption offences" (as defined in s.109(3)) could be prosecuted in the UK where the relevant act was done outside the UK, by a national of or body incorporated in the UK and the act would, if it had been done in the UK, constitute an offence.

20.2. After 1 July 2011, the BA provided additional offences with potentially extra-territorial effect. Under s.12 of the BA, an offence under s.1, 2 or 6 BA can be committed if a person's act or omission done or made outside the UK would be an offence if done or made in the UK and the person has a "close connection with the UK" (as defined in s.12(4)). Under s.12(5) of the BA, an offence can be committed by a relevant commercial organisation under s.7 BA irrespective of whether the acts or omissions which form part of the offence take place in the UK or elsewhere. The SFO has jurisdiction to investigate such suspected offences.

21. At all material times, the Director of the SFO had the power, by s.1(3) of the Criminal Justice Act 1987 ("CJA"), to investigate any suspected offence which appeared to the Director on reasonable grounds to involve serious or complex fraud. The SFO's primary investigative powers were contained in s.2 CJA, namely:

21.1. The SFO had the power, without a court order, to compel a person to answer questions (s.2(2) CJA);

21.2. The SFO had the power, without a court order, to compel a person to produce documents (s.2(3) CJA). The right to withhold disclosure of documents subject to legal professional privilege was expressly recognised in s.2(9) CJA;

21.3. The SFO had the power to apply to court for a search warrant authorising it to enter and search premises and take possession of documents found therein (a "raid") (s.2(4) CJA). In order to secure a search warrant, the SFO was required to satisfy the requirements of s.2(4)(a) and (b) CJA. In making such an application the SFO owed a duty of candour which required it to disclose all known material facts that might be relevant to its application. This would include, for example, the fact that a relevant company was engaged in the process of cooperating with the SFO.

22. At all material times, the SFO published acceptance criteria which set out the key factors it would consider in order to decide whether any alleged fraud or corruption was serious or complex such as to merit investigation. The criteria included whether: the monies at risk or lost exceeded £1 million; there was a significant international dimension; the case was likely to be of widespread public concern; the case required highly specialist knowledge; and there was any need to use the powers in s.2 CJA.

23. As a consequence of the above matters:

23.1. In relation to an alleged offence which had occurred at any material time, where it involved significantly less than £1 million the risk of the SFO deciding to investigate was low, due to the acceptance criteria.

23.2. In relation to an alleged bribery offence which had occurred before 1 July 2011, it was exceptionally difficult for the SFO to investigate and successfully prosecute a

corporate body because the SFO had to prove, to the criminal standard, that the directing mind was guilty of the substantive offence in question.

Self-reporting guidelines

24. On 21 July 2009, the SFO published its "Approach of the Serious Fraud Office to Dealing with Overseas Corruption" ("2009 Guidance"). This described the SFO's approach to "self-reporting" by corporates in cases of overseas corruption.

25. The 2009 Guidance recognised that a corporate did not need to approach the SFO unless the corporate had decided, following advice and a degree of investigation by its professional advisers, that it had a real and substantial issue of relevance and interest to the SFO and that remedial action was necessary. A corporate had to identify actual criminal wrongdoing which satisfied (or might satisfy) the SFO's acceptance criteria before approaching the SFO. (The 2009 Guidance acknowledged the possibility of earlier engagement to obtain an early indication of the SFO's approach where appropriate). The 2009 Guidance included the following:

> "[The investigation] will be at the expense of the corporate. We undertake to look at this in a proportionate manner and to have regard, where appropriate, to the cost to the corporate and the impact on the corporate's business….
>
> We are able to discuss the methodology for [document recovery and analysis] with the corporate and its advisers to ensure that the cost is proportionate to the amount and seriousness of the issues reported."

26. The 2009 Guidance did not have a statutory underpinning and did not provide any and/or any adequate guidance as to the process and/or procedure for self-reporting and/or the protections for the corporate that needed to be put in place (including the protection of any legal privilege). Accordingly, a corporate's engagement with the SFO before self-reporting and/or entering into a self-reporting process were uncertain and unpredictable steps for it to take.

27. On 9 October 2012, the SFO repealed its 2009 Guidance and issued new guidance on the self-reporting process (the "2012 Guidance"). The 2012 Guidance said that the SFO would not give any advice on the likely outcome until the completion of the process, and that self-reporting was no guarantee that a prosecution would not follow.

28. Section 72 of the Serious Organised Crime and Police Act 2005 provides that if a specified prosecutor within the SFO thinks that for the purposes of the investigation or prosecution of a relevant offence it is appropriate to offer any person an undertaking that information of any description will not be used in any criminal or confiscation proceedings, or civil recovery, he may give that person a restricted use undertaking. Any such undertaking must be given in writing (a "Section 72 Notice").

29. In the alternative to a Section 72 Notice, it was at all material times open to a company engaging in dialogue with the SFO to seek to agree with the SFO a set of written terms of reference, which set out an agreement between the company and the SFO as to: the parties' expectations as to the process; the existence, and extent of any waiver, of legal professional privilege; and whether any material handed to the SFO during the process could be used against the company in any future prosecution of the matters being investigated and reported to the SFO.

30. All of the matters set out in paragraphs 17 to 29 above were, or should have been, known to solicitors with expertise in corporate crime, internal investigations and SFO investigations and prosecutions, and should have been reflected in the advice and guidance given by those advisers at the time. Such matters were and/or should have been known to Dechert and Mr Gerrard, and/or should have been reflected in the advice and guidance given by Dechert and Mr Gerrard to ENRC at all material times.

**Allegations against ENRC**

31. The factual context in which DLA (from December 2010 to April 2011) and Dechert (from April 2011 to March 2013) were instructed by ENRC included the following.

   31.1. On 20 December 2010, ENRC received an anonymous email purporting to be from an engineer employed by SSGPO in Kazakhstan, which reported allegations amounting to frauds committed on (and to the detriment of) ENRC. The email alleged inter alia that: (a) certain identified employees of SSGPO were taking

advantage of the tendering process to obtain personal financial benefit and certain named factories were the source of poor quality and overpriced equipment purchased by SSGPO (together the "Procurement Allegations"); and (b) the President of SSGPO was using company assets for his privately-owned farm (the "Farm Allegation").

31.2. On 4 February 2011, ENRC's Internal Audit department raised concerns over the grant of a scholarship of c.US$38,000 awarded to the son of a local police chief of a region in which SSGPO operated (the "Education Allegation").

31.3. In early April 2011 ENRC became aware that Eric Joyce MP had written to the SFO asking it to investigate whether ENRC had adequate procedures in place to prevent bribery in relation to ENRC's acquisition in August 2010 of a 50.5% stake in a mining company incorporated in the Democratic Republic of Congo ("DRC") called Camrose Resources ("Camrose"). The remaining 49.5% stake in Camrose was owned or controlled by Mr Dan Gertler.

31.4. Subsequently, ENRC's Audit Committee gave consideration to whether ENRC's anti-bribery and corruption procedures had been adequate in relation to ENRC's acquisition in November 2009 of the Central African Mining and Exploration Company ("CAMEC") which operated principally in the DRC, and ENRC's acquisition in 2010 of a Zambian copper and cobalt metal producing company Chambishi Metals Plc ("Chambishi").

31.5. On 10 August 2011, Keith McCarthy, Chief Investigator at the SFO, wrote to ENRC to say that he had discussed with the Director of the SFO, Richard Alderman, "recent intelligence & media reports" concerning allegations of corruption and wrongdoing by ENRC (the "10 August Letter").

31.6. On or around 6 December 2011, ENRC received an anonymous email making further allegations about SSGPO. The email said inter alia that while the procurement process at SSGPO had improved, SSGPO employees were still manipulating SSGPO's tendering process to obtain personal financial benefit. This was an extension of the Procurement Allegations.

31.7. On 16 December 2011, Arek Kowalewski (head of internal audit at ENRC) met Dechert and said that ENRC's Internal Audit had concerns that SSGPO was unnecessarily outsourcing certain stripping works (i.e. the removal of topsoil from mining sites) (the "Stripping Allegation"), which might indicate that some SSGPO employees were committing further frauds on SSGPO.

32. The Procurement Allegations, Farm Allegation, Education Allegation and Stripping Allegation are hereinafter referred to as the "Kazakhstan Allegations". Having regard to the matters pleaded in paragraphs 17 to 23 above, the Kazakhstan Allegations were not matters which were likely to be the subject of UK criminal investigation or prosecution. In particular:

32.1. The Farm and Education Allegations involved sums of money of less than £1 million, which made the risk of investigation of these allegations low. All of the sums of money involved were modest in the context of ENRC's revenues (which exceeded US$6.6 billion in 2010 and US$7.7 billion in 2011).

32.2. The Kazakhstan Allegations did not relate to acts done by ENRC or its employees, but to acts done by employees of one of its foreign subsidiaries, SSGPO. The Kazakhstan Allegations concerned potential fraud offences, in which ENRC was the victim of the relevant fraud.

32.3. The Kazakhstan Allegations arose out of events which took place outside the UK and took place principally before 1 July 2011 when the BA came into force. For the reasons given above, this constrained the SFO's jurisdiction. Further the UK had no mutual legal assistance treaty with Kazakhstan, which further limited the SFO's ability to investigate the Kazakhstan Allegations.

33. The questions raised in relation to Camrose, CAMEC and Chambishi are hereinafter referred to as the "Africa Allegations". Having regard to the matters pleaded in paragraphs 17 to 23 above, absent pro-active cooperation from ENRC, it would have been challenging for the SFO to investigate or bring a prosecution in relation to the Africa Allegations. This was particularly so in the case of Camrose and CAMEC given the absence of a Mutual Legal Assistance treaty between the UK and the DRC.

**Instruction of DLA**

34. In late December 2010, promptly in response to the matters pleaded at paragraph 31.1 above, ENRC instructed Mr Gerrard (then of DLA) to investigate the Procurement and Farm Allegations.

35. By letter dated 24 December 2010, Mr Gerrard set out the terms on which DLA would act. By a further letter dated 29 December 2010 to Gerhard Ammann (Chairman of ENRC's Audit Committee and Independent Non-Executive Director), Mr Gerrard advised on the scope of investigation into the allegations. The letter set out the specific steps that Mr Gerrard proposed to take, together with the date by which he expected them to be performed. In the letter, Mr Gerrard said that a final report would be produced within one month by the end of January 2011. In addition, he advised that ENRC should immediately brief him on "any other issues that may affect" ENRC, such as "allegations of wrong doing in other jurisdictions", and should consider 'self-reporting' to the SFO.

36. By a letter dated 17 January 2011, Mr Gerrard set out the next steps in the investigation. He advised that the scope and nature of the investigation ought to be such as to meet the approval of third parties (which, as Mr Gerrard intended, ENRC understood to refer to at least the SFO and/or Financial Services Authority ("FSA") and/or the United Kingdom Listing Authority ("UKLA")).

37. By a letter dated 28 January 2011, Mr Gerrard set out for ENRC a summary of the allegations. He did not, however, provide any legal analysis of whether or how ENRC could be criminally liable for any of the alleged wrongdoing. Mr Gerrard proposed in the letter a two-phase approach to the investigation. He said that initial enquiries would be made of SSGPO's procurement processes, the price at which equipment was purchased and whether any agricultural equipment was purchased. If these initial enquiries identified "some truth" in the allegations, then Mr Gerrard proposed a "more extensive" investigation (including a full-scale e-document retrieval and review exercise).

38. In February 2011, in response to the matter pleaded at paragraph 31.2 above, ENRC instructed Mr Gerrard to investigate the Education Allegation.

39. By a letter dated 11 March 2011, Mr Gerrard gave ENRC an investigation update. He advised inter alia that the Education Allegation "may breach" UK bribery law. He did not, however, advise as to whether this was, in fact, the case and what statutory and/or common law offence might have been committed. Nor did he provide any legal analysis of whether ENRC could be criminally liable for any of the alleged wrongdoing. In this respect, the allegations concerned employees of an ENRC subsidiary defrauding that subsidiary, with the result that ENRC was the victim of any fraud; the allegations could not have amounted to a criminal offence committed by ENRC.

40. By letter dated 29 March 2011, Mr Gerrard outlined a "SSGPO Investigation Plan". At this stage, the investigation was internal to ENRC and aimed at establishing the truth or otherwise of the Kazakhstan Allegations concerning frauds perpetrated on ENRC's subsidiary. Mr Gerrard increased the pressure on ENRC to authorise an extensive investigation: his letter suggested that SSGPO employees were "obstructive" towards the investigation and that DLA were unable to "fully investigate". Further, Mr Gerrard also noted:

> "POTENTIAL CONSEQUENCES OF FAILURE TO FULLY INVESTIGATE
>
> If a regulatory investigation were to be commenced by one of the government agencies in the UK or the USA and/or civil litigation commenced by third parties, it is likely that the Audit Committee will be asked what steps it took to investigate the allegations of which it as aware. If third parties believe that the Audit Committee ignored or failed to properly investigate serious allegations of misconduct, this could result in litigation and/or regulatory investigation against ENRC plc and its directors (including non-executive directors). Additional consequences could include any of the following:
>
> - Breaches of the Companies Act 2006, including for example breaches of directors' duties including, criminal charges for inaccurate accounting and record keeping;
> - Possible derivative civil claims by shareholders against individual directors;
> - Significant reputation damage and drop in share price;
> - Suspension of trading of ENRC plc shares;
> - De-listing of ENRC plc.
>
> We should make it clear at this stage of the investigation that we are not saying that ENRC plc or its directors are guilty of any misconduct. However, the real risk to ENRC plc is the threat of a regulatory investigation which, from our experience, can take a number of years, is hugely disruptive and expensive."

41. By a letter dated 21 April 2011, Mr Gerrard gave advice on maintaining legal professional privilege over documents and communications created in relation to the Kazakhstan investigation. He referred to legal advice and litigation privilege and explained that "Both types of privilege can be lost if confidentiality is lost. Similarly both types of privilege can be deliberately waived, for example by self reporting to a regulator."

42. On 22 April 2011, Mr Gerrard left DLA. He became a partner and member in Dechert on 23 April 2011. ENRC does not know the terms on which Mr Gerrard was remunerated by Dechert or the terms, if any, agreed between DLA and Dechert and/or Mr Gerrard upon or following Mr Gerrard's departure from DLA. In any event, as a partner of the firm, Mr Gerrard had a personal interest, whether direct or indirect, in the level of fees which ENRC was charged by Dechert. ENRC reserves the right to plead further to such interest upon disclosure.

**THE RETAINER**

43. By letter dated 27 April 2011, Mr Gerrard confirmed to ENRC that Dechert had conduct of the matter for ENRC and that the investigation would proceed according to the DLA investigation work plans. Dechert thereafter advised ENRC. Mr Gerrard endorsed and adopted the advice and strategy he had devised whilst a member of DLA on becoming a member of Dechert (whether expressly or impliedly) in April 2011. In advising that the DLA work plans should be adopted, Dechert assumed responsibility for the representations and advice proffered therein.

44. The Retainer assumed by Dechert on or about 27 April 2011 incorporated:

44.1. The scope of work described in DLA's letters dated 24 and 29 December 2010, including providing advice to ENRC's Audit Committee on: (a) its obligation to investigate the Kazakhstan Allegations; (b) the appropriate scope of such an investigation; (c) the design and implementation of the investigation; (d) whether self-reporting in Kazakhstan or elsewhere was necessary; (e) reporting and any remedial actions that needed to be taken; and (f) ENRC's reporting obligations "at all stages" to auditors and "other interested parties". It further incorporated DLA's

agreement to (g) conduct the investigation; and (h) provide a final report and action list and communications plan.

44.2. The work described in DLA's letter dated 17 January 2011, including the responsibility to consider and advise as to "how best to preserve any legal professional privilege available to the company".

44.3. The work described in DLA's letter dated 29 March 2011 and the accompanying "SSGPO Investigation Plan", in particular, the responsibility to advise ENRC as to how best to minimise the risks set out in the letter dated 29 March 2011 and/or conduct the matter on ENRC's behalf to that end.

44.4. The undertaking, evidenced by the advice which Mr Gerrard in fact gave whilst at DLA, to advise ENRC on any changes required to the scope, methods, or conduct of the investigation.

45. Immediately after ENRC's receipt of the 10 August Letter, the Retainer was expanded by mutual consent and/or conduct between Dechert/Mr Gerrard and ENRC, to include advising ENRC on how best to act in the light of the SFO's inquiries and engaging with the SFO on ENRC's behalf. The expanded scope of the Retainer was evidenced and/or confirmed by an engagement letter dated 17 January 2012 and/or a presentation of the same date given by Dechert to ENRC, which set out "Next Steps" including "Advise ENRC on engagement with the SFO".

46. In the premises, the Retainer included an agreement by Dechert to advise ENRC on:

46.1. The appropriate scope of any investigation that ENRC should conduct to ensure that the cost and possible outcomes of any investigation on the one hand was proportionate to the possible detriment to ENRC and/or the expectations and/or risk of any regulatory action and/or prosecutorial authority action on the other.

46.2. What, if any, remedial steps should be taken (if necessary).

46.3. The nature of any possible risk posed to ENRC by the SFO and/or any other authorities or regulators, in particular: (a) whether the matters being investigated in

Kazakhstan at SSGPO and in relation to ENRC's African operations might constitute criminal wrongdoing which could be the subject of an SFO investigation and/or prosecution; (b) how criminal liability could attach to ENRC for alleged acts of overseas corruption prior to and after the BA coming into force; (c) whether the allegations of wrongdoing satisfied (or might satisfy) the SFO's acceptance criteria; (d) the risk of any SFO raid; and (e) the financial and/or evidential difficulties which might prevent or hinder the SFO from deciding to open an investigation and/or bring any prosecution against ENRC.

46.4. Subject to the above matters, how, if at all, ENRC ought to liaise and engage with the SFO, in particular: (a) what interaction (if any) with the SFO was appropriate; (b) the SFO's self-reporting regime (and the uncertainties of the same); (c) the steps (if any) ENRC should take to establish its relationship with the SFO, including but not limited to how best to protect ENRC's privilege and the SFO's use of any information disclosed to it voluntarily or as part of any self-reporting; and (d) the management of ENRC's relationship with the SFO (including the SFO's expectations and demands) as the investigation progressed.

47. From 27 April 2011 to January 2012, Dechert and Mr Gerrard took (and/or, as they knew, ought to have taken) instructions from ENRC's General Counsel and/or the head of ENRC's Audit Committee. In January 2012, a committee was formed to instruct Dechert and Mr Gerrard with authority delegated from ENRC PLC's Board (the "Special Investigations Committee", also sometimes referred to at the time as the Special Committee). From January 2012 to April 2013, Dechert and Mr Gerrard took (and/or ought to have taken) instructions from the Special Investigations Committee.

**DUTIES OWED TO ENRC**

48. Pursuant to the Retainer, Dechert owed express contractual obligations ~~including~~ as set out in Dechert's letters dated 27 April 2011 (incorporating DLA's previous correspondence, as set out above) and 17 January 2012.

49. It was an ~~express, alternatively~~ implied, term of the Retainer that Dechert would act in respect of the subject matter of the Retainer only in accordance with ENRC's instructions

16

and/or not contrary to the same, and that Dechert would not disclose to any third party (including the SFO or the press) any confidential information belonging to ENRC, save with ENRC's express consent to such disclosure.

50. It was an implied term of the Retainer that Dechert would act pursuant to the Retainer with all the care and skill reasonably to be expected of a firm of solicitors having the specialist expertise and qualities set out at paragraph 15 above.

51. Each of Dechert and Mr Gerrard owed to ENRC a duty of care in tort to carry out the Retainer and/or advise and/or act for ENRC with the same degree of care and skill, co-extensively with the contractual duties averred above.

52. As ENRC's solicitors, each of Dechert and Mr Gerrard owed fiduciary obligations to ENRC. In particular, Dechert and Mr Gerrard owed ENRC a duty to act only in the best interests of ENRC, and not to permit that duty to conflict with their own interests. Further Dechert and Mr Gerrard owed ENRC a duty of confidentiality.

53. Dechert was and is vicariously liable pursuant to s.6(4) of the Limited Liability Partnerships Act 2000 and/or in any event, for its partners' and/or members' conduct detailed herein.

54. In addition, at all material times, Dechert, as a firm regulated by the Solicitors Regulation Authority ("SRA"), and Mr Gerrard, as an individual so regulated, owed professional obligations as set out in the SRA Code of Conduct 2011, including obligations owed to ENRC as the client:

54.1. To achieve the "Client care" outcomes, including: treating clients fairly; providing services in a manner which protects clients' interests; providing a competent service, delivered in a timely manner which takes account of clients' needs and circumstances; and ensuring clients are in a position to make informed decisions about the services they need, how their matter will be handled and the options available to them.

54.2. To achieve the "Conflicts of interest" outcomes, including: having effective systems and controls in place to enable the identification and assessment of potential conflicts of interests; ensuring systems and controls for identifying 'own interest conflicts' enable an assessment of all the relevant circumstances, including whether the ability of the solicitor or the firm to act in the best interests of the client is impaired by any financial interest; and not acting if there is an 'own interest conflict' or a significant risk of an 'own interest conflict'.

54.3. To achieve the "Confidentiality and disclosure" outcomes, including: keeping the affairs of clients confidential unless disclosure is required or permitted by law or the client consents.

**DECHERT'S CONDUCT OF THE RETAINER**

**APRIL TO AUGUST 2011**

**Events before the SFO's involvement**

55. In the period April to August 2011, the scope of the investigation being conducted by Mr Gerrard expanded very significantly. First, the issues under investigation in Kazakhstan grew in number and the way in which they were being investigated expanded. Secondly, Mr Gerrard began to investigate certain issues in ENRC's African operations which he appeared to consider would fall within the SFO's remit; he did not specify on what legal basis this would be the case.

56. ENRC became concerned about the scope and cost of the investigation. ENRC's concerns in this period included:

56.1. ENRC understood (based upon legal advice obtained from Taylor Wessing in April 2011) that its duty was to respond to the allegations proportionately. The relevant losses arising from the Kazakhstan Allegations were unlikely to be material in quantum.

56.2. The cost to ENRC of the investigatory work began to escalate and there was no end in sight. For example, the Education Allegation concerned impropriety over a sum of US$40,000, yet by 31 May 2011 US$400,000 had been spent investigating it without resolution.

56.3. The massive electronic review proposed by Dechert in May 2011 (for example, the review of 1 million documents and the imaging of 56 desktop computers) was neither proportionate nor in the interests of ENRC. In this regard, in about July 2011, Dechert began a process (which continued through the remainder of 2011 and 2012) of bringing documents from Kazakhstan to the UK. Dechert did so without advising ENRC (either at the outset or at any time thereafter) on the implications of bringing documents into the jurisdiction or as to the SFO's limited ability to investigate the Kazakhstan Allegations (as pleaded at paragraph 32.3 above).

56.4. ENRC was not receiving satisfactory answers to its queries. For example, Dechert was asked to provide a written report addressing ENRC's concerns by 9 June 2011 but failed to do so. It failed to advise ENRC of the different options available to ENRC at the time, such as stopping the investigation and introducing systems and controls to prevent wrongdoing akin to that which had allegedly occurred.

57. Mr Gerrard rejected ENRC's concerns and insisted upon continuing and expanding the investigation.

57.1. Mr Gerrard did so even though he knew that the BA did not come into force until 1 July 2011 and that it did not have retrospective effect. In this regard, ENRC relies upon an email dated 11 April 2011 from Mr Gerrard to Randal Barker (then General Counsel at ENRC) in which Mr Gerrard advised that the BA did not come into force until 1 July 2011 and therefore (a) no BA offence could have occurred in relation to the Camrose transaction which took place before this date and (b) there existed no offence equivalent to that under s.7 BA until the BA came into force.

57.2. In or about June 2011, during a trip to Kazakhstan, Mr Gerrard was given a copy of an internal SSGPO telephone directory. The directory appeared to reveal the

corporate structure of SSGPO. Mr Gerrard reacted to being given the directory by saying with satisfaction words to the effect "this will keep the investigation going".

58. ENRC continued to follow and rely upon Mr Gerrard's advice because:

58.1. Mr Gerrard stated that the allegations which had been made against ENRC put ENRC at risk of a SFO investigation. He said that the only way to avoid an investigation was to report itself to the SFO.

58.2. When ENRC questioned Mr Gerrard in respect of the scope of his proposed investigations, Mr Gerrard became aggressive and raised objections. For example, in April 2011, Mr Ammann spoke to Mr Gerrard by telephone seeking to understand why he believed it was appropriate to continue the investigations in the (expansive) manner which Mr Gerrard was proposing. Mr Gerrard's response was to raise his voice and to shout (words to the effect) that "if you press me again I will resign and you will get raided."

58.3. On a regular basis thereafter, Mr Gerrard orally advised ENRC that the risk of a SFO raid was immediate and urgent. In particular, on one occasion he informed Mr Ehrensberger that the risk extended to raids on the homes of ENRC's senior officers and that such raids could be highly intrusive, explaining that the SFO would "go through your wife's underwear".

58.4. Mr Gerrard advised ENRC that he had strong connections with key individuals at the SFO and that he had a unique ability to assist ENRC to resolve any SFO concerns by way of civil resolution. Mr Gerrard put pressure on ENRC such that (as Mr Gerrard plainly intended) it had no real choice but to do what he said.

59. It is to be inferred from the matters pleaded in paragraphs 56, 57 and 58 above that Mr Gerrard's insistence on continuing and expanding the investigation, coming so soon after he moved firms, was motivated by a desire to bill ENRC for the work he planned Dechert would do.

60. On 9 August 2011, an article by David Robertson under the headline "Copper giant calls in outsiders to examine corruption claims" was published in The Times. It appeared to

have been based upon leaked confidential documents and was very damaging to ENRC's interests. Within ENRC, the knowledge that the allegations contained in the article had been made public made it more difficult to insist that Dechert should wrap up the investigation swiftly.

60A. The article published on 9 August 2011 was in fact based upon the following documents, the existence and contents of which were (save for the first document identified) confidential to ENRC:

60A.1 An "Investigation Report" dated 25 September 2007 by the law firm Herbert Smith LLP marked "private and confidential" and "Legally Privileged – prepared for the purpose of obtaining legal advice";

60A.2 A "Report on Findings in Relation to SSGPO and AOK" dated 11 March 2010 by the law firm Peters & Peters Solicitors LLP and a firm called Risk Advisory, marked "Strictly Private & Confidential" and "Subject to Legal Professional Privilege";

60A.3 The whistle blower email referred to in paragraph 31.1 above;

60A.4 A letter headed "SSGPO Investigation Plan" dated 29 March 2011 from DLA Piper to the ENRC Audit Committee, marked "Privileged & Confidential".

60B. The documents identified at paragraphs 60A above were deliberately leaked by Mr Gerrard to The Times. ENRC relies upon the following matters:

60B.1 In July 2011, Mr Gerrard had in his possession copies of the documents identified in paragraph 60A above.

60B.2 At the end of July 2011, Mr Gerrard orally informed Mr Findlay that he wished to place sensitive information in the public domain in order to "kick start" an expansion of the investigation and sought Mr Findlay's assistance. Mr Findlay in turn sought the assistance of Mr Trevelyan. Mr Trevelyan knew

a freelance journalist, with whom he arranged to meet at about 10.30am on 28 July 2011 at the Cadogan Hotel, Sloane Street, London, to discuss the matter.

60B.3 At about 2pm on 1 August 2011, the freelance journalist met Mr Robertson at the offices of The Times in Wapping. Mr Robertson expressed interest in the contents of the documents proposed to be provided. This indication was orally passed back through Mr Trevelyan to Mr Findlay, and in turn to Mr Gerrard.

60B.4 In early August 2011, Mr Gerrard orally instructed Mr Findlay to collect a package from the reception of Dechert's offices. Mr Gerrard told Mr Findlay that it would contain the documents he wanted to be leaked to the press. Mr Findlay went to Dechert's offices and collected a sealed envelope from reception. Mr Findlay then met Mr Trevelyan in a park near ENRC's offices (where he was then working) and gave him the sealed envelope.

60B.5 At about 11am on 3 August 2011, Mr Trevelyan met the freelance journalist at the Cadogan Hotel and gave him the sealed envelope, which contained the documents listed in paragraph 60A above.

60B.6 On the afternoon of 4 August 2011, the freelance journalist met Mr Robertson of The Times and handed him the documents listed in paragraph 60A above. Mr Robertson then used the information contained in such documents in the article identified above.

60B.7 ENRC reserves the right to plead further to Dechert's knowledge and handling of this apparent leak and media interest.

**The SFO's first letter to ENRC**

61. As noted above, on 10 August 2011 the SFO wrote to ENRC concerning "recent intelligence & media reports" concerning allegations of corruption and wrongdoing by ENRC. Mr McCarthy of the SFO referred ENRC to the SFO's self-reporting guidance and urged ENRC to consider it carefully when undertaking any internal investigations. He requested a meeting to discuss ENRC's "governance and compliance programme" and its

response to the allegations as reported, but confirmed that no formal SFO criminal investigation was underway.

62. When ENRC received the 10 August Letter, ENRC was already engaged in a far reaching anti-corruption and bribery initiative. In July 2011, ENRC had instructed Jones Day to oversee ENRC's work to ensure compliance with the BA. Such work was being carried out by, inter alia, Deloitte. ENRC had also instructed Forensic Risk Alliance ("FRA") to carry out an extensive books and records review.

63. After receipt of the 10 August Letter, Mr Gerrard did not advise ENRC to focus on the "governance and compliance" agenda to which the SFO had referred in the 10 August Letter (by, for example, preparing a presentation detailing ENRC's existing extensive work on anti-bribery and corruption compliance and procedures). Instead, his advice to ENRC continued to be that if ENRC did not enter into a self-reporting process then it would likely face a raid by the SFO.

64. On 19 August 2011, ENRC responded to the SFO saying that it was very happy to meet and to discuss its governance and compliance programme and its response to the allegations in the press, and that it understood the "merits of self-reporting" which it was looking forward to discuss at the meeting. A meeting was scheduled for 3 October 2011.

**SEPTEMBER 2011 TO DECEMBER 2011**

**First meeting between the SFO and ENRC**

65. On 26 September 2011, before ENRC's first meeting with the SFO scheduled for 3 October 2011, Mr Gerrard had a meeting on his own with Mr Alderman and Mr McCarthy of the SFO. ENRC has very limited information about this meeting because Mr Gerrard did not provide an attendance note to ENRC (and has not provided any note since the meeting, notwithstanding requests from ENRC to do so).

66. On 3 October 2011, ENRC held its first meeting with representatives of the SFO. It was attended, on behalf of ENRC, by Mr Gerrard, Sion Richards (of Jones Day), and Beat Ehrensberger (General Counsel of ENRC). As recorded in the SFO note of the meeting,

Mr Gerrard informed the SFO that he was looking to close enquiries in Kazakhstan in November 2011. The SFO said that ENRC needed to satisfy it that the company had in place adequate procedures, suggested that its primary focus was Africa, and sought inter alia a public statement from the ENRC Board committing it to an anti-corruption culture.

67. At the meeting on 3 October 2011 Mr Gerrard did not: (a) explain to the SFO that the Kazakhstan investigation did not concern criminal offences committed by ENRC which could be the subject of a criminal prosecution by the SFO; (b) inform the SFO that ENRC had no reason to believe or suspect that it had committed any crime; (c) inform the SFO that ENRC was unaware of any basis to suspect corporate wrongdoing which would justify reporting itself; (d) take any steps to confine (or attempt to confine) the scope of the SFO's interest to ENRC's anti-bribery and corruption policies; (e) emphasise ENRC's continuing compliance and governance work which it was already conducting; (f) take any and/or any adequate steps to limit the scope of the SFO's interests to the matters in the 10 August Letter and which the SFO had requested at the meeting, namely the adequacy of compliance procedures within ENRC; and (g) take any steps to confirm the terms (if any) of ENRC's engagement with the SFO, including in respect of ENRC's privilege and/or the use by the SFO of any information disclosed to it by ENRC (whether as part of a self-reporting process or otherwise).

68. After the meeting on 3 October 2011, Dechert and Mr Gerrard did not advise ENRC that: (a) the SFO was not demanding (or intimating) that multimillion-pound investigations into Kazakhstan were required; (b) ENRC's approach to further engagement with the SFO should focus exclusively on the requests which had been made by the SFO at the meeting; (c) ENRC might (and should certainly attempt to) satisfy the SFO by focusing its work on the FRA books and records review and by limiting the scope of any self-reporting to this work (if relevant); and (d) it should write to the SFO setting out that it agreed to conduct work which was limited to some or all of the foregoing.

69. On 7 October 2011, following on from ENRC's first meeting with the SFO, Mr Gerrard spoke by telephone to Mr McCarthy of the SFO. The conversation was instigated by Mr Gerrard. As recorded in an email of that date from Mr McCarthy to Mr Alderman, Mr Gerrard told Mr McCarthy inter alia that "our tactics worked", ENRC would make "voluntary disclosure" the following week, it would perform a full forensic audit, and that

there were "lots of red flags" and "lots to tell". Mr Gerrard had no instructions or authority from ENRC to make such disclosures to the SFO. Further:

69.1. ENRC has no knowledge or information as to the "tactics" to which Mr Gerrard was referring, including as to whether or not those tactics were shared between Mr Gerrard and the SFO. ENRC reserves the right to plead further to such tactics on disclosure.

69.2. As Mr Gerrard knew, ENRC was not in any position to provide any "voluntary disclosure" (whatever that meant) on any issue in the following week. In suggesting that ENRC would be making some sort of disclosure, Mr Gerrard misled the SFO as to his level of knowledge about ENRC and alleged wrongdoing at ENRC.

69.3. Mr Gerrard's claim to the SFO that there were "lots of red flags" and "lots to tell" was wrong because ENRC did not know what, if any, material might form the basis of a report to the SFO. It was also damaging to ENRC's interests because it was calculated to lead the SFO to conclude (wrongly) that anything less than disclosure of "lots of red flags" and "lots to tell" would represent a lack of frankness on the part of the ENRC.

70. On 21 October 2011, Mr Gerrard sought to speak to Mr McCarthy by telephone to "relay some further information" to him about ENRC "together with keeping [the SFO] informed of a few other issues." ENRC does not know what was discussed between Mr Gerrard and Mr McCarthy. Mr Gerrard had no instructions or authority from ENRC to telephone the SFO and provide any further information.

**ENRC decision to establish a dialogue with the SFO**

71. On 8 November 2011, at an ENRC Board meeting, the Board agreed (in reliance on Mr Gerrard's advice) to establish a dialogue with the SFO.

72. On 9 November 2011, Mr Ehrensberger of ENRC wrote to the SFO saying that ENRC would conduct "certain further reviews of operations" and "engage with the SFO

regarding the results of those reviews". Following Mr Gerrard's advice, ENRC believed that self-reporting was essential to prevent a formal investigation and a raid by the SFO, with likely disastrous consequences for the business.

73. The SFO gave the ENRC case the codename Project Quest (it may previously have been described as Project X). However, rather than formally open an investigation into ENRC, the SFO chose to have an informal process of engagement, through its contact with Dechert, in which ENRC funded its own investigation and disclosed to the SFO information which was otherwise confidential and/or privileged to ENRC.

74. On 14 November 2011, Mr Gerrard wrote to Mehmet Dalman (then the Senior Independent Director of ENRC) to summarise the provisions of the BA. Mr Gerrard's letter identified the "strict liability" nature of the offence under s.7 of the BA and its "extremely wide jurisdiction". Mr Gerrard (wrongly) did not inform Mr Dalman that the BA only came into force on 1 July 2011 and did not have retrospective effect. Mr Gerrard ought to have reiterated the advice he had given to Mr Barker on 11 April 2011, set out at paragraph 57.1 above.

75. A second meeting between the SFO and ENRC was scheduled for 30 November 2011.

**Second meeting between the SFO and ENRC**

76. On 30 November 2011, before ENRC's meeting with the SFO that same day, as recorded in a SFO file note, Mr Gerrard told Mr Thompson of the SFO inter alia that: (a) ENRC "did want to self-report", but there were some issues for him in advising ENRC; (b) in terms of the high level "tone from the top" message, ENRC had been "a little dilatory" in arranging public statements about its commitment to anti-corruption work; (c) ENRC needed to be "full and frank on all issues" if ENRC was going to engage with the SFO in the process. Mr Gerrard even suggested that he considered ENRC may not be being full and frank about wider company concerns, and encouraged the SFO to impress upon ENRC the requirement for "full and frank disclosure."; and (d) alleged that information was "emerging" from his investigation which could indicate problems in jurisdictions other than Africa, and that he "was concerned that any such issues should be included in the scope of this process".

77. Mr Gerrard had no instructions or authority from ENRC to make such statements and/or disclosures to the SFO and it was obviously contrary to ENRC's interest for them to be made ostensibly on ENRC's behalf. Mr Gerrard did not inform ENRC that he had given the SFO the above (or any) information and/or given his opinion as to how the SFO should act. Further:

77.1. ENRC had not identified any wrongdoing that it wanted to report to the SFO. To the best of ENRC's knowledge and belief, neither ENRC nor Dechert had discovered anything to justify, in part or at all, Mr Gerrard's statement that ENRC wanted to engage in any self-reporting;

77.2. Mr Gerrard had not advised and did not advise ENRC that it needed to issue public statements more quickly than it in fact did;

77.3. Mr Gerrard did not advise ENRC that ENRC (or Dechert on ENRC's behalf) should encourage the SFO to adopt an approach whereby everything was investigated;

77.4. Mr Gerrard did not inform ENRC that he had encouraged the SFO to impress upon ENRC (his belief in) the need for full and frank disclosure on all issues;

77.5. Mr Gerrard did not inform ENRC that he had informed the SFO that he was "concerned" to include any issues from ENRC's global operations in the "process".

78. On 30 November 2011, Mr Gerrard, Mr Ehrensberger of ENRC, and Mr Richards of Jones Day met representatives of the SFO. At the meeting, and as recorded in the SFO file note:

78.1. Mr Gerrard stated that ENRC was analysing "red flags" that had allegedly been identified. Mr Gerrard did not, however, inform the SFO that the red flags merely indicated "control weaknesses" in ENRC's governance and compliance procedures (as noted in the draft First Interim Report produced by FRA in November 2011) rather than indicating criminality.

78.2. The SFO expressly said that the costs of any review needed to be proportionate to the risk of bribery and corruption. The SFO suggested that, on the basis of Mr Gerrard's disclosures, it looked like there were a lot of high risks of bribery and corruption, but that it would assist by pointing out particular concerns it had which it would want ENRC to investigate. Mr Gerrard did not advise ENRC that it should seek to clarify with the SFO any areas of concern, notwithstanding the SFO's invitation to do so.

79. A third meeting between ENRC and the SFO was scheduled for 20 December 2011.

**Third meeting between the SFO and ENRC**

80. On 9 December 2011, Mr Gerrard called Mr Thompson of the SFO on his mobile telephone, and asked to meet him in advance of ENRC's meeting with the SFO on 20 December 2011. On 19 December 2011, Mr Gerrard appears to have met Mr Thompson, without any ENRC representative present, and provided "an indication of some of his findings". Mr Gerrard had no instructions or authority from ENRC to communicate with the SFO without ENRC's knowledge. ENRC reserves the right to plead further, following disclosure, in respect of mobile telephone communications and the notes of such meetings between Mr Gerrard and the SFO.

81. On 11 December 2011, two articles under the headlines "Mining giant slips into a new hole" and "Fraud office steps in at embattled Footsie mining giant" were published in The Sunday Times. The articles appeared to have been based upon leaked confidential documents and were very damaging to ENRC's interests. Within ENRC, the knowledge that the allegations contained in the articles had been made public made it more difficult for those concerned about the scope and scale of the investigations to insist upon a focussed and proportionate approach. Accordingly, the articles were helpful to Dechert's strategy. It is to be inferred from the matters pleaded in paragraphs 60, 60A and 60B above that, directly or indirectly, Dechert also caused or permitted this leak. ENRC reserves the right to plead further to Dechert's knowledge and handling of this apparent leak and media interest.

82. On 16 December 2011, Mr Kowalewski (head of internal audit at ENRC) met Dechert and informed it of the Stripping Allegation. At the meeting, Mr Gerrard advised that he needed to know about all allegations of wrongdoing (or possible wrongdoing) that ENRC was aware of as part of the preparations for a meeting with the SFO on 20 December 2011.

83. On 20 December 2011, ENRC met the SFO to discuss the scope of the SFO's interest in ENRC and the areas of alleged wrongdoing. At the meeting, as recorded in the SFO file note:

    83.1.  The SFO identified certain work which it wanted ENRC to undertake in respect of two of the company's acquisitions in Africa, namely Camrose and CAMEC. The SFO stressed, however, that ENRC should not re-do its due diligence in respect of these acquisitions, nor over-burden the SFO, and that any information reported to the SFO needed to be more than "mere suspicion". It also said that frauds committed on ENRC in Kazakhstan might not be relevant to the SFO, and would only be of interest if they involved UK personnel. The SFO sought an update by the end of February 2012.

    83.2.  Mr Gerrard: (a) referred again to the existence of various "red flags"; (b) said he was confident of "having something" for the SFO within a month or two; (c) suggested (without any sufficient evidential basis) that the Kazakhstan scholarship payment was "supposedly" authorised by the "UK CEO"; and (d) that "A lot of African payments are authorised in the UK."

84. At the meeting, Mr Gerrard did not explain that: (a) the "red flags" only identified potential "control weaknesses", which (taken at their highest) were only suspicions of wrongdoing; (b) ENRC did not know when it would be in a position (if at all) to engage in self-reporting; (c) ENRC had not yet analysed the authorisation of African payments.

85. After the meeting, Dechert and Mr Gerrard did not: (a) formulate or seek to formulate with the SFO an agreed written document limiting the matters within the scope of any investigation to what was necessary and proportionate; (b) document and agree with the SFO the investigative steps which Dechert should perform; (c) limit the review of the

Camrose and CAMC acquisitions to a London-based review, with interviews of professional advisers, the board and senior management involved in the transaction; (d) ensure (or attempt to ensure) that the investigation was limited to the 'red flags' raised by the FRA's books and records review in Africa; (e) agree (or attempt to agree) controls or limits as to the use to which the SFO could make of material disclosed to it, or agree (or attempt to agree) the extent to which ENRC's privilege was protected, particularly in the event that the engagement process broke down and/or no self-reporting took place and/or a civil settlement was not reached and a criminal investigation and prosecution was launched.

**JANUARY 2012 TO DECEMBER 2012**

**Dechert advice to ENRC on investigation scope**

86. In January 2012, Dechert proposed an extensive scope of work with numerous workstreams relating to ENRC's corporate structure and acquisitions in Africa.

87. On 2 February 2012, Mr Gerrard met representatives of ENRC and Ambassador Pierre Prosper and Judge Stephen Larson of Arent Fox LLP to discuss the scope of the investigation that ENRC ought to try to agree with the SFO. Arent Fox LLP had been engaged by ENRC to advise on whether there had been any sanctions violations. There was a discussion as to whether the acquisition of CAMEC ought to be within scope of the investigation. Mr Prosper suggested that ENRC should attempt first to establish the SFO's position on such matters in order better to understand how to deal with the SFO. Mr Gerrard responded aggressively, saying words to the effect: "I don't appreciate having you guys [Pierre Prosper and Stephen Larson] parachuted in … you two fuckers [ENRC's representatives] parachute these guys in … this is my world".

88. Mr Gerrard then advised that: (a) "if we don't investigate everything ENRC will be raided"; (b) he did not "know how long [he] can hold [the SFO] off"; (c) "…if I don't deliver – and I've repeated this fucking hundreds of times – if we don't deliver fraud or corruption...we've got no deal"; and (d) ENRC would be better to admit to wrongdoing, even if there was none, to achieve settlement with the SFO.

89. On 3 February 2012, Mr Gerrard emailed Mr Ehrensberger and advised that: (a) Jones Day's involvement in the SFO process should be reduced; and (b) his approach should be followed because "I know the SFO guys and what works". Mr Gerrard did not, however, advise ENRC that (a) reducing Jones Day's involvement with the SFO would reduce the emphasis on governance and compliance (which was the SFO's initial stated interest) in any presentation of the work undertaken by the ENRC; and (b) an informal approach with the SFO risked a lack of clarity as to the scope of investigations required and the protections afforded to ENRC (including in respect of any information provided to the SFO).

90. On 15 February 2012 Mr Richards of Jones Day emailed Mr Ehrensberger expressing concerns that Dechert's investigation was not proportionate and would mean that ENRC would "end up investigating Africa for a longer period" than necessary.

91. On 29 February 2012, Ms Caroline Black of Dechert emailed a note to Mr Ehrensberger. This was the only written advice which ENRC ever received from Dechert concerning the advantages and disadvantages of entering into self-reporting with the SFO. The note recommended self-reporting to the SFO. Some advantages and disadvantages of self-reporting were listed. However, the list of disadvantages was incomplete. The advice did not and/or did not adequately explain the restrictions on the SFO's ability to undertake any raid, and did not and/or did not adequately explain the risks of the SFO commencing a criminal investigation or prosecution even if ENRC adopted Mr Gerrard's proposed strategy.

**Fourth meeting between the SFO and ENRC**

92. On 5 March 2012, ENRC met the SFO. The meeting was attended by Mr Richards of Jones Day and Mr Prosper of Arent Fox, as well as representatives of the SFO, ENRC and Dechert. As recorded in a Dechert note, at the meeting:

92.1. Mr Gerrard informed the SFO about: (a) ENRC's acquisition of Camrose, including certain payments made to Mr Gertler and to a company owned or controlled by Mr Gertler, and a US$400 million loan from ENRC to Camrose (which included US$165 million for capital and expenditure and about which

Dechert had concerns as to what happened and what was accounted for); and (b) "red flags" identified in the books and records review including authorisation of payments and visibility of payments (as a result of Mr Gertler's involvement).

92.2. The SFO: (a) accepted that the investigations into the Education Allegation and Farm Allegation could be closed; (b) acknowledged that ENRC's work should be proportionate: Mr Dick Gould of the SFO made clear that it was "not proposing a global investigation"; (c) said that no further reports to the SFO on any alleged sanctions violations were required; and (d) requested a full written report on Kazakhstan by June 2012.

93. At the meeting on 5 March 2012, Dechert and Mr Gerrard did not: (a) limit the issues which they presented to SFO to those which amounted to more than a "mere suspicion" of wrongdoing (as required by the SFO at the 20 December 2011 meeting) because information was disclosed on matters that they had only just begun to investigate; (b) seek to agree with the SFO a clear scope of any investigation.

94. After the meeting on 5 March 2012, Dechert prepared for ENRC a summary note of the meeting which: (a) did not acknowledge the SFO's recognition of proportionality; (b) said that the SFO was concerned by alleged obstruction of the investigation team in Kazakhstan, but the SFO had not said this; (c) said that the SFO had raised concerns about the integrity of future evidence, but the SFO had not said this; and (d) said that the SFO required further work in respect of the loan to Camrose when in fact this was Dechert's statement about what it would do, not what the SFO required. The inaccuracies in Dechert's meeting note were consistent with Dechert's own agenda to maintain and expand the scale of the investigations.

95. On 14 March 2012, Mr Gerrard met Mr Thompson of the SFO. Mr Gerrard volunteered information about: the acquisition of CAMEC, further possible due diligence issues surrounding the acquisitions of Camrose and CAMEC (including internal audit reports), the alleged need for Mr Gerrard's team to access e-mail servers in London and Zurich, and recent concerns which he allegedly held about an excavator purchased by an ENRC subsidiary. ENRC was not informed by Dechert about such meeting, either before or

after it took place, and Mr Gerrard had no instructions or authority from ENRC to make such disclosures to the SFO and it was not in ENRC's interests for him to do so.

**Expansion of the Kazakhstan and Africa investigations**

96. Far from completing his investigations by November 2011 (as Mr Gerrard had suggested to the SFO on 3 October 2011), and notwithstanding that the SFO made clear on 5 March 2012 that any investigation should be proportionate and it did not expect a global investigation in to ENRC's operations, Dechert and Mr Gerrard sought unreasonably to expand the scope of their enquiries into the Kazakhstan Allegations. For example:

    96.1. From 26 March 2012 Dechert conducted a further data recovery exercise in Kazakhstan despite a data recovery exercise which had taken place in the previous year.

    96.2. On 13 April 2012, Dechert sought from ENRC a further extension of time to complete the data recovery exercise. Despite the distracting effect on SSGPO's operations, ENRC consented to an extension of time for the data recovery exercise.

    96.3. On 17 April 2012, Dechert made a further request to conduct another IT search of data stored on ENRC's London servers in relation to the Kazakhstan investigation. Dechert had conducted the same exercise the previous year, but had failed to ensure that the search terms could be applied to PDF documents. In an email to Mr Ehrensberger dated 19 April 2012, Mr Gerrard advised ENRC that the SFO would "expect" the data to be searched again.

97. Such work had not been requested by the SFO and Dechert had not made any effort to establish precisely the minimum steps which ENRC would be required to take to satisfy the SFO. It is averred that Mr Gerrard's references to the SFO "expecting" work to be done was used by him as purported justification for further costly work to be undertaken by Dechert. Mr Ehrensberger was critical of the delay and expansion, and said that June 2012 was the absolute time limit for the completion of the investigation into the Kazakhstan Allegations.

98. Mr Gerrard also sought to expand the Africa investigations:

98.1. In or around March 2012, Mr Gerrard began to advise ENRC that its acquisition of the Chambishi mining operation in Africa ought to be investigated. He advised this further enquiry, notwithstanding that the scope of work discussed with the SFO on 5 March 2012 had not included the Chambishi acquisition.

98.2. On 12 April 2012, Ms Caroline Black of Dechert emailed Mr Ehrensberger a work plan entitled "Work Plan "Deep Dive" Into the CAMEC Acquisition". The work plan wrongly asserted that Mr Ehrensberger had "approved" a "deep dive" into CAMEC; he had in fact only said he would "look at" the work plan. In an email dated 12 April 2012 to Mr Ehrensberger, Mr Richards of Jones Day considered the Dechert plan "way over the top and baffling."

98.3. On 13 April 2012, Mr Gerrard advised ENRC that the work set out in the work plan would be "required" by the SFO and was what the SFO would "expect", despite the fact that Dechert had taken insufficient action in its discussion with the SFO to determine the scope of work required, and so Mr Gerrard could not know what was "required" or what the SFO would "expect".

98.4. In reliance upon Mr Gerrard's advice, ENRC agreed that the investigation should focus on the acquisition of Chambishi as well as the acquisition of Camrose. There arose an ongoing debate between ENRC and Dechert as to whether the CAMEC acquisition was a matter which ought to be investigated. On 8 June 2012, Mr Ehrensberger emailed Mr Mehmet Dalman (who had become ENRC's Chairman):

> "...Despite the fact that we agreed to review Camrose and Chambishi, Neil feels obliged to review everything, including CAMEC – just in case. This is a massive expansion of the agreed scope which will not only cost us a fortune but it also has a significant impact on the timing of the Africa review; basically, it turns the exercise to an open end investigation...
>
> All in all, I'm absolutely convinced we should keep the Africa investigation strictly focused on the red flags. Instead, I have a gut feeling Neil turns the exercise to an open end investigation where one issue leads to another one which requires again a full-blown investigation and so on and so forth. I've

34

*seen this pattern before with the SSGPO investigation. If you don't set clear boundaries to Neil he feels free to broaden his investigation to an extent, which is damaging for the company, both in terms of cost and, moreover, time. I can't imagine that's what the SFO would expect from us, since the former director Alderman stressed the principle of proportionality…"*

99. When ENRC queried the inclusion of the CAMEC acquisition within Dechert's investigation, Ms Lee of Dechert said in an email of 8 June 2012 that the SFO "may insist" on a review of CAMEC, notwithstanding the fact that the SFO's main concern with CAMEC had related to possible sanctions issues with which the SFO was by then satisfied. Dechert's advice was to the effect that it was required to review everything (including CAMEC). Such advice was wrong and turned the Africa review into an open-ended investigation which was not proportionate and/or in ENRC's best interests.

100. On 9 May 2012, at a meeting of the Special Investigations Committee, attended by Mr Gerrard:

100.1. In respect of Kazakhstan, Dechert and Mr Gerrard did not advise ENRC that the scope of the Kazakhstan investigation could be limited because of: (a) the timescale which the SFO had given for report to be produced (by June 2012); (b) the SFO's expressed concern about jurisdictional issues; (c) the SFO's emphasis on Africa; and (d) the SFO's desire not to be overburdened.

100.2. In respect of Africa, Dechert's presentation identified "issues emanating from meetings with the SFO" on 30 November and 20 December 2011. But Dechert was unable to present a precise and clearly delimited scope of investigation because it had failed to seek to agree the same with the SFO.

**Fifth and sixth meetings between the SFO and ENRC**

101. On 10 May 2012, Mr Thompson and Mr Dick Gould, the interim head of the SFO's Proceeds of Crime Unit, met Mr Gerrard and Mr Dalman. As recorded in a manuscript note made by him, Mr Thompson said that the SFO's perception was that ENRC's progress had been slow and that "nothing substantive had been reported yet." Mr Gould said that he "considered the approach of Jones Day and Beat Ehrensberger had been defensive and that they were too close to some of the transactions about which there

were concerns". Jones Day and Mr Ehrensberger had each been critical of Dechert's approach. Mr Gould's view echoed statements made by Mr Gerrard about each of Jones Day and Mr Ehrensberger. Both Jones Day and Mr Ehrensberger had recently been excluded from further participation with the encouragement of Mr Gerrard. In light of the foregoing and in light of the matters pleaded in paragraph 108 below, it is to be inferred that Mr Gould expressed the view quoted above at Mr Gerrard's suggestion.

102. On 18 June 2012, Mr Gerrard spoke with Mr Thompson of the SFO. The telephone conversation was followed by a letter dated 18 June 2012, sent by email from Mr Thompson to Mr Gerrard. The SFO's letter suggested that the meeting later the same day was to enable Dechert to provide an update to the SFO and "agree the immediate steps necessary for [ENRC]… to continue to avail itself of our Protocol on Self-Reporting". The letter continued, "I would take this opportunity to remind your client of the following points: The need for a full and thorough formal report of any wrong-doing that has been discovered; The requirement that the SFO is satisfied that the scope of the investigation has been [sic] not been restricted; The Board of Directors have demonstrably committed to the process". In light of the facts that the letter was immediately preceded by a telephone call between Mr Gerrard and the SFO, the substance of the message delivered by the SFO was consistent with Dechert's own agenda, and the letter was an unusual piece of communication from the SFO in content, timing and tone, it is to be inferred that Mr Gerrard requested that the SFO write the letter and suggested its contents, and that he did so improperly to ensure that ENRC followed his advice.

103. On 18 June 2012, ENRC met the SFO. At the meeting, as recorded in the Dechert meeting notes:

103.1. Mr Thompson expressed concern that ENRC had yet to make a substantive report to the SFO. ENRC believes that Mr Thompson was relying upon Mr Gerrard's statement on 20 December 2011 that he would have "something" for the SFO within a month or two. The SFO said that ENRC should consider submitting a proposal for the disposal of the case when finalising any report, and said that ENRC was in the "last chance saloon."

103.2. Mr Gerrard volunteered to the SFO that (a) there was "evidence" of an alleged material fraud with a value of c.£20 million in Kazakhstan in respect of the Stripping Allegation; and (b) there remained the "issue" of subsidiaries of ENRC other than SSGPO which had not been scrutinised. Mr Gerrard's disclosures in respect of the Stripping Allegation were plainly prejudicial to ENRC. In fact, KPMG later concluded that SSGPO had been overcharged c.US$9 million for stripping works.

103.3. Mr Gerrard did not oppose or seek to resist the SFO's suggestion that alleged delays in securing electronic material might lead to the systematic removal of data, which would justify a raid on the company's premises. In circumstances where the SFO expressly stated that there was no evidence that such activity was taking place, the SFO's prospects of obtaining a warrant (and having grounds to raid ENRC) were limited.

104. Dechert's note of the meeting on 18 June 2012 was misleading in that it purported to record a number of statements by the SFO which were consistent with Dechert's own agenda (to maintain and expand the investigations) but of which ENRC's representative at the meeting, Mr Zinger, had no recollection (when he marked up the draft meeting notes on 3 July 2012).

105. On 25 June 2012, Mr Zinger sent an email to Mr Gerrard in which he suggested that ENRC should ask the SFO what evidence the SFO had to corroborate any alleged wrongdoing by ENRC, so that ENRC could address the SFO's actual concern. Mr Zinger stated "As it stands, we are expending considerable sums looking at a multitude of things while they pretend to hold some vital piece of damning information. It just seems to fly in the face of public policy and the notion of proportionality that they are meant to be applying." In reply on the same day, Mr Gerrard stated his opinion that "it would be a mistake at this stage to push [the SFO] on what evidence or concerns they have". He stated that the SFO might "be more willing to open up" in due course and that proportionality was something ENRC should "consider raising later."

106. During July 2012, notwithstanding the discussions with the SFO at the 5 March 2012 meeting, Dechert advised ENRC that any review of CAMEC, Camrose and Chambishi needed to cover due diligence and valuations, loans and funding of transactions,

management and board knowledge, market disclosures and the FRA books and records review. Dechert provided a work plan to Mr Simon Zinger, ENRC's deputy general counsel. As to the workplan:

106.1. In an email from Mr Zinger to Mr Gerrard dated 3 July 2012, Mr Zinger said that the scope of work envisaged in the workplan was not proportionate in relation to the matters which needed to be investigated to satisfy the SFO.

106.2. Mr Gerrard responded in an email of dated 4 July 2012 that any amendments to the workplan (such as to attempt to ensure that the investigation was proportionate) would run the very real risk that the SFO would lose confidence in the company leading to the commencement of a criminal investigation.

106.3. Mr Gerrard's assertions were made without any foundation at all. His advice (in his email of 4 July 2012) that "the SFO will lose confidence in the company's ability and willingness to provide a full and frank report" if ENRC's proposed amendments to the workplan were implemented was given in circumstances in which the SFO had (on several occasions) recognised the importance of a proportionality in any investigation. In the circumstances, his advice was wrong.

107. On 6 July 2012, Mr Gerrard emailed Mr Thompson asking him to call Mr Gerrard on his mobile telephone, to discuss rumours that the SFO was about to raid ENRC. Mr Thompson of the SFO informed Mr Gerrard that the rumours were untrue and that the SFO had very few investigators working on the ENRC matter. From this date (at least) Dechert and Mr Gerrard were aware that the SFO's resources deployed in respect of ENRC were limited. Dechert and Mr Gerrard did not, however, inform ENRC of the same at any time.

108. In July 2012, the SFO was put on notice of allegations of improper conduct by and an inappropriately close relationship between Mr Gerrard and an SFO officer referred to as "Dick". An anonymous letter was sent to David Green QC, Director of the SFO, containing a number of serious allegations. The author of the letter reported having heard Mr Gerrard boasting, inter alia, that he had been given "insider information" and that Mr Gerrard had an "agreement" with the SFO by which he could guarantee that his

clients would never be investigated and that he could change a criminal investigation into a civil settlement. The author of the letter also reported witnessing Mr Gerrard claiming "to have 'fucked' any relationship the law firm Jones Day may have with the SFO by 'judicious leaking'." Pending disclosure, ENRC reserves its position as to the impact, if any, of these allegations on the SFO's approach to its concerns about ENRC. For the avoidance of doubt, ENRC did not learn of this anonymous letter until March 2013.

109. On 11 July 2012, Dechert met Herbert Smith LLP, former corporate advisers of ENRC, who had advised and completed due diligence on ENRC's Africa acquisitions. Dechert enquired into the acquisitions of Camrose, CAMEC, and Chambishi. Notwithstanding the fact that, as far as the SFO was concerned, sanctions issues were (in Mr Gerrard's words, as recorded in a Dechert note of the meeting) "off the table", Dechert proceeded to ask Herbert Smith a series of questions about sanctions issues concerning ENRC's African operations. Further, in a presentation dated 2 August 2012 to the Special Investigations Committee Dechert and Mr Gerrard sought to re-open and investigate possible sanctions infringements concerning ENRC's African operations.

**Seventh meeting between the SFO and ENRC**

110. On 20 July 2012 ENRC met the SFO. At the meeting, as recorded in Dechert's presentation and note:

110.1. Mr Gerrard: (a) reported on the findings of the investigation into SSGPO; (b) listed a number of issues which he claimed to have identified, but not investigated; (c) informed the SFO that once the relevant documents concerning the relevant SSGPO mines were received, then the investigation into the Stripping Allegation would be completed within weeks to one month at most; (d) said that "red flags" existed in Africa (concerning ENRC's use of an agent), relatively minor "annoyance payments" had been made, and that work was ongoing on other funding issues; and (e) provided the SFO with detailed money flow charts in respect of ENRC's acquisition of Camrose. Dechert and Mr Gerrard took no steps to protect ENRC's interests in the disclosure of such information to the SFO.

110.2. Mr Thompson of the SFO observed that in respect of the SSGPO investigation the only offences within the SFO's purview were "potential false account and books and records offences in London". Mr Gerrard did not inform the SFO that, since none of the individuals whom Dechert had identified as implicated in any wrongdoing at SSGPO was based in London, it was implausible to consider that ENRC had committed any wrongdoing of interest to the SFO.

111. On 6 August 2012, Dechert emailed ENRC an investigation timeline, which suggested that it would complete its reports into Kazakhstan and Africa by 1 December 2012 at the latest.

112. By August 2012, Mr Gerrard had been investigating for some 20 months, Dechert had been instructed for some 16 months and it was one year since the SFO had first raised concerns with ENRC. By this time, Dechert had not produced any report summarising its investigations, all "self-reporting" to the SFO had been done orally (whether formally or otherwise) and there was no prospect of any written report for a further three months.

113. On 20 August 2012, Mr Gerrard told Mr Gould of the SFO that he had concerns about the sum of US$35 million withdrawn in cash over a period of 10 days from a subsidiary of ENRC (Metalkol) in Africa for an administrator based in BVI/Guernsey. In fact, Metalkol was not, at the time, a subsidiary of ENRC; ENRC had an indirect interest in 35.35% of Metalkol. The detailed contents of Mr Gerrard's discussion with Mr Gould are not known to ENRC because Dechert failed to provide any attendance note to ENRC of the same. Mr Gerrard had no instructions or authority from ENRC to make such disclosures to the SFO, which were plainly contrary to ENRC's interests.

114. On 4 October 2012, Mr Gerrard telephoned Mr Thompson of the SFO. As recorded in a SFO internal note, Mr Gerrard said, inter alia, that around £35 million in cash had been withdrawn from ENRC accounts (in fact the withdrawal was from the Metalkol account), for which there had been no satisfactory accounting. He also said that the main problem was that relevant documentation was in the Democratic Republic of Congo under the control of Mr Gertler, and that ENRC would update the SFO in

October/November 2012. Mr Gerrard had no instructions or authority from ENRC to make such disclosures to the SFO, which were plainly contrary to ENRC's interests.

115. During the autumn 2012, Dechert began a process (which continued through the remainder of 2012 and into 2013) of bringing documents from Africa to the UK. Dechert did so without advising ENRC (either at the outset or at any time thereafter) on the implications of bringing documents into the jurisdiction or as to the SFO's limited ability to investigate the Africa Allegations (as pleaded at paragraph 33 above).

116. On 9 October 2012, the SFO issued the 2012 Guidance (to which reference is made at paragraph 27 above), which signalled a significant change of approach by the SFO. Notwithstanding the new guidance, Dechert and Mr Gerrard gave no advice to ENRC about any possible change in the SFO approach, nor (until December 2012) did Dechert or Mr Gerrard take any steps to establish the SFO's approach to the current engagement with ENRC in the light of the 2012 Guidance.

117. On 26 October 2012, at an ENRC Special Investigations Committee meeting, as recorded in an email dated 1 November 2012 from Ms Catharine Barker to Ms Clarissa Coleman (two solicitors from Addleshaw Goddard, which firm had been instructed to assist ENRC's in house legal function), Dechert said it would write to the SFO to "confirm" that ENRC was still in the "self-reporting procedure". However, Dechert had neither previously sought nor received any written confirmation from the SFO on the status of the relationship between ENRC and the SFO established by Dechert.

118. At the end of October 2012, ENRC instructed KPMG to assist ENRC's Internal Audit department in relation to the Stripping Allegation. KPMG was asked to identify why certain contractors were selected to perform stripping works, to quantify any losses for appropriate disclosure in ENRC's financial statements, and where possible to identify whether any SSGPO employees or ex-employees were involved in wrongdoing.

119. In or around early November 2012, PwC received a whistleblower report concerning Ms Zaure Zaurbekova (ENRC's CFO) and her potential involvement in matters relating to the Stripping Allegation. On or around 2 November 2012 Mr Gerrard met PwC. As recorded in an Addleshaw Goddard note of the meeting, Mr Gerrard told PwC that he

was "obliged" to inform the SFO of the whistleblower report, and said he wanted to be involved in any PwC investigation. Mr Gerrard advised that if PwC carried out the investigation without his involvement the SFO would ask Dechert "to go in and carry out our own investigation". Mr Gerrard's assertions had no foundation. On 29 November 2012, Ms Zaurbekova was interviewed by, amongst others, Mr Gerrard.

**Eighth and final meeting between the SFO and ENRC**

120. On 28 November 2012, ENRC met the SFO. At the meeting:

120.1. Mr Dalman made a presentation (which had been prepared by Dechert), which noted the loss of value in ENRC's shares of US$4 billion "due to current issues under investigation".

120.2. Mr Gerrard said that (a) a stripping fraud had been discovered which potentially had a London connection; (b) disclosed further information on the Camrose acquisition; (c) disclosed information on CAMEC in relation to the payment made to Mr Gertler and others for their shares; (d) disclosed further information on the Chambishi acquisition; and (e) informed the SFO about the allegations relating to Ms Zaurbekova (notwithstanding that there was no evidence implicating Ms Zaurbekova beyond mere suspicion).

120.3. Mr Gerrard's assertions were highly prejudicial to ENRC and should not have been made.

121. Despite Dechert having previously said to ENRC that it anticipated completing all its investigations by 1 December 2012 at the latest, it did not do so. By this point in time, the investigations had become very large in scale. For example, in a presentation to ENRC dated 4 December 2012, Dechert recorded that the Kazakhstan investigation had included interviews of 85 individuals in Kazakhstan, the imaging of 101 computers, the review of over 500,000 electronic documents, and the review of 90 lever arch files of hard copy documents. Further, Dechert's review of the electronic documents involved the application, in some cases, of extremely wide and wholly inappropriate search

terms, which produced disproportionate numbers of "hits", each of which had to be manually reviewed.

**The draft Section 72 Notice**

122. It was not until late 2012 that Dechert first sought formal confirmation of the nature of ENRC's engagement with the SFO and/or guidance from the SFO in relation to the change in the self-reporting guidance (following the publication of the 2012 Guidance). On 12 December 2012, approximately 16 months after the SFO had sent the 10 August Letter, Dechert wrote to Mr Gould of the SFO seeking (for the first time) to:

    122.1. Confirm the status of ENRC's relationship with the SFO in writing. Dechert sought confirmation that ENRC remained "still part of the corporate self-reporting process" before it submitted its Kazakhstan report; and

    122.2. Protect ENRC's privilege, such that any report would be submitted under a limited waiver of legal professional privilege for the purposes of corporate self-reporting only, and so restrict the SFO from using any Dechert report material as part of a prosecution of ENRC, any subsidiary of ENRC, or director or employee of ENRC or its subsidiaries.

123. In an email of the same date, Mr Jonah Anderson of Dechert said to ENRC that Dechert was waiting for the SFO response before finalising and handing over the Kazakhstan report, and it expected to receive the SFO confirmation the next day. In an email dated 13 December 2012, Ms Caroline Black of Dechert informed ENRC that Mr Gould of the SFO had said that he was considering issuing a Section 72 Notice.

124. Mr Gerrard also appears to have sought a meeting with Mr Thompson of the SFO around this time before 20 December 2012. ENRC does not know whether any such meeting took place. Mr Gerrard had no instructions or authority from ENRC to arrange or attend such a meeting.

125. On 20 December 2012, Mr Gould of the SFO emailed Mr Gerrard a draft Section 72 Notice. Mr Gould said in his email that the draft was a "potential response" to

Dechert's 12 December 2012 letter and was a "flavour of where I think we might wish to go…my personal belief is that this situation is best served by a totally transparent approach which is best displayed by this undertaking."

126. On 20 December 2012, Mr Gerrard forwarded Mr Gould's email and draft Section 72 Notice to Dechert solicitors Mr Duncan Wiggetts and Ms Caroline Black, saying that the document was "for our [Dechert's] purposes only". Dechert did not (at any time) advise or inform ENRC of the fact or terms of the draft Section 72 Notice, or that it had received such a draft notice.

## JANUARY TO MARCH 2013

**Dechert advice to ENRC on the investigation scope**

127. On 7 January 2013, Mr Anderson of Dechert emailed ENRC to say that Dechert would need to conduct another further review to cover the entirety of ENRC's global operations. He suggested that as a result of meetings with the SFO in July and November of 2012, the SFO was "expecting a global Books and Records review", which extended to ENRC's non-African entities, and he proposed plans for putting such a review into place. In fact, there was no reason to suppose that SFO was expecting any such global review. Further, the proposed global review was disproportionate and unnecessary, given that ENRC was then a listed company with audited financial statements.

128. On 8 January 2013, KPMG presented to ENRC its draft findings in relation to the Stripping Allegation. For the reasons given in paragraph 32 above, its findings were not matters which would be of any interest to the SFO.

129. In an email dated 18 January 2013, Mr Wiggetts of Dechert outlined for ENRC the further work which Dechert proposed to do between January and April 2013 in respect of the reports into ENRC's Kazakh and African operations. Dechert suggested that both reports would be completed by the end of April 2013. It estimated that 128 partner hours, 299 associate hours, 11 trainee hours, and 164 paralegal hours were required for the Kazakhstan investigation, and 1,754 partner hours, 6,929 associate hours, 1,007

trainee hours and 6,719 paralegal hours were required for the Africa investigation. At this time, to the best of ENRC's knowledge and belief, Dechert had undertaken no substantive drafting of the Africa report.

**The SFO's letter dated 21 January 2013**

130. By a letter dated 21 January 2013, Mr Patrick Rappo, head of the Bribery and Corruption Business Area Division at the SFO, rejected Dechert's requests for protections for ENRC set out in its 12 December 2012 letter (contrary to Dechert's expectations). The SFO letter said that "Self-reporting is not, and never has been and never could be, a guarantee that a prosecution will not follow. Each case must turn on its own facts." The SFO also said that ENRC had provided no report or supporting evidence to the SFO, and that the SFO could give "no assurances" that any report would be subject to legal professional privilege or accept any of the conditions to service of the report as proposed by Dechert. The letter continued:

> *"We are concerned at the apparent lack of progress since August 2011. We understand that your report on Kazakhstan has been completed, subject to an addendum dealing with the issue of the Chief Financial Officer, and that your report on the Congo is nearing completion. You will appreciate that if we cannot progress these matters with your assistance, we have no alternative but to progress them without your assistance.*
>
> *Therefore if we do not receive your report on Kazakhstan by close of business on Thursday 31 January 2013, we will have no option but to open a criminal investigation into ENRC's activities there, with a view to the exercise of our investigative powers…"*

131. At this time Dechert and Mr Gerrard did not advise ENRC that Dechert's failure to address such matters with the SFO before its 12 December 2012 letter had damaged ENRC's ability to resolve those matters to its advantage.

132. On 24 January 2013, the Special Investigations Committee met and discussed the SFO's 21 January 2013 letter. Mr Dalman expressed to Mr Gerrard his surprise and concern to have received the SFO's letter "out of the blue", given ENRC's understanding of the self-reporting process from Mr Gerrard. Mr Dalman said that it was clearly a "rap across the knuckles" of ENRC caused by the delay in producing any report. ENRC had left the approach and strategy in respect of the SFO to Mr Gerrard,

but the SFO now appeared to be taking a very different line from the one which Mr Gerrard had advised to ENRC. At the meeting:

132.1. Mr Gerrard did not advise ENRC that Dechert's failure to address these matters at a much earlier stage had prejudiced ENRC's ability successfully to resolve them at this point in time, and that ENRC should (as a matter of urgency) correct the SFO's misapprehension (howsoever obtained) that a report on Africa was "nearing completion". (In fact, Dechert had not even started drafting a report on Africa).

132.2. Mr Gerrard advised that the SFO would, on reading the Kazakhstan report "consider whether or not to pursue a criminal or civil settlement or both". In fact there was nothing in the Kazakhstan report that would justify a criminal prosecution of ENRC, or indicated that ENRC had received a financial benefit which might form the subject matter of a civil settlement. Mr Gerrard's advice was wrong.

133. In the light of the SFO's letter, on 24 and 25 January 2013 Mr Gerrard sought to contact Mr Rappo. In an email to Mr Gerrard dated 25 January 2013, Mr Rappo said that the letter was "sufficiently self-explanatory", but Mr Gerrard replied there was a matter on which he "need[ed] to seek clarity on which would probably be better dealt with over the phone." Around this time, on at least 28 January 2013, without ENRC's knowledge, Mr Gerrard had a series of telephone calls with Mr Gould and Mr Thompson. ENRC does not know the purpose or content of these communications, and reserves the right to plead further following disclosure. Mr Gerrard had no instructions or authority from ENRC to engage in such communications.

134. On 29 January 2013, ENRC responded to the SFO's 21 January 2013 letter. It said it was:

> *"...both concerned and disappointed with your letter, in particular your comments regarding the corporate self-reporting process. Dechert have been engaged to conduct an independent in depth investigation exercise, to which the company has devoted a very substantial amount of management time and resource at all levels, and alongside this we have been engaged in an ongoing programme considering and implementing appropriate remedial actions. The SFO have of course been kept well briefed along the way. I can assure you that the committee with responsibility and*

*oversight over this investigation (the "ENRC Special Investigations Committee") has worked tirelessly over the past six weeks."*

135. ENRC was so concerned by the SFO's letter, in particular by the contrast between Dechert's advice about self-reporting and the position taken by the SFO, that Mr Dalman asked lawyers from Addleshaw Goddard seconded to ENRC to prepare a list of Dechert's failings in respect of its Kazakhstan and Africa investigations. The failings set out in Addleshaw Goddard emails dated 24 January 2013 included: (a) "Dechert's general conduct – accusatorial interviews and threatening behaviour (senior management complaints) and professional conduct towards other law firms"; (b) the opaque nature of Dechert's " 'off the record' discussions with SFO contacts and exactly what the SFO were or were not being told"; (c) "Consistent criticism of and consequently tension with other professionals particularly where the involvement of others impinged on Dechert's assumed total control of the Investigation e.g. from time to time, PWC, KPMG, Herbert Smith, Jones Day, and Addleshaws"; (d) criticisms of Dechert's "massive document review exercises" and "repeat[s] of electronic search; no clear direction on search terms or document requests"; and (e) the failure to consider whether there was a risk the SFO would "resile from the tacit understandings that NG obviously believed he had with the SFO".

136. At Mr Dalman's request, Ms Coleman wrote to Dechert on 29 January 2013 requesting a 'roadmap' of the outstanding areas to conclude the investigation in Africa, how this was to be achieved, and by when. Mr Gerrard replied by email on the same day stating "I think this is a good idea and we will get to work on a first draft".

137. After the SFO had sent its 21 January 2013 letter, Dechert and Mr Gerrard advised ENRC to provide the draft Kazakhstan report to the SFO and gave such advice: (a) despite the fact that the SFO had declined to give any assurances on the use which the SFO would (or could) make of the Kazakhstan report; (b) without disclosing to ENRC that Dechert had received a draft Section 72 Notice which would, or might, have assisted ENRC in responding to the SFO; (c) without advising that ENRC had the option of not disclosing the report given the SFO's position in its letter of 21 January 2013. They did so in circumstances in which they had advised that there was a risk the contents of the Kazakhstan report might form the basis of a criminal prosecution against ENRC and/or its subsidiaries, directors or employees.

138. On 30 January 2013, Dechert responded to the SFO's 21 January 2013 letter. Dechert's letter noted the level of reporting and engagement provided by ENRC to the SFO, including the large amount of documentation provided to the SFO. The letter also appended a draft of the Kazakhstan report, which had been produced two years after the date on which Mr Gerrard had first said that the report could be produced.

**Dechert's work in February and March 2013**

139. During February and March 2013, Dechert and Mr Gerrard sought to expand their investigations yet again: they sought to investigate disparate allegations about employee treatment in Kazakhstan, and conduct an additional books and record review in relation to Africa.

140. It was also at or around this time, and unknown to ENRC, that Mr Gerrard made or sought to make increasingly frequent communications with the SFO, including with Mr Rappo in the week preceding 26 February 2013. ENRC does not know the purpose or content of such communications, and reserves the right to plead further following disclosure.

141. On 27 February 2013, Mr Gerrard called Mr Thompson of the SFO. Mr Gerrard informed Mr Thompson that: (a) SSGPO's outsourced stripping contracts had been consistently inflated and/or fraudulent by about 30%; (b) there was insufficient evidence to amount to relevant criminality for the SFO's purposes in respect of SSGPO, but that some sort of civil action or referral to the UKLA could be considered; (c) whilst he was providing that advice to the SFO, his work was still in draft form and subject to expert agreement and ENRC Board approval; (d) the situation in Africa was complicated, but more concerning for the ENRC Board; (e) he had taken his work as far as he could without there being a risk to any investigation which the SFO might wish to carry out; and (f) he would like to attend the SFO to explain further.

142. Mr Gerrard had no instructions or authority from ENRC to make such assertions to the SFO, which were plainly contrary to ENRC's interests. Further, Mr Gerrard's statement about the stripping contracts was wrong. KPMG's findings (as Mr Gerrard knew at this

time) found that the value of unperformed stripping work which SSGPO had paid, amounted to c.10% of the total value of the outsourced contracts.

143. On 28 February 2013, as recorded in a SFO file note, Mr Gerrard called Mr Thompson of the SFO. Mr Gerrard informed the SFO that: (a) he had received a further whistleblower report that the management of SSGPO was implicated in the Stripping Allegation; (b) there was a "massive problem on sanctions" in Africa, and that it appeared ENRC had conspired to breach various sanctions and had been dealing with sanctioned individuals until very recently; (c) the information provided by Mr Prosper in relation to sanctions in March 2012 (at the meeting to which reference is made at paragraph 92 above) "may have been misleading" such that Mr Gerrard wanted a meeting with the SFO to get a steer as to whether he should keep investigating sanctions; (d) a corrupt payment of £35 million had been made to Mr Gertler; (e) he did not want to continue his work to the detriment of any future investigation by the SFO (thus repeating his assertion of 27 February 2013).

144. Mr Gerrard had no instructions or authority from ENRC to make such assertions to the SFO which were plainly contrary to ENRC's interests. Further:

144.1. Mr Gerrard subsequently told ENRC that he had spoken to Mr Thompson, but he did not tell ENRC that he had informed Mr Thompson of any of the matters above.

144.2. In light of the facts that the disclosures were so obviously unauthorised and contrary to ENRC's interests and that Mr Gerrard kept the substance of his disclosures secret from ENRC, it is to be inferred that Mr Gerrard informed the SFO of the new whistleblower report (without authority or instruction and notwithstanding ENRC's decision not to instruct Dechert on the matter) in order to bring it within the scope of the SFO process and so secure instructions for Dechert to investigate this new matter.

145. On 13 March 2013, as recorded in a SFO file note, Mr Gerrard telephoned Mr Rappo and informed him that he had identified allegedly "significant evidence of wrongdoing", and referred inter alia to the following: (a) US sanctions breaches; (b)

European sanctions breaches; (c) "hard evidence" that "35 million" had been given to Mr Gertler and "material to suggest that this had gone on as bribes"; (d) ENRC's lawyers had been aiding and abetting criminality and misleading the SFO and HM Treasury. In the evening of 13 March 2013 Mr Gerrard further emailed Mr Rappo informing him that ENRC was to have a Board meeting the next day, Dechert "expect[ed] a rough ride" and that he would call Mr Rappo the next morning. Mr Gerrard had no instructions or authority from ENRC to make such disclosures to the SFO which were plainly contrary to ENRC's interests.

146. On 14 March 2013, Mr Gerrard met ENRC's non-executive directors. As recorded in a manuscript note produced by Addleshaw Goddard, he said that the SFO was disappointed with the Kazakhstan report and had suggested that it showed "endemic fraud and corruption" in SSGPO. In fact, this had not been said by the SFO. There was no basis, so far as ENRC is aware, for Mr Gerrard to say what he did. He also failed to inform ENRC of the contents of his conversations with and/or assertions to the SFO on 28 February 2013 and 13 March 2013.

147. On 14 March 2013, an article by Christopher Thompson with the headline "ENRC internal inquiry raises suspicions" was published in the Financial Times. It put into the public domain a number of serious allegations about ENRC's business in Kazakhstan, which was very damaging to ENRC's interests. The article referred to a "draft presentation to the [SFO] prepared by Dechert", the content of which it described in some detail. The article appeared to be based upon a leaked, confidential document. A representative of the Financial Times subsequently informed ENRC that it had in its possession (and had relied upon) a PowerPoint presentation document dated July 2012 produced by Dechert and described the content of such document. Such document appears to have been a version of a presentation produced by Dechert for a meeting with the SFO on 20 July 2012, to which had been later added certain allegations which only came to light after that date. To the best of its knowledge, ENRC does not have any copy of a document fitting such description. In light of the foregoing, it appears that such document was produced by Dechert after 20 July 2012 and that Dechert was responsible for causing or permitting it to be supplied in or before early March 2013, directly or indirectly, to the Financial Times. Further, it is to be inferred from the matters pleaded in paragraphs 60, 60A and 60B above that Dechert was also the source

of this leak.  ENRC reserves the right to plead further to Dechert's knowledge and handling of this apparent leak and media interest.

148. On 15 March 2013 Mr Gerrard requested (once again) an urgent conversation with Mr Rappo regarding what he described as some recent developments.  Mr Gerrard had no authority or instructions from ENRC to contact Mr Rappo.

**Termination of the Retainer**

149. In the light of ENRC's concerns about Dechert's and Mr Gerrard's conduct, and given the SFO's reaction to Dechert's proposals in respect of the Kazakhstan report, which was at odds with the advice which Dechert and Mr Gerrard had provided to ENRC for over 16 months, ENRC terminated the Retainer on 27 March 2013.  The termination was confirmed in an email dated 1 April 2013 from Mr Ehrensberger to Mr Gerrard which identified some of Dechert's shortcomings under the following headings: "1. Unauthorized Disclosure of Privileged & Confidential Information to the Press"; "2. Inappropriate Communications with SFO"; "3. The Investigation has been conducted improperly and un-professionally"; "4. Retaliatory Actions"; and "5. Improper Billing". Thereafter ENRC appointed new counsel to take over conduct of ENRC's engagement with the SFO and the investigations.

150. The day after termination of the Retainer, on 28 March 2013, the SFO served Dechert with notices (under s.2A of the CJA) requiring Dechert to provide all material in its possession relating to ENRC.

151. Subsequently, the SFO commenced a formal criminal investigation into ENRC's global operations, including in Kazakhstan and Africa. The SFO announced the investigation on 25 April 2013. The SFO is currently using the information which had been collected by Dechert and Mr Gerrard in their investigations and has sought to compel the production of further material created by Dechert.

152. On 2 February 2016, the SFO brought a claim against ENRC for a declaration that certain documents generated during the investigations by Dechert and others were not subject to legal professional privilege.  On 8 May 2017, judgment was handed down in

favour of the SFO. On 12 October 2017, ENRC was granted permission to appeal against that judgment. The appeal remains outstanding. ENRC has incurred substantial costs to date in relation to these proceedings: if its appeal fails, it will bear its own and the SFO's costs; if its appeal succeeds and the SFO is ordered to pay ENRC's costs, ENRC will still bear some irrecoverable costs.

153. In respect of work done during the Retainer, Dechert billed ENRC in the total sum of over £16 million. ENRC paid such bills in order to retain Dechert's services (whilst the Retainer was in place) and in order to release a lien on ENRC's papers in Dechert's possession (after the Retainer was terminated), without prejudice to its right to challenge such bills. ENRC has sought a detailed assessment of approximately £11 million of such bills, which proceedings are ongoing (the "Costs Proceedings").

**BREACHES OF DUTY**

154. During the Retainer, Dechert and Mr Gerrard acted in repeated breach of each of the duties owed by each of them to ENRC:

154.1. In breach of their fiduciary duties, Dechert and Mr Gerrard acted contrary to the best interests of ENRC and/or in the interests of Dechert and/or in the interests of Mr Gerrard personally.

154.2. In breach of the implied term (set out at paragraph 50 above) and/or negligently, Dechert and Mr Gerrard acted under the Retainer without all the care and skill reasonably to be expected of a firm of solicitors having the specialist expertise and qualities set out above at paragraph 15 above.

154.3. In breach of their fiduciary duties and/or in breach the express alternatively implied terms (as set out at paragraph 49 above) and/or negligently, Dechert and Mr Gerrard acted without authority or instructions from ENRC.

154.4. In breach of their fiduciary duties and/or in breach the express alternatively implied terms (as set out at paragraph 52 above) and/or negligently, Dechert and Mr Gerrard disclosed to third parties confidential information belonging to ENRC.

**(1) Unauthorised disclosures**

155. Mr Gerrard had a series of unauthorised, informal, and uncontrolled communications and other "off the record" contacts with individuals at the SFO, whether in person, by telephone, text message, or other means. During such communications, Mr Gerrard made disclosures of confidential information and statements of opinion which were prejudicial to ENRC's interests. At no point, in any of the formal or official meetings between ENRC and the SFO, did Mr Gerrard (or the SFO) acknowledge the existence of these additional conversations and/or communications between Mr Gerrard and the SFO. ENRC does not know the full extent of such communications, and pending disclosure reserves its right to plead further. The SFO and Dechert have acknowledged the fact that text messaging was a medium of communication used between Mr Gerrard and the SFO in relation to ENRC, although ENRC understands that electronic data from devices used by Mr Gould, Mr Thompson and Mr Gerrard has been lost or destroyed. ENRC reserves the right to plead further in this regard.

156. Mr Gerrard had unauthorised, informal, and uncontrolled communications with individuals at the SFO on the following occasions (particulars of each of which are set out above):

156.1. During 2011, on (at least) 7 October 2011, 21 October 2011 and 30 November 2011;

156.2. During 2012, on (at least) 14 March 2012, 18 June 2012, 20 August 2012 and 4 October 2012;

156.3. During 2013, on (at least) 27 February 2013, 28 February 2013, 13 March 2013 and 15 March 2013.

157. By each such communication:

157.1. Dechert and Mr Gerrard acted in breach of their fiduciary duties. The fact and content of each such communication was contrary to the best interests of ENRC and/or in the interests of Dechert and/or in the interests of Mr Gerrard personally.

157.2. Dechert acted in breach of the implied term (set out at paragraph 50 above). Further or alternatively, Dechert and Mr Gerrard acted negligently. A solicitor with the relevant expertise and qualities exercising reasonable skill and care would not have engaged in such communications.

157.3. Dechert acted in breach of the implied term (set out at paragraph 49 above). Further or alternatively, Dechert and Mr Gerrard acted negligently and/or in breach of their fiduciary duties. A solicitor with the relevant expertise and qualities, exercising reasonable skill and care and complying with his or her fiduciary duties, would not have engaged in such communications without authority or instructions from ENRC.

157.4. Dechert acted in breach of the implied term (set out at paragraph 52 above). Further or alternatively, Dechert and Mr Gerrard acted in breach of their fiduciary duties. A solicitor with the relevant expertise and qualities, exercising reasonable skill and care and complying with his or her fiduciary duties, would not have disclosed to third parties confidential information belonging to ENRC.

158. Mr Gerrard caused or permitted the unauthorised disclosure of documents confidential to ENRC on the following occasions: (i) In early August 2011, to The Times, as pleaded in paragraphs 60, 60A and 60B above; (ii) In or about early December 2011, to The Sunday Times, as pleaded in paragraph 81 above; (iii) ~~An unidentified representative of Dechert caused or permitted the unauthorised disclosure of a confidential document which led to its provision,~~ in or before early March 2013, directly or indirectly, to the Financial Times, as pleaded in paragraph 147 above. By each such act, Dechert acted in breach of its duties in the ways identified in paragraph 157 immediately above.

**(2) Wrong advice as to criminal wrongdoing**

159. Dechert and Mr Gerrard failed to give any, or any adequate, advice as to how any alleged wrongdoing in either Kazakhstan or Africa was legally, evidentially or jurisdictionally justiciable in England and Wales, and/or of the complications such issues would cause to the SFO (including the substantial difficulties the SFO would face seeking to investigate

alleged wrongdoing abroad in Kazakhstan or Africa). Paragraphs 56.3 and 115 above are repeated in this regard. Further:

159.1. Dechert and Mr Gerrard failed at any stage to advise ENRC as to the risks and disadvantages of collating and bringing into the UK documents and/or material from Kazakhstan and Africa.

159.2. In the premises, it is to be inferred that Mr Gerrard did not have and/or failed to apply for the benefit of ENRC the understanding of the provisions of the BA that would be expected of a solicitor of his professed expertise.

160. Dechert and Mr Gerrard gave wrong advice as to criminal wrongdoing, or failed to advise, on the following occasions (particulars of which are set out above):

160.1. On 14 November 2011 Dechert and Mr Gerrard gave ENRC advice on the effect of the BA without referring to the important fact that the BA did not have retrospective effect. They ought to have reiterated the advice which Mr Gerrard had given to Mr Barker on 11 April 2011, set out at paragraph 57.1 above. At all material times after these dates, they failed to correct this omission.

160.2. At all material times, Dechert and Mr Gerrard failed to advise on how the SFO had jurisdiction over any wrongdoing in Kazakhstan.

160.3. At all material times, Dechert and Mr Gerrard failed to advise on how the SFO had jurisdiction over any wrongdoing in Africa.

160.4. At all material times, Dechert and Mr Gerrard failed to advise on the risks to ENRC of bringing documents into the UK.

160.5. At all material times, Dechert and Mr Gerrard failed to advise that a corporate body could only be successfully prosecuted for fraud offences if it could be shown that a directing mind of the corporate body had the necessary dishonest intent, or for bribery and corruption offences occurring before 1 July 2011 if it could be shown that a directing mind of the corporate body had the necessary corrupt intent.

161. By each such act or omission, Dechert acted in breach of the implied term (set out at paragraph 50 above). Further or alternatively, Dechert and Mr Gerrard acted negligently. A solicitor with the relevant expertise and qualities exercising reasonable skill and care would not have given wrong advice in the respect alleged and/or omitted to give correct advice in the respects alleged in a timely fashion.

**(3) Wrong advice as to admissions**

162. Dechert and Mr Gerrard repeatedly failed to take any and/or any adequate steps to advise ENRC on the inherent uncertainties for a corporate which participated in the self-reporting regime and did not provide any written advice to ENRC in respect thereof until 29 February 2012.

163. Dechert and Mr Gerrard wrongly advised that ENRC (and Dechert) owed a duty to the SFO to be "full and frank" such that Dechert and Mr Gerrard had to inform the SFO of mere suspicions concerning possible wrongdoing at ENRC, notwithstanding there was no and/or no evidential basis to do so and/or it was not in ENRC's best interests to do so. On a regular basis from September 2011 onwards, Dechert and Mr Gerrard gave such wrong advice.

164. Dechert and Mr Gerrard wrongly advised ENRC that the risk posed by the SFO was particularly severe such that ENRC should settle and/or admit criminal wrongdoing in circumstances where there was an insufficient basis to reach any reliable conclusion that ENRC had in fact committed any criminal wrongdoing. Dechert and Mr Gerrard gave wrong advice as to the need to make admissions on the following occasions (particulars of which are set out above):

164.1. On 2 February 2012, Dechert and Mr Gerrard wrongly advised ENRC that it should settle and/or admit criminal wrongdoing.

164.2. At all material times after that date, Dechert and Mr Gerrard failed to correct their earlier advice.

165. By each such act or omission, Dechert acted in breach of the implied term (set out at paragraph 50 above).   Further or alternatively, Dechert and Mr Gerrard acted negligently. A solicitor with the relevant expertise and qualities exercising reasonable skill and care would not have given wrong advice in the respect alleged and/or omitted to give correct advice in the respects alleged in a timely fashion.

**(4) Wrong advice as to the risk of a raid**

166. Dechert and Mr Gerrard wrongly advised ENRC (on a continuing and regular basis) that a risk of a SFO raid on ENRC was immediate and urgent. There was no such immediate and urgent risk at any material time; indeed, ENRC has never been raided. Alternatively, the risk of a raid arose for the first time in late 2012 and early 2013 as the SFO became frustrated at the failure of Dechert, on behalf of ENRC, to produce a report on either Kazakhstan or Africa. Mr Gerrard put pressure on ENRC such that ENRC was persuaded (as Mr Gerrard plainly intended) that it had no real choice but to do what Mr Gerrard said.   Dechert and Mr Gerrard failed at any time to correct their wrong advice on the risk of a raid.

167. Dechert and Mr Gerrard gave wrong advice as to the risk of a raid on the following occasions (particulars of which are set out above):

   167.1. On a regular basis after receipt of the SFO's 10 August Letter and for the remainder of the Retainer, Dechert and Mr Gerrard gave wrong advice that the SFO was likely to raid ENRC.

   167.2. Dechert and Mr Gerrard failed to correct this wrong advice, even after 6 July 2012 when Dechert and Mr Gerrard were aware that the resources being deployed by the SFO in relation to ENRC were limited.

168. The wrong advice as to the risk of a raid was given in order to compel ENRC to follow Dechert's proposed approach to the investigation and to interacting with the SFO.   In these circumstances, by each such act or omission:

168.1. Dechert and Mr Gerrard acted in breach of their fiduciary duties. The fact and effect of the wrong advice was contrary to the best interests of ENRC and/or in the interests of Dechert and/or in the interests of Mr Gerrard personally.

168.2. Dechert acted in breach of the implied term (set out at paragraph 50 above). Further or alternatively, Dechert and Mr Gerrard acted negligently. A solicitor with the relevant expertise and qualities exercising reasonable skill and care would not have given wrong advice in the respect alleged.

**(5) Failure to establish scope of SFO's concerns**

169. Dechert and Mr Gerrard failed to establish, or attempt to establish, with the SFO a clear and precise scope of the matters which needed to be investigated at any of the formal or official meetings with the SFO (or on any other occasion). To the contrary (and in addition to the matters contained in the unauthorised disclosures), at the official meetings with the SFO, Dechert and Mr Gerrard wrongly provided the SFO with detailed information and referred to "red flags" in a manner highly prejudicial to ENRC's interests and such as to encourage SFO suspicion in ENRC.

170. Dechert and Mr Gerrard failed to establish the scope of the SFO's concerns on the following occasions (particulars of which are set out above):

170.1. At the meetings between the SFO and ENRC on 3 October 2011, 30 November 2011, 20 December 20115 March 2012, 18 June 2012, 20 July 2012 and 28 November 2012, Dechert missed the opportunity to establish and fix the scope of matters which the SFO required ENRC to investigate, and instead acted so as to encourage and widen SFO suspicion in ENRC.

170.2. On 25 June 2012, Dechert declined ENRC's proposal to press the SFO in correspondence to be precise about the nature and scope of its concerns.

170.3. At all material times in and after September 2011, Dechert failed to establish the scope of the SFO's concerns, in correspondence or otherwise. Having failed to do

so, Dechert was then unable to conduct a proportionate investigation focussing on the areas of particular concern to the SFO.

171. By each such act or omission, Dechert acted in breach of the implied term (set out at paragraph 50 above). Further or alternatively, Dechert and Mr Gerrard acted negligently. A solicitor with the relevant expertise and qualities exercising reasonable skill and care would have promptly sought to establish the scope of the SFO's concerns, communicated them to ENRC and conducted a proportionate investigation focussing on such concerns.

**(6) Failure to protect ENRC's privilege**

172. Dechert and Mr Gerrard failed to take any and/or any adequate steps to protect ENRC's legal interests in its engagement with the SFO.

172.1. At all material times, Dechert and Mr Gerrard failed to protect any information which ENRC provided as part of the self-reporting process, and/or failed to obtain limitations on the subsequent use to which the SFO could put the information disclosed to it.

172.2. At all material times Dechert failed to provide any, or any adequate, advice on whether and, if so how, ENRC's privilege should be protected. In particular, in light of DLA's general advice on 21 April 2011 (to which reference is made in paragraph 41 above), Dechert should have given, and failed to give, specific advice throughout ENRC's engagement with the SFO on the existence of privilege and on the issue of possible waiver through self-reporting.

172.3. Dechert and Mr Gerrard failed to advise on or (save as set out below) take steps to obtain a Section 72 Notice. Further or alternatively, Dechert and Mr Gerrard failed to seek or agree terms of reference with the SFO. They failed to obtain the SFO's agreement as to what information and documents would be provided by ENRC to the SFO during and at the end of ENRC's investigations, as to whether such information and documents would be commonly understood by ENRC and SFO as attracting privilege and as to whether, and if so when and to what extent, ENRC would be treated as having waived any such privilege.

172.4. Dechert and Mr Gerrard made no attempt to seek any such protections before any of the eight official meetings with the SFO (particularised above) and/or on any other occasion until 12 December 2012. Dechert and Mr Gerrard caused or permitted information to be transmitted to the SFO without the benefit of any such protections.

172.5. Dechert's attempt on 12 December 2012 to seek such protection in respect of the Kazakhstan report was belated and did not produce a satisfactory outcome for ENRC.

172.6. In January 2013, Dechert and Mr Gerrard wrongly advised ENRC to provide the draft Kazakhstan report to the SFO without successfully obtaining from the SFO any protection of ENRC's privilege or any limitations on the subsequent use to which the SFO could put the information disclosed to it. Upon receipt of the SFO's letter dated 21 January 2013, Dechert and Mr Gerrard should have advised ENRC to refuse to provide the draft report absent reasonable protections.

173. By each such act or omission, Dechert acted in breach of the implied term (set out at paragraph 50 above). Further or alternatively, Dechert and Mr Gerrard acted negligently. A solicitor with the relevant expertise and qualities exercising reasonable skill and care would have given appropriate advice to ENRC on the protection of its documents and privilege and would have taken prompt steps to obtain an appropriate degree of protection from the SFO before the provision by ENRC of any information to the SFO.

**(7) Unnecessary expansion of investigation scope**

174. Dechert and Mr Gerrard repeatedly and wrongly expanded the scope of their investigations into ENRC's operations in Kazakhstan and Africa, without any regard for the need for the investigations to be proportionate to the risks and issues faced by ENRC. Dechert's work and/or investigations did not need to be expanded and/or not to the extent so advised, and/or such work expansion was unreasonable. Dechert and Mr Gerrard suggested, without basis, that the SFO "expected" a vast range of matters to be investigated. Dechert and Mr Gerrard continued to investigate and/or re-opened

matters which had been closed, for example possible breaches of sanctions in relation to which the SFO had stated it was satisfied.

175. In light of the matters pleaded in paragraphs 56, 57, and 58 above and the obvious disproportionality of, in particular, the Kazakhstan investigation, it is to be inferred that the scope of Dechert's investigations was wrongly expanded in order to generate the opportunity for Dechert to do more work and charge more fees. In these circumstances, by each such act or omission:

175.1. Dechert and Mr Gerrard acted in breach of their fiduciary duties. The fact and effect of the wrong advice was contrary to the best interests of ENRC and/or in the interests of Dechert and/or in the interests of Mr Gerrard personally.

175.2. Dechert acted in breach of the implied term (set out at paragraph 50 above). Further or alternatively, Dechert and Mr Gerrard acted negligently. A solicitor with the relevant expertise and qualities exercising reasonable skill and care would not have given wrong advice in the respect alleged.

**Reckless nature of the breaches**

176. Dechert's and Mr Gerrard's actions had the effect of serving their own interests in generating significantly higher fees and were obviously detrimental to ENRC's interests (including causing the loss particularised below). In the circumstances, it is to be inferred that Dechert and Mr Gerrard acted recklessly in breach of their duties so as to generate grossly excessive fees for Dechert. Pending disclosure, the best particulars which ENRC can currently give as to facts and matters from which it should be inferred that Mr Gerrard and (through him) Dechert acted recklessly are as follows:

176.1. Given Mr Gerrard's apparent knowledge and experience (as pleaded at paragraph 15 above), he would have been very familiar with the legal and regulatory context in which he was working (including as set out at paragraphs 17 to 29 above). Indeed, by way of example, by his email dated 11 April 2011 Mr Gerrard demonstrated his knowledge that the BA had no effect prior to 1 July 2011. In those circumstances, his breaches of duty were so numerous, so serious and so

sustained that they are most unlikely to have arisen from mere error of judgement on his part.

176.2. The disclosures made by Mr Gerrard to the SFO (including as set out at paragraph 156 above) were: (a) made covertly and without the knowledge or approval of ENRC; (b) made frequently over a sustained period; and (c) damaging to ENRC's interests or disparaging of ENRC in content.

176.3. The threats made by Mr Gerrard of a SFO raid, particularly in 2011 and the first half of 2012 (including as set out at paragraphs 58, 63, and 88 above), were (a) not a proper reflection of the true level of risk, as Mr Gerrard must have known; (b) made frequently and in an exaggerated fashion; and (c) strategically deployed to exert pressure on ENRC to agree to Mr Gerrard's recommendations.

176.4. Mr Gerrard's dealings with and comments about ENRC's other professional advisors who questioned the scope of Dechert's investigations (including as set out at paragraphs 87, 89, 101 and 143 above) were (a) unwarranted attacks or criticisms; (b) calculated to dismiss any challenge (however reasonable) to Mr Gerrard's own judgements or decision making.

176.5. Mr Gerrard's expansion of the scope of investigation (including as set out at paragraphs 96 and 139 above) was (a) far beyond any proportionate and/or reasonable investigation; and (b) far beyond the scope of an investigation that would have been advised by a solicitor acting in the interests of ENRC.

177. ENRC relies upon Mr Gerrard's deliberate leaking of privileged and confidential documents to the press in early August 2011. In so far as Mr Gerrard had any other unauthorised communications directly and/or indirectly with any third parties, in particular with any media representatives, in relation to his investigations into ENRC which were contrary to ENRC's interests, ENRC will rely upon such communications as further particulars of Mr Gerrard's wrongful conduct.  Pending disclosure, ENRC reserves its position in relation to the foregoing. and more particularly in relation to whether It is to be inferred from his conduct in early August 2011 that Mr Gerrard was responsible for the leak which led to the damaging articles published in The Sunday

Times on 11 December 2011 and in the Financial Times on 14 March 2013 ~~or~~ and any other relevant articles~~, two other examples of which are pleaded above~~.

178. By their acts and omissions, summarised above and particularised below, Dechert and Mr Gerrard acted in breach of and/or recklessly disregarded the professional obligations owed by each of them to ENRC.  Dechert and Mr Gerrard:

  178.1.  Failed to achieve the "Client care" outcomes: they did not treat ENRC fairly; they failed to protect ENRC's interests; they provided a service which was not competent, not delivered in a timely manner and which did not take account of ENRC's needs and circumstances; and they failed to ensure that ENRC were in a position to make informed decisions about the investigation work properly required by the SFO and the options available to ENRC.  Such failures were or should have been obvious to Dechert and Mr Gerrard.

  178.2.  Failed to achieve the "Conflicts of interest" outcomes: there is no evidence that they had in place systems and controls to identify and assess potential conflicts of interest; they failed to assess whether Mr Gerrard's ability to act in the best interests of ENRC was impaired by his financial interest in generating fees for Dechert; and they omitted to cease acting when such an 'own interest conflict' arose.  Such failures were or should have been obvious to Dechert and Mr Gerrard.

  178.3.  Failed to achieve the "Confidentiality and disclosure" outcomes: they repeatedly failed to keep the affairs of ENRC confidential, by making unauthorised and damaging disclosures to, amongst others, the SFO. Such failures were or should have been obvious to Dechert and Mr Gerrard.

## CAUSATION, LOSS AND DAMAGE

179. Dechert's and Mr Gerrard's breaches of duty identified above caused ENRC loss and damage.  The first three heads of loss identified below were a result of the investigation carried out by or under the control of Dechert being far more extensive than was reasonable in the circumstances.  All seven categories of breach identified above caused

the SFO to have wider or more serious concerns than was appropriate and/or caused ENRC to sanction more extensive enquiries than were required, which in turn caused or permitted the ever widening investigation. The fourth head of loss arises out of the sixth category of breach identified above, namely failure to protect ENRC's privilege.

**(1) Unnecessary legal fees**

180. Dechert's and Mr Gerrard's investigations were of greater length and/or complexity than was necessary and/or otherwise required. The vast majority of the fees paid by ENRC to Dechert in respect of work done in the period September 2011 to March 2013 were unnecessary. But for Dechert's and Mr Gerrard's breaches of duty, the work undertaken by Dechert and Mr Gerrard for ENRC would have been much more limited. In particular:

    180.1. Had Dechert and Mr Gerrard not breached their duties as set out above, then ENRC would not have agreed to enter into the process with the SFO as advised by Dechert and Mr Gerrard. Instead, ENRC would have sought to limit, so far as possible, the extent of work promised to the SFO to prospective work to: (a) improve ENRC's systems and controls; and/or (b) the completion of FRA's books and records review in Africa; and/or (c) a limited review of the due diligence associated with the Camrose and CAMEC acquisitions, to involve interviews with professional advisers, members of the board and senior management.

    180.2. Further or alternatively, had Dechert and Mr Gerrard not breached their duties as set out above, they would not have continued investigations in Kazakhstan beyond October 2011.

181. ENRC claims as damages for breach of contract (against Dechert) and/or negligence (against Dechert and Mr Gerrard) unnecessary legal fees paid to Dechert. Such damages are in an amount to be assessed. In calculating its loss and damage arising from unnecessary payments to Dechert, ENRC will give credit, in a sum to be assessed, for payments which it would have made for investigatory work in the relevant period by a firm of solicitors which acted with the care and skill reasonably expected of a firm

of solicitors having the specialist expertise and qualities set out in paragraph 15 above (the "Necessary Work").

182. Alternatively ENRC claims equitable compensation for breach of fiduciary duty (against Dechert and Mr Gerrard) in respect of unnecessary legal fees paid to Dechert.

183. In the further alternative, ENRC seeks a declaration that: Due to the breach of its contractual, tortious and fiduciary duties to ENRC, Dechert's entitlement to charge ENRC in respect of the period September 2011 to March 2013 was limited to such reasonable fees as it would have incurred in carrying out the Necessary Work.

**(2) Unnecessary third party fees**

184. ENRC had to engage third party law firms and/or other third party professional advisers to advise and assist on matters concerned with Dechert's wrongful conduct of its investigation (during the Retainer). Such law firms and advisers included Addleshaw Goddard, Arent Fox, Bridge2, Deloitte, FRA, Herbert Smith, Jones Day, KPMG, PwC, and The Risk Advisory Group, to whom ENRC paid very substantial fees. But for Dechert's and Mr Gerrard's breaches of duty, ENRC would not otherwise have incurred such fees and costs and/or not incurred them to the same extent because ENRC would not have engaged such third party advisers and/or the work and advice of such third party advisers would have been more limited in scope and duration.

185. ENRC claims as damages for breach of contract (against Dechert) and/or negligence (against Dechert and Mr Gerrard) unnecessary third party fees, in an amount to be assessed. The best estimate that ENRC is presently able to give as to the amount of such unnecessary third party fees is at least £10 million.

186. Alternatively ENRC claims equitable compensation for breach of fiduciary duty (against Dechert and Mr Gerrard) in respect of unnecessary third party fees.

**(3) Lost management and employee time**

187. Dechert's and Mr Gerrard's breaches caused significant disruption and/or delay to ENRC's business. In particular, ENRC's management and/or employees lost and/or wasted valuable time and work responding to and/or otherwise engaging with Dechert and Mr Gerrard (acing in breach of duty), including investigating and mitigating the effects of the problems caused by Dechert and Mr Gerrard. As a result, ENRC's management and/or employees were diverted from their normal work duties and/or diverted their work time which would otherwise have been spent on developing and/or promoting ENRC and/or the ENRC business and/or generating revenue for ENRC.

188. ENRC claims as damages for breach of contract (against Dechert) and/or negligence (against Dechert and Mr Gerrard) the value of wasted management and employee time, in an amount to be assessed.

189. Alternatively ENRC claims equitable compensation for breach of fiduciary duty (against Dechert and Mr Gerrard) in respect of the value of wasted management and employee time.

**(4) Legal costs in connection with SFO proceedings**

190. Dechert's and Mr Gerrard's failure to seek or agree terms of reference with the SFO has caused ENRC to become embroiled in litigation with the SFO about the status of various documents. The claim and appeal described in paragraph 152 above could have been avoided if ENRC had been properly advised and represented in relation to its dealings with the SFO. In particular, the dispute would not have arisen if Dechert had, at the outset, sought the SFO's agreement as to what information and documents would be provided by ENRC to the SFO during and at the end of ENRC's investigations, as to whether such information and documents would be commonly understood by ENRC and SFO as attracting privilege and as to whether, and if so when and to what extent, ENRC would be treated as having waived any such privilege.

191. ENRC claims as damages for breach of contract (against Dechert) and/or negligence (against Dechert and Mr Gerrard) such costs as ENRC may ultimately have to bear in connection with the SFO's claim, which could have been avoided by an early agreement to terms of reference.

**INTEREST**

192.  ENRC borrowed on commercial terms the money from which it drew the funds spent on unnecessary legal fees and unnecessary third party fees.  ENRC paid interest at a rate of at least 6.1% per annum on such borrowing. ENRC claims compound interest at such rate, either as damages at common law or by way of equitable remedy.

193.  Further, and in any event, ENRC is entitled to and claims simple interest upon such sums as are awarded to it, pursuant to the inherent jurisdiction of the Court and/or section 35A of the Senior Courts Act, at such rate(s) and over such period(s) as the Court thinks fit.

AND THE CLAIMANT CLAIMS:

(1) Damages as aforesaid;

(2) Further or alternatively, equitable compensation to be assessed;

(3) Further or alternatively, declaratory relief;

(4) Interest as aforesaid;

(5) Costs; and

(6) Such further and other relief as the Court considers fit.

Laurence Rabinowitz QC

Anna Boase

Emma Jones

**Statement of Truth**

I believe that the facts stated in these Amended Particulars of Claim are true.

I am authorised to sign these Amended Particulars of Claim on behalf of the Claimant.

Full name:  Felix Vulis

Position:  Director

Signed:

Dated:  May 17, 2018