# Exhibit 5

<u>**Claim No. BL-2019-001377**</u>

<u>**IN THE HIGH COURT OF JUSTICE**</u>
<u>**BUSINESS & PROPERTY COURTS OF ENGLAND & WALES**</u>
<u>**BUSINESS LIST (ChD)**</u>
**B E T W E E N :**

**EURASIAN NATURAL RESOURCES CORPORATION LIMITED**

<u>**Claimant**</u>

**- and -**

**AKE-JEAN QAJYGELDIN**
**(f.k.a. AKEZHAN KAZHEGELDIN)**

<u>**Defendant**</u>

_____

<u>**AMENDED PARTICULARS OF CLAIM**</u>

<u>**under CPR rule 17.1(2)(a)**</u>

_____

**A.  PARTIES**

**(i) The Claimant**

1.      The Claimant is a private limited company incorporated in England (Company Number 06023510) with its registered office address at 5th Floor, 6 St Andrew Street, London, EC4A 3AE. At all material times, the Claimant was the parent company of a diversified natural resources group consisting of numerous subsidiaries and associated entities operating on an international scale (collectively the **"ENRC Group"**). In addition to extensive mining interests which are operated in Kazakhstan and Africa, the ENRC Group also maintains substantial integrated energy, processing and logistics operations.

2.      Between 12 December 2007 and 25 November 2013 (when it was delisted), shares in ENRC (then a public limited company) were admitted to trading on the Main Market of the London Stock Exchange. ENRC was a constituent of the FTSE 100 from 12 March 2008.

1

3.　　The ultimate majority owners of ENRC Group are three businessmen and investors, with connections to Kazakhstan: Alexander Mashkevich, Patokh Chodiev and Alijan Ibragimov. During the time when shares in the Claimant were publicly traded, Messrs Mashkevich, Chodiev and Ibragimov held, collectively, the largest minority shareholding in the Claimant.

4.　　The Claimant is and was at all material times the owner of information of a confidential character concerning the business activities, management and ownership of the ENRC Group, as more fully described in Paragraph 32 below.

**(ii) The Defendant**

5.　　The Defendant is a Kazakh national, who is ordinarily domiciled and resident at 25 Wilton Street, London, SW1X 7AX.

6.　　He served in the former Soviet Union as an officer of the intelligence services (KGB) before embarking on a political career and serving as the Prime Minister of Kazakhstan between October 1994 and October 1997. He also has, or previously had, various business interests in Kazakhstan.

7.　　After his time in office, the Defendant formed the Republican People's Party of Kazakhstan in opposition to the regime of the then President of Kazakhstan, Nursultan Nazarbayev, who was in power from 24 April 1990 to 20 March 2019. The Defendant was later accused of various offences, including embezzlement, tax evasion, money laundering and abuse of office. He fled Kazakhstan in or around 1999 and was tried, in absentia, in 2002.

8.　　The Defendant remains politically active and has been a vocal opponent of the regime of former President Nazarbayev. To this end, through his political and business connections in Kazakhstan, the Defendant has worked on behalf of various individuals - including politicians, influential businesspeople and the Kazakh governmental agencies - who share a political and/or commercial interest in damaging his opponents, including the Claimant or its ultimate owners, Messrs Mashkevich, Chodiev, and Ibragimov.

**B. SUMMARY**

9.　　As set out below, over a substantial period of time from ~~2012~~ at least 2010 onwards, the Defendant was a focal point for the exchange in England, the US and Kazakhstan of unlawfully obtained, confidential and, in some instances, legally privileged information belonging to the Claimant and concerning the Claimant, ENRC Group more widely, or its owners. On the pretext of acting as the political opposition in Kazakhstan, the Defendant in fact acted (and continues to act~~.~~) to this day) with the objective, directly or through intermediaries, of disseminating such information to political or business adversaries of ENRC Group or its owners, and/or to the authorities in UK (such as the Serious Fraud Office **"SFO"**), Kazakhstan, or elsewhere with the goal of damaging and destabilising the Claimant. During the period in question, the Defendant

often met with representatives of commercial interests opposed to ENRC Group and governmental agency contacts to pass on information.

10. As further outlined in Paragraphs 12 to 30 below, the Defendant intentionally took steps to acquire a large quantity of confidential information belonging to the Claimant, in the form of documents and data which had been copied from the Claimant's IT systems without its knowledge or authorisation.

(a) The Defendant acquired the said information, knowing it to be confidential, from at least two sources: (i) Robert Trevelyan, a computer forensics expert, who was responsible for the original unauthorised copying and retention of the Claimant's data containing the confidential information; and (ii) Mark Hollingsworth, who received the Claimant's data containing the confidential information from, among others, Mr Trevelyan and Philip Van Niekerk (the source of the latter's information was the SFO, as alleged in the Claimant's application seeking an Order of the US District Court for the District of Maryland pursuant to 28 U.S.C. § 1782 to take discovery from Mr Van Niekerk in support of other proceedings in this jurisdiction).

(b) Amongst other information, in 2012 or 2013 the Defendant obtained a hard disk containing electronic documents and emails which had been returned by Mr Trevelyan running keyword searches across the Claimant's data which he had acquired and unlawfully retained (and which included a ~~complete copy of the contents of~~ large quantity of data extracted from the Claimant's London and Zurich email servers, emails and documents from the computer of a member of its senior management, and a copy of a hard disk belonging to the personal assistant to another senior manager, which contained over 40,000 documents, including 13,000 emails).

(c) The Defendant subsequently disclosed this and other confidential information belonging to the Claimant to third parties, by providing them with copies of data or documents containing such information, or by disclosing the informational content of those data and documents. On occasions, the Defendant and Mr Trevelyan received substantial remuneration for doing so, including a payment of US$50,000 for disclosing the hard disk referred to above (or a copy of the contents thereof) to an unidentified 'client' who, there is reason to infer, was at the time engaged in a legal dispute with the Claimant's affiliates.

(d) The Claimant does not presently know the identity of all the persons or entities to whom its confidential information was disclosed, directly or indirectly by the Defendant, or the ways in which those recipients used such information. However, the Claimant has grounds to infer that such disclosure included the Defendant passing unlawfully obtained and in some instances legally privileged information to *inter alia*: (i) litigation opponents

of ENRC Group companies; and (ii) the SFO, in both instances in order to damage the Claimant reputationally and financially.

(e) The Claimant is also challenging the basis for the SFO investigation and the manner in which it was conducted on other grounds, in separate legal proceedings before this court (Claim No. BL-2019-000613).

## C. THE DEFENDANT'S MISAPPROPRIATION OF THE CLAIMANT'S CONFIDENTIAL INFORMATION

11. Pending disclosure and the provision of further information in this action, the Claimant does not know and cannot particularise the full extent or precise nature of the confidential information which the Defendant was able to obtain in respect of its affairs, or the use to which he, and those to whom he disclosed it, subsequently put the same. Without prejudice to the constraints imposed by this reality, the best particulars which the Claimant can presently give as to the confidential information which the Defendant has misappropriated are as set out below.

**(i) Acquisition of data and information from Robert Trevelyan**

12. Between approximately 2007 and 2011, Mr Trevelyan was repeatedly engaged on behalf of the Claimant in connection with a number of IT security and forensic data collection projects. Mr Trevelyan primarily provided his services to the Claimant through a company (**"Cyntel"**), which he founded in mid-2008. In each case, Mr Trevelyan was granted access to the ENRC Group's premises and/or IT systems (or parts thereof) for this work and, in some instances, was permitted to make copies of certain data stored within those IT systems for the limited purposes of carrying out testing or other analysis.

13. In 2007, Mr Trevelyan was engaged to conduct a security penetration test ('pentest') on the Claimant's IT systems in order to identify security weaknesses. As part of this exercise:

(a) Mr Trevelyan and his colleagues conducted a search of employees' desks in the Claimant's London office premises, in the course of which Mr Trevelyan made a copy of the contents of an external hard drive found on the desk of the personal assistant to a member of the Claimant's senior management. The hard drive contained approximately 40,000 files, including around 13,000 of the Claimant's internal emails from around the time of its December 2007 IPO (the **"PA Data"**).

(b) Mr Trevelyan gained unauthorised access to the computer of a senior manager of International Mineral Resources BV (**"IMR"**) and made copies of various files, including emails sent to and by that senior manager (the **"IMR data"**).

14.    In or around 2008, Mr Trevelyan was engaged, through Cyntel, to investigate the suspected misappropriation of the Claimant's electronic data by two former employees of the Claimant's IT department, shortly after they left the Claimant to join a competitor (the **"IT Employee Data"**).

15.    From January 2011 onwards, Mr Trevelyan was engaged, through Cyntel, to assist with the collection of data for the purposes of an internal investigation (the **"Internal Investigation"**), conducted under the supervision of the Claimant's external legal counsel—initially DLA Piper LLP and later Dechert LLP, and led in each case by Neil Gerrard, a partner in both firms. The investigation was initially prompted by the Claimant's receipt on 20 December 2010 of an email purportedly sent by a 'whistle-blower', making allegations of wrongdoing by employees and managers at one of the Claimant's subsidiaries in Kazakhstan, JSC Sokolov-Sarybai Mining Production Association (also referred to as SSGPO). To this end:

   (a)    In January 2011, ~~Mr Trevelyan~~ Cyntel carried out the forensic imaging of computer servers in the Claimant's London and Zurich office premises;

   (b)    On 31 May 2011, Mr Trevelyan travelled to Kazakhstan with Mr Gerrard, where he undertook the forensic imaging of a further 58 desktop computers used by employees of SSGPO.

   (c)    In 2011 or 2012, ~~Mr Trevelyan~~ Cyntel repeated the imaging of the Claimant's London and Zurich servers, to address deficiencies in the January 2011 data collection process, which had resulted in 'archived' data being omitted.

16.    The data obtained by Mr Trevelyan and Cyntel from these three collection exercises, before processing amounting to some 15TB, was made available to the Claimant's legal counsel in connection with the Internal Investigation (the **"Investigation Data"**).

17.    From November 2011, Mr Trevelyan was engaged, through Cyntel, to assist the Claimant with an internal audit relating to a forensic investigation into allegations regarding misappropriation of funds. In the course of this work, Mr Trevelyan and his colleagues engaged local consultants to make ~~made~~ forensic images of a large number of USB hard drives in the Claimant's office premises in Moscow, Russia (the **"Audit Data"**).

18.    In each case, without ENRC's knowledge or authorisation, Mr Trevelyan retained a copy of the PA Data, the IMR Data, the IT Employee Data, the Investigation Data and the Audit Data (collectively, the **"ENRC Dataset"**) after his work on the mandate in question had come to an end.

*The Defendant's relationship with Mr Trevelyan*

19.    Mr Trevelyan was first introduced to the Defendant by a mutual acquaintance, Mr Ambrose Carey, a Director at the private intelligence firm, Alaco Limited.

20. Some time later, Mr Trevelyan told the Defendant about his work for the Claimant, as described at Paragraphs 12 to 18 above, and his consequential access to confidential information relating to the affairs of the Claimant and its owners in the form of a large quantity of electronic data relating to the Claimant (*i.e.* the ENRC Dataset, as then constituted).

21. In or around 2012 or 2013, the Defendant met Mr Trevelyan in London and asked Mr Trevelyan to access the ENRC Dataset and provide him with documents that were responsive to a list of search terms, so that the Defendant could, in turn, provide them to an unnamed 'client'. The Defendant negotiated a fee of US$50,000 with his 'client' for providing the documents, which he and Mr Trevelyan agreed that they would share, with Mr Trevelyan receiving US$40,000 and the Defendant retaining US$10,000.

22. The Defendant subsequently gave Mr Trevelyan a piece of paper with between 20 and 50 search terms printed on it. The search terms primarily related to the Claimant's mining operations. Mr Trevelyan subsequently used those keywords to search the ENRC Dataset via an electronic data analysis and review platform.

23. Having undertaken the requested searches, Mr Trevelyan extracted copies of the files which had been identified as a consequence. The documents extracted included email files and their attachments, document files (*e.g.* Word and .PDF files), spreadsheets and compressed archive files (*e.g.* ZIP, .RAR). Mr Trevelyan saved the extracted files within a separate encrypted volume on an external 2.5" USB hard disk drive (the **"AK Disk"**). He also created and saved to the unencrypted portion of the AK Disk a PDF file containing instructions on how to download the necessary software to decrypt the files. Mr Trevelyan placed the AK Disk in a padded envelope and put the password required to decrypt the files on a piece of paper in a second, separate envelope.

24. The envelopes were provided to the Defendant by Mr Trevelyan at a pre-arranged drop at the Washington Hotel on Curzon Street in London. It was intended that the Defendant would provide the first envelope containing the AK Disk to his 'client' and, having received payment, he would then provide the second envelope to enable his 'client' to decrypt and access the files.

25. Shortly afterwards, the Defendant and Mr Trevelyan met for a third time, again in the Washington Hotel, and the Defendant paid Mr Trevelyan the agreed sum of US$40,000 in cash. During a subsequent meeting, the Defendant confirmed to Mr Trevelyan that his client had accessed the AK Disk.

**(ii) Acquisition of information from Mark Hollingsworth**

26. Mark Hollingsworth is and was at the relevant times a London-based intermediary who, for at least the past 15 years, has relied on work in the private intelligence field as his primary source of income. A primary focus of his private intelligence work has been Kazakhstan.

27.    In 2012 Between at least 2010 and 2015 2013, the Defendant and Mr Hollingsworth met and communicated very frequently about the Claimant, its subsidiaries, and its owners (who Mr Hollingsworth referred to as the "*Trio*"). On several occasions, Mr Trevelyan provided documents and data extracted from the ENRC Dataset, including by way of keyword searches, to Mr Hollingsworth, including in response to specific requests and instructions emanating from the Defendant.

28.    Notwithstanding the constraints on the Claimant's ability to account for and particularise the same, it is apparent that the Defendant used Mr Hollingsworth in order to obtain a very substantial quantity of confidential information about the Claimant (including privileged information) for himself and on behalf of his clients. Those disclosures took place as part of a concerted project which the Defendant financed and which sought to destabilise and damage the Claimant and its owners. In support of its case in this regard, the Claimant will rely on the following instances where the Defendant acquired confidential information (including privileged communications and documents) about the Claimant and its owners through Mr Hollingsworth.

*Disclosures relating to the Claimant's owners*

28A.    The Defendant met with Mr Hollingsworth on 13 October 2010.  The following day on 14 October 2010, Mr Hollingsworth sent an email to the Defendant forwarding two press releases which had been issued by First Quantum Minerals Limited (**"FQM"**), the parent company of an Anglo-Canadian mining and metals group, in respect of legal proceedings which affiliates of FQM had recently commenced against four British Virgin Islands companies owned by the Claimant.  Mr Hollingsworth remarked that the *"stakes were very high for the Trio"* and that he was looking forward to seeing the Defendant the following Monday at *"the usual place"*. On 18 and 22 October 2010, the Defendant met with Mr Hollingsworth, including it is inferred to discuss the Claimant and its ultimate owners.  Subsequently, on 27 October 2010, Mr Hollingsworth sent an email to the Defendant informing him: *"my contact is compiling more documents on the three entities that you are interested in – The Trio, Mr M and Mr K.  I will collect them by the end of this week* [*i.e.* on 28 or 29 October 2010]*."*  Mr Hollingsworth proposed a meeting with the Defendant on the day after he had collected these additional documents and the Defendant met with Mr Hollingsworth on 28 October 2010. In the circumstances, it is inferred that:

(a)    Mr Hollingsworth's *"contact"* in respect of this project was Mr Trevelyan and the documents which Mr Trevelyan was compiling had been, and were being, obtained, in whole or in part, from the ENRC Dataset, as it stood at that time.

(b)    Mr Hollingsworth had disclosed documents and information which he had obtained from Mr Trevelyan about the Claimant and its ultimate owners to the Defendant at their meetings on 18 and/or 22 October 2010 and/or at or around the same time (hence the

reference in Mr Hollingsworth's email of 27 October 2010 to the fact that Mr Trevelyan was in the process of compiling *"more"* documents).

(c)   Either at these meetings on 18 and/or 22 October 2010 or shortly thereafter, the Defendant made a number of further requests for confidential documents about the Claimant and its ultimate owners.

(d)   These additional documents were disclosed to the Defendant either at the meeting on 28 October 2010 or shortly thereafter.

29.   Mr Hollingsworth and the Defendant met on ~~16~~ 19 and 20 April 2011 ~~2012~~. Shortly afterwards, on 22 April 2011 ~~2012~~, Mr Hollingsworth emailed the Defendant promising (apparently in response to a request raised by the Defendant) to "*talk to my contact about the material on Alexander M*[ashkevich] *and Trio and… and ensure that the documents and files are still available for you*". On 26 April 2011 ~~2012~~, Mr Hollingsworth sent another email to the Defendant stating: "*…please keep me informed on any interest in the material on Trio and Alexander M*" (a remark which suggests that the Defendant was now actively looking for third-parties who might have an interest in receiving and using the acquired information about the Claimant's owners). It is inferred that Mr Hollingsworth's "*contact*" was Mr Trevelyan and that the *"material"* and *"documents and files"* to which he referred contained confidential information which Mr Hollingsworth had asked Mr Trevelyan to obtain from the ENRC Dataset and/or from his ongoing access to the Claimant and its IT systems.

29A.  On 28 July 2011, the Defendant met with Mr Hollingsworth at 9.00am.  Later that afternoon, Mr Hollingsworth sent an email to the Defendant attaching his "*proposal on the Trio*" (*i.e.* a proposal for a new project which the Defendant and Mr Hollingsworth had discussed, pursuant to which Mr Hollingsworth intended to obtain and disclose confidential information to the Defendant about the affairs of the Claimant's ultimate owners).  The document attached to this email set out a number of *"highlights"* in which Mr Hollingsworth summarised some of the confidential and privileged information relating to the Claimant and its owners which was in his possession and in relation to which he promised that he had "*masses of detail*" available for further disclosure to the Defendant.

*Disclosures to, and about, the SFO investigation*

30.   From at least April 2012 onwards, Mr Hollingsworth also obtained information regarding the SFO's threatened investigation into the Claimant's business affairs, including details of highly confidential communications between the SFO and the Claimant or its representatives about the status of that investigation, as well as the steps being taken by the Claimant's management in response to that investigation and, it may reasonably be inferred, privileged legal advice which the Claimant had received from its lawyers in respect of the same.

(a)    Given the Defendant's substantial interest in the SFO's pursuit of an investigation into the Claimant, it is inferred that Mr Hollingsworth passed information concerning the same to him at meetings which they arranged on 16 April or 25 April 2012, including copies or details of the communications and legal advice referred to above.

(b)    In addition, following a further meeting between the Defendant and Mr Hollingsworth on 20 May 2012, Mr Hollingsworth met Mr Trevelyan on both the following day and on 23 May 2012 to discuss the confidential SFO investigation. Again it is inferred that the Defendant requested that Mr Hollingsworth seek to obtain information and/or documents regarding or relating to the said investigation and that information and documents which were acquired as a consequence from Mr Trevelyan were relayed to the Defendant at a further meeting which he and Mr Hollingsworth arranged three days later on 26 May 2012.

(c)    On 16 July 2013, Mr Hollingsworth sought to contact the Defendant regarding an "*SFO chart on Trio* [*i.e.* the Claimant's owners] *property*". It is to be inferred that this chart was prepared by Mr Hollingsworth and requested by the Defendant, with the intention that he would provide it to the SFO; alternatively, that Mr Hollingsworth had in his possession an "*SFO chart*", concerning property belonging to the Claimant's owners, which he intended to provide to the Defendant. In either case, it is reasonably inferred that other documents and information concerning the Claimant or its owners would likewise have been passed amongst Mr Hollingsworth, the Defendant and the SFO.

## D. THE CONFIDENTIAL NATURE OF THE INFORMATION OBTAINED BY THE DEFENDANT AND HIS AWARENESS OF THE SAME

31.    Notwithstanding the constraints referred to at Paragraph 16 above, it is evident that a very substantial proportion of the information and material obtained by the Defendant (including that acquired from Mr Trevelyan and Mr Hollingsworth in the circumstances described above) would have contained confidential and legally privileged information belonging to and/or relating to the Claimant and its affairs (**"ENRC Confidential and Privileged Information"**). Further, the Defendant (or a reasonable person in his position) must have known the same and appreciated that he was under an equitable duty to keep that information confidential and not to misuse it. A reasonable person in the position of the Defendant would have realised, and the Defendant did in fact know that the information was confidential and/or had been acquired by Mr Trevelyan and Mr Hollingsworth in circumstances imposing upon him a duty of confidence. The Defendant was accordingly subject to a duty to maintain that confidence and not to receive, retain, disclose or make any use of that information.

32.    In support of its case that the ENRC Confidential and Privileged Information had the necessary quality of confidence and was imparted in circumstances which imposed an equitable duty of confidence on the Defendant, the Claimant will rely on the following facts and matters:

(a)    The ENRC Dataset (and the information and documents which were obtained from it, including the AK Disk and the information separately obtained from Mr Trevelyan by Mr Hollingsworth) was comprised of information contained in data and documents of an inherently confidential nature:

    (i)    Internal emails and communications between <u>directors,</u> officers, employees and agents of the Claimant;

    (ii)    Personal emails of ENRC employees and officers;

    (iii)    External emails and communications between officers, employees and agents of the Claimant and third-parties, including the Claimant's business associates (such as its suppliers, customers, contractors, prospective and actual business partners), banks and professional advisors (including its lawyers, accountants, auditors);

    (iv)    Electronic documents in various formats (such as word processing files, .PDF documents, spreadsheets, presentations, images etc), concerning sensitive commercial, financial and management data about the business affairs and transactions of the Claimant and its subsidiaries. By way of example only, these documents would likely have included:

- Financial statements, records and agreements;

- Business analysis and strategy reports;

- Internal memos;

- Internal audits;

- Due diligence and compliance reports;

- Documents generated in respect of existing and prospective transactions, purchases and sales;

- Minutes and records of Board meetings and communications;

- Communications with relevant regulators;

- Documents generated in the course of ongoing or anticipated legal proceedings and/or containing legal advice received by ENRC and its subsidiaries from its legal advisors, including in respect of the ongoing SFO investigation.

(b)   As is apparent from the lengths to which the Defendant was prepared to go in order to acquire them, the overwhelming majority of the documents and information which the Defendant acquired were not publicly available but were stored securely on the Claimant's premises and IT systems and could not lawfully be accessed, other than by persons authorised to do so by the Claimant. Even amongst ENRC Group employees and officers, such persons were only able to access a subset of the material comprised in the ENRC Dataset, relevant to their respective roles - for instance, their own corporate email accounts, their computers' local hard disks, and portions of certain shared drives.

(c)   Mr Trevelyan's retention of the ENRC Dataset after his mandated work was completed was manifestly improper, a fact which would have been obvious to any reasonable person. The Defendant therefore knew that the vast majority of the documents and information which he received from Mr Trevelyan and Mr Hollingsworth had been obtained unlawfully, including in clear breach of the terms of Mr Trevelyan's engagement with the Claimant.

(d)   On several occasions, Mr Hollingsworth in particular referred openly to the private, sensitive and/or confidential nature of documents which he had obtained for the Defendant (presumably because he recognised that such information was what the Defendant and his clients were hoping to acquire and because, in their eyes, such information was more commercially valuable).

(d)(e)   The confidential nature of the information, and the fact that it was unavailable through other channels, is further evidenced by its substantial monetary value to the Defendant and its ultimate recipients. By way of example:

(i)    The Defendant and Mr Trevelyan received US$50,000 for the AK Disk, as set out at Paragraph 21 above.

(ii)   Meetings which took place between Mr Hollingsworth and the Defendant in December 2012 regarding obtaining information about the Claimant's owners, also involved also discussions between the pair about budgets and fees for recent and anticipated work on their Kazakh project.

(iii)  The sum of €2,000 which Mr Hollingsworth required the Defendant's client to pay for the confidential information about the SFO's investigation into the Claimant at Paragraph 40(d) below.

(e)(f)   In light of the circumstances in which the Defendant sought to obtain communications and documents concerning the Defendant Claimant or its owners (including, in particular, in the context of pending legal proceedings), and the likely subject matter of such material (insofar as presently known to the Claimant), it is reasonably inferred that a substantial proportion of the acquired documents were liable to include information

belonging to the Claimant which was both highly sensitive and confidential and in many instances subject to legal professional privilege (thereby attracting obligations of confidentiality of the highest order and the strictest protections against unauthorised use).

(f)    Information and documents pertaining to the SFO's ongoing engagement with the Claimant, and the Claimant's response to and interactions with the same, was sensitive information in respect of which the SFO owed clear obligations of confidentiality to the Claimant and which the Claimant could reasonably expect would not be disclosed to or acquired by third parties.

32A.  The Defendant knew that the information which he was receiving from Mr Trevelyan and Mr Hollingsworth about the Claimant and its affairs was confidential and accordingly was under an equitable duty to maintain that confidence and not to obtain or otherwise misuse the said information.  The Claimant will rely on the following facts and matters in this regard:

(a)    Mr Trevelyan's retention of the ENRC Dataset, and his willingness to access and search the same at the behest of the Defendant and Mr Hollingsworth, was manifestly improper, a fact which would have been obvious to the Defendant, who therefore knew that the vast majority of the documents and information which he received from Mr Trevelyan and Mr Hollingsworth had been obtained unlawfully, including in clear breach of the terms of Mr Trevelyan's engagement.  Paragraph 20 above is repeated.

(b)    The lengths to which the Defendant was prepared to go in order to obtain the documents and information from Mr Trevelyan and Mr Hollingsworth as set out in Paragraphs 19 – 31 above, including the substantial financial sums which he and/or his clients were required to pay to acquire the same (as to which Paragraphs 21 and 30(d) above are repeated).

(c)    On several occasions, Mr Hollingsworth in particular referred openly to the private, sensitive and/or confidential nature of documents which he had obtained for the Defendant and emphasised that they had been *"leaked"* or otherwise procured without the Claimant's awareness or authorisation (presumably because he recognised that such information was what the Defendant and his clients were hoping to acquire and because, in their eyes, such information was more commercially valuable).

(d)    The Defendant's focus on obtaining confidential communications and documents concerning the involvement of the Claimant and its owners in the context of pending legal proceedings, including the legal proceedings issued by FQM (Paragraph 29A), the SFO's investigation into the Claimant (Paragraph 30) and litigation between the Claimant's related companies and EuroChem (as to which Paragraph 37 below is repeated) meant that it was likely that a proportion of the acquired documents were liable

to include information belonging to the Claimant which was subject to legal professional privilege.

(e)(g) The Defendant took concerted measures to ensure that his appropriation of information and documents about the Claimant, including from Mr Trevelyan and Mr Hollingsworth, remained covert (measures which would have been wholly unnecessary if he had not appreciated the sensitive and confidential status of the information in question). Again by way of example:

(i)     The Defendant dealt with Mr Trevelyan personally, rather than through his company, Cyntel, and its other employees;

(ii)    The Defendant also sought where possible to avoid electronic communications which would create a record of his interactions with Mr Trevelyan and Mr Hollingsworth. For example, the search terms which the Defendant provided to Mr Trevelyan and by which he wished Mr Trevelyan to interrogate the ENRC Dataset, were provided in hard-copy format alone and with a view to them being both untraceable and easily destroyed after the work was complete. The Defendant typically exchanged sensitive information with Mr Trevelyan or Mr Hollingsworth during face-to-face meetings which were arranged by telephone, text message or other erasable instant messaging applications such as WhatsApp, Signal, or Telegram. To the extent that the Defendant communicated with Mr Hollingsworth or Mr Trevelyan by email, he used anonymous webmail accounts (including operaksgb@gmail.com and operabus@gmail.com);

(iii)   Mr Trevelyan encrypted the material which was extracted from the ENRC Dataset and placed on the AK Disk and protected it with a highly secure password, which he gave to the Defendant in a separate envelope.

(f)     The information which the Defendant received from Mr Hollingsworth about the SFO's engagement with the Claimant, and the latter's response to the same, was sensitive information relating to the ongoing progress of a developing investigation by a law enforcement agency which, as the Defendant must have appreciated, could only have been disclosed in clear breach of the Claimant's reasonable expectation that such information would be kept confidential between itself and the SFO.

32B.   Alternatively, in light of the facts and matters set out in Paragraphs 32(a) and 32A above, a reasonable person in the Defendant's position would have appreciated that the information which he received from Mr Trevelyan and Mr Hollingsworth about the Claimant and its affairs was confidential and accordingly he was subject to a duty to maintain that confidence and not to receive, retain, disclose or make any use of that information.

**E. BREACH OF CONFIDENCE / MISUSE**

33.    In the circumstances, the Defendant was and remains under a duty of confidence towards the Claimant in respect of the ENRC Confidential and Privileged Information, and each part thereof, and was not entitled to receive, access or otherwise use or disclose the same.

34.    In breach of the said obligation of confidence, the Defendant misused ENRC's Confidential and Privileged Information by:

    (a)    Obtaining the disclosure of ENRC Confidential and Privileged Information from at least Mr Trevelyan and Mr Hollingsworth without the Claimant's authorisation and despite knowing that the Claimant reasonably expected such material to be confidential (as to which Paragraphs 31 and 32 above are repeated);

    (b)    Further misusing ENRC Confidential and Privileged Information, including by disclosing it to various third-parties for payment, and with a view to obtaining personal, political and/or financial gain for himself and/or those third-parties and/or to cause substantial harm to the Claimant and its owners.

35.    Again, the Claimant does not know (and is accordingly unable fully to particularise) the full extent and precise nature of the Defendant's use of the ENRC Confidential and Privileged Information and will seek further disclosure and further information from the Defendant in this action. Pending such disclosure, however, the best particulars which the Claimant is able to give in support of its case in this regard is set out in Paragraphs 36 – 40 below.

**(i) Known disclosures of the AK Disk**

36.    Very shortly after having received the AK Disk from Mr Trevelyan, the Defendant disclosed the same and the ENRC Confidential and Privileged Information which it contained to an unnamed third-party 'client' in accordance with the terms of the previously agreed deal referred to in Paragraph 21 above. In this regard, the Claimant will rely on the fact that:

    (a)    Approximately one week after Mr Trevelyan provided the AK Disk to the Defendant, the Defendant paid Mr Trevelyan his share (US$40,000) of the agreed fee (paragraph 21, above), which he must have received from his 'client' in return for providing it with the AK Disk.

    (b)    During a subsequent meeting, the Defendant told Mr Trevelyan that his 'client' had accessed the information on the AK Disk.

    (c)    Likewise, the Defendant also received payment in the sum of at least US$10,000 for supplying the AK Disk to the said 'client'.

37.     In addition, in 2012 or 2013, the Defendant provided Rinat Akhmetshin, a Russian-American lobbyist and former Soviet counterintelligence officer with a longstanding record of acting on behalf of political opponents of President Nazarbayev's rule in Kazakhstan, with an external hard disk drive containing document files, emails and data concerning *"Kazakhstan assets"*, *"the Trio"* (*i.e.* the Claimant's owners) and the *"Trio's standing in… Kazakhstan"*. It is inferred that the hard disk that Mr Akhmetshin received from the Defendant was either a copy of the AK Disk itself or, alternatively, another hard disk which contained the same or similar ENRC Confidential and Privileged Information, not least given since 2012, Mr Akhmetshin had been engaged by the law firm Salisbury & Ryan LLP, as a consulting expert in relation to a legal dispute between Salisbury & Ryan LLP's client, EuroChem Volga-Kaliy LLC's (**"ECVK"**) and the Claimant's related companies IMR and Shaft Sinkers (Pty) Limited which had arisen over a drilling contract relating to a potash mining project in Russia. ECVK is an affiliate of EuroChem Group, a vertically integrated agricultural and fertilizer business in Russia.

38.     Moreover, as the Defendant knew and intended would occur given the nature of Mr Akhmetshin's clients and political affiliations and Mr Akhmetshin's wider involvement in the Defendant's ongoing project to destabilise and harm the Claimant and its owners (as to which Paragraph 37 above is repeated), Mr Akhmetshin subsequently disclosed the ENRC Confidential and Privileged Information which he had received from the Defendant to other third-parties, including Barukh Halpert, the principal of Sapir Capital, an Israeli firm, which is or was previously an investor in EuroChem Group, and to whom Mr Akhmetshin disclosed a hard disk containing such information at a meeting in London on 30 January 2014.

**(ii)  Suspected further misuse by the Defendant**

39.     Further, it is reasonably inferred that the Defendant and/or persons acting on his behalf have unlawfully disclosed ENRC Confidential and Privileged Information on numerous occasions to other third parties with a view to furthering the interests of those third parties and/or to damage the Claimant's own interests, causing substantial harm and damage to the Claimant's business and reputation.  The Claimant will rely on the facts and matters set out below as justifying an order that the Defendant should disclose to the Claimant what he has done with the ENRC Confidential and Privileged Information, by identifying those persons to whom he has disclosed it and any other use that he has made thereof.

40.     In this context, the Claimant has reason to suspect that the Defendant may have disclosed ENRC Confidential and Privileged Information to at least the following individuals or organisations with the ultimate aim of damaging the Claimant:

(a)     ***Contacts within the Kazakhstan government***, with whom it is known that the Defendant was in close and frequent contact throughout the relevant period, thereby exposing other individuals who were sympathetic to the Defendant's political and

commercial agenda in Kazakhstan to the ENRC Confidential and Privileged Information to which the Defendant and Mr Trevelyan had access.

(b)    **The United Kingdom's Serious Fraud Office**, which opened its formal investigation into the Claimant in 2013 and to which it is to be inferred the Defendant passed confidential information, with a view to inciting the SFO to instigate or pursue the investigation and so cause damage to the Claimant. At the relevant times, the SFO's investigation was handled principally by, Richard (Dick) Gould and John Gibson, among others. The former subsequently moved from the SFO to work for the UK National Crime Agency. It is reasonably inferred that Mr Gould or Mr Gibson would have utilised the said confidential information in the course of their work. In this regard, the Claimant will rely on:

(i)    The Defendant's keen interest in the course and progress of the SFO investigation into the Claimant, as evidenced by the frequency with which he raised the SFO with Mr Hollingsworth and the communication between them of documents such as the *"SFO chart on Trio property"*;

(ii)    The work (including remunerated work) which the Defendant is known to have undertaken for third-party clients with a similar interest in the outcome of the SFO investigation and in destabilising the Claimant;

(iii)    A key focus of the ENRC Confidential and Privileged Information which the Defendant acquired was concerned to shed light on the circumstances surrounding the Claimant's acquisition of mineral assets in the DRC (an issue which was fundamental to the SFO's ongoing investigations);

(iv)    The close contact between the Defendant and influential actors in the Kazakh government in circumstances where the Kazakh government and state could be expected to share and exchange information on relevant cross-border cases with relevant law enforcement agencies in other jurisdictions, including the UK's SFO.

(c)    **Glenn Simpson**, a principal of the US private intelligence firm Fusion GPS, whose clients include, amongst others, hedge funds and/or other investors with a potential interest in influencing, or predicting movements in, the Claimant's stock price resulting from negative publicity about the company. In particular, Mr Simpson repeatedly sought to obtain information relating to the Claimant its affairs and owners.

(d)    *A further unnamed client of the Defendant, for whose benefit Mr Hollingsworth sent an email to the Defendant on 14 May 2015, attaching a document which Mr Hollingsworth described as pertaining to one of the "projects" which he and the Defendant had discussed earlier that day and which was titled "Highlights – SFO Investigation into ENRC". As the attached document made clear, this project involved*

Mr Hollingsworth preparing a report for the Defendant and his ultimate client which would contain a substantial quantity of confidential information about the Claimant and its interactions with the SFO, including

(i)    *"New and up-to-date inside information"* about the SFO's investigation into the Claimant, including details of the status of the SFO's inquiries in both Kazakhstan and Africa;

(ii)    The identity of a former senior officer or the Claimant who was said to be *"most vulnerable"* as a result of the SFO's investigation;

(iii)    The *"relevance"* of a case in the High Court, in which the Claimant was being sued by a former joint business venture partner, to the SFO's operations against the Claimant;

(iv)    The identity of the *"ENRC operatives who are being targeted by the SFO as part of its Africa investigation".*

Mr Hollingsworth stated that the price for this report would be €2,000 and also alerted the Defendant to a *"second email and attachment"* which he was intending to send later the same evening. The following day on 15 May 2015, Mr Hollingsworth sent a further email to the Defendant in which he asked the Defendant whether he had received *"any response on SFO and Trio"* (it is inferred a reference to the proposal which he had made the previous day and in respect of which the Defendant was in the process of obtaining confirmation from his client to proceed).

**LOSS AND DAMAGE**

41.    By reason of the matters aforesaid, the Claimant has suffered very substantial loss and damage. The Claimant is unable to particularise the nature of the same, pending disclosure and information about the actual nature and extent of the Defendant's use of the ENRC Confidential and Privileged Information. Without prejudice to this, however, the damage and loss sustained by the Claimant will include:

(a)    The costs incurred by the Claimant in investigating the extent, nature and source(s) of the Defendant's breaches of confidence and in attempting to limit the risks and potential liabilities arising as a consequence;

(b)    The costs of dealing with regulatory bodies, business partners, employees, agents, advisors and third-parties in respect of information which has been obtained and/or disclosed by the Defendant;

(c)    The costs occasioned by adverse legal settlements and outcomes which the Claimant was forced to contemplate as a consequence of the Defendant's practice of leaking of confidential and privileged information to a number of its opponents.

42.    The Claimant is entitled to and claims an inquiry into damage and the payment of equitable compensation in respect of such loss and damage. Alternatively, and at the Claimant's sole discretion, the Claimant claims an account of the profits made by the Defendant and an account of such profits.

43.    Further, and unless restrained by this Court, there is a real prospect that the Defendant will continue to misuse ENRC Confidential and Privileged Information, including that which he received from Mr Trevelyan, Mr Hollingsworth or otherwise and including by continuing to disclose it to third parties.

**AND THE CLAIMANT CLAIMS:**

(1) A declaration that the Defendant misused the Claimant's confidential information;

(2) Damages or equitable compensation for misuse of the Claimant's confidential information (alternatively, at the Claimant's option, an account of profits accruing to the Defendant as a result of that misuse);

(3) An injunction to restrain the Defendant, whether acting directly or indirectly, or by his servants, agents or otherwise howsoever, from communicating or disclosing to any third party, copying, or in any way using the ENRC Confidential and Privileged Information or the documents and data which contain that information;

(4) Delivery up by the Defendant confirmed by a statement of truth of all documents and data (whether in hard copy or electronic form) in his possession containing ENRC Confidential and Privileged Information, including the AK Disk and any full or partial copies of the contents thereof, and any other ENRC Confidential Information which he obtained from Mr Trevelyan, Mr Hollingsworth or otherwise;

(5) The provision of a list, verified by a Statement of Truth, detailing the documents which the Defendant has, or has had, in his possession or control containing ENRC Confidential and Privileged Information;

(6) Orders for:

(a) Confirmation, verified by a Statement of Truth, that the Defendant has:

(i)    Ceased using the ENRC Confidential and Privileged Information for any purpose;

(ii)    Deleted any and all the ENRC Confidential and Privileged Information which cannot be subject to the order for delivery up in (4) above.

(b) Information in the form of a witness statement from the Defendant verified by a Statement of Truth:

(i)     Identifying each and every aspect of the ENRC Confidential and Privileged Information which he has, or has had, in his possession and control;

(ii)     Setting out the precise time, nature and format in which each and every aspect of the ENRC Confidential and Privileged Information came into his possession; the person(s) who disclosed the same to him; and the extent to which he remains able to access or otherwise use the relevant aspect of the ENRC Confidential and Privileged Information;

(iii)     Identifying any agent, employee or servant who accessed or otherwise used the ENRC Confidential and Privileged Information and setting out the time and nature of that access; the parts of the ENRC Confidential and Privileged Information which that person(s) accessed; and the objectives and use to which the same person(s) put the ENRC Confidential and Privileged Information;

(iv)     Identifying each and every third party to whom the Defendant disclosed the ENRC Confidential and Privileged Information, or any part thereof; the time, nature and extent of any such disclosure; and the objectives and use to which the third party put the ENRC Confidential and Privileged Information;

(v)     Setting out the steps taken by the Defendant to preserve the security of the parts of the ENRC Confidential and Privileged Information which has been in his possession and control;

(vi)     Specifying any monetary sums or equivalent rewards which he either paid to acquire the ENRC Confidential and Privileged Information (or any part thereof) and/or which he was paid by others to obtain, use or disclose the same.

(7) Such further or other relief or orders as are just in the circumstances.

**DAVID GLEN**

24 July 2019

**PAUL STANLEY QC**

**DAVID GLEN**

5 December 2019

19

**STATEMENT OF TRUTH**

The Claimant believes that the facts stated in these Amended Particulars of Claim are true.

I am duly authorised by the Claimant to sign this Statement.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Felix Vulis

Director, for and on behalf of Eurasian National Resources Corporation Limited

Address for delivery of documents:

Fried, Frank, Harris, Shriver & Jacobson (London) LLP

41 Lothbury

London

EC2R 7HF

UNITED KINGDOM

Attn: Justin Michaelson

Ref: JBM/DKS/5314-1

Claim No. BL-2019-001377

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS & PROPERTY COURTS OF ENGLAND & WALES**
**BUSINESS LIST (ChD)**
**B E T W E E N :**

**EURASIAN NATURAL RESOURCES**
**CORPORATION LIMITED**

**Claimant**

**- and –**

**AKE-JEAN QAJYGELDIN**
**(f.k.a. AKEZHAN KAZHEGELDIN)**

**Defendant**

---

**AMENDED PARTICULARS OF CLAIM**

**under CPR rule 17.1(2)(a)**

---

**Fried, Frank, Harris, Shriver & Jacobson (London) LLP**

41 Lothbury

London

EC2R 7HF

JBM/DKS/5314-1

**Solicitors for Claimant**

2208917