# Exhibit 27

[No. 2]          Coco v. A. N. Clark (Engineers) Ltd.

IN THE HIGH COURT OF JUSTICE—CHANCERY DIVISION

*Before* MR JUSTICE MEGARRY

28th June and 1st July, 1968.

COCO *v.* A. N. CLARK (ENGINEERS) LTD.

5    *Confidential information—Misuse of—Moped engine—Interlocutory injunction— Elements of breach of confidence—No prima facie case of infringement or that information was confidential—Defendants' undertaking to pay royalty into joint account—Interlocutory injunction not appropriate.*

     The plaintiff designed a moped engine and sought the co-operation of the
10 defendants in its manufacture. After the plaintiff had disclosed to the defendants all the details of his design and proposals for its manufacture, the parties fell out and the defendants decided to manufacture their own engine. The plaintiff alleged that the defendants had deliberately broken with him with a view to using his design without compensation, and when the defendants brought out their own design
15 which closely resembled the plaintiff's, he brought a motion for an interlocutory injunction to restrain the defendants from misusing information communicated to them in confidence solely for the purposes of the joint venture. The defendants denied that any confidential information had been supplied to them, or used by them in their engine.

20    *Held*, (1) *that of the three elements essential to a cause of action for breach of confidence, namely* (a) *that the information was of a confidential nature,* (b) *that it was communicated in circumstances importing an obligation of confidence and* (c) *that there was an unauthorised use of the information, only the second condition was satisfied by the plaintiff.*

25    *Saltman Engineering Co. Ltd.* v. *Campbell Engineering Co. Ltd.* (1948) 65 R.P.C. 203 and *Seager* v. *Copydex Ltd.* [1967] R.P.C. 349 followed.

     (2) *That where, as here, the information was communicated allegedly in confidence in the expectation that the plaintiff would receive a monetary reward therefor, it was doubtful whether an injunction against using the information was the
30 appropriate remedy if a dispute occurred.*

     (3) *That the plaintiff had not established a strong prima facie case that the information was confidential in nature, or a prima facie case of infringement, as the evidence adduced by him had failed to reveal that the similarities between the two engines were achieved by the use of the information, or that his engine had original
35 qualities which would amount to confidential information.*

(4) *That unlike the* Terrapin *case, interlocutory relief was not appropriate in the present case as there was no cross-examination of witnesses on the hearing on motion ; the plaintiff's charge of fraud could not be determined on affidavit evidence on motion and the plaintiff's engine was not in production and did not need the same degree of protection.*

*Terrapin* v. *Builders' Supply Co. (Hayes) Ltd.* [1960] R.P.C. 128 distinguished.

(5) *That the motion would be dismissed subject to an undertaking given by the defendants that they would keep an account of a royalty of 5s. 0d. per engine produced, put all such royalties into a special joint bank account on trusts, and supply a monthly account of the total number of engines made to the plaintiff's solicitors and counsel, subject to undertakings of secrecy by them.*

This was a motion for an interlocutory injunction brought by the plaintiff, Marco Paolo Coco against the defendants A. N. Clark (Engineers) Limited to restrain them from misusing confidential information. The facts of the case appear from the arguments of counsel and the following judgment.

*W. J. Mowbray*, instructed by *Tatton Gaskell & Tatton*, appeared for the plaintiff. *R. S. Alexander*, instructed by *Waterhouse & Co.* for *Glanvilles (Portsmouth)* appeared for the defendants.

*Mowbray*—The motion is for interlocutory relief pending trial of the action to restrain the misuse of a mini-bike engine developed by the plaintiff and manufactured by the defendants under a licensing arrangement. The plaintiff's case is that the defendants are now using that same engine for their own purposes. The design was developed by the plaintiff. The mini-bike became known as the Coco machine and the defendants' machine is known as the Scamp moped. There had been discussions with the defendants about pistons made to the plaintiff's design which could be used in mopeds produced by the defendants. The plaintiff supplied information, drawings and other aids such as a list of possible suppliers of parts for the machine. The defendants misused that information, and so were in breach of the rule that information given to someone confidentially for a particular limited purpose must not be used for another unauthorised purpose. The plaintiff's case does not rest on breach of contract, or copyright, or infringement of a patent, but on the equitable doctrine relating to confidential communications.

Because the defendants are guilty of a breach of confidence, an injunction ought to be granted until the trial to restrain them from using the plaintiff's engine in the Scamp product. It is not being said that, had the defendants properly, and without any special circumstances being present, got hold of one of the plaintiff's machines and drawn it and produced it, they would have interfered with any rights claimed by the plaintiff. Likewise, if the defendants had started with the same public knowledge as the plaintiff and had reached the same or some similar conclusion, it could not be said that they were breaking in on any of the plaintiff's rights when they manufactured their machine. But what the plaintiffs do say is that if a prototype is delivered to the defendants, and they know it is the plaintiff's, also that it is delivered to them for a limited purpose, then the defendants must not use it for any other purpose. That is the rule, and a breach of the rule is a breach of the plaintiff's rights: see *Saltman Engineering Co. Ltd.* v. *Campbell Engineering Co. Ltd.* per Lord Greene, M.R. (1948) 65 R.P.C. 203 at 213. The confidentiality doctrine there expressed can be applied to the circumstances of the present day.

In the present case, the defendants knew that the information imparted to them was the plaintiff's own property. They knew that the use of it was for the limited purpose of manufacture of a moped based on the plaintiff's design. Yet, after terminating negotiations with the plaintiff saying that his design would not fit,
5 and that they would have to make a moped to a different design, the plaintiff later discovered that the new design was in substance the same as his own. The plaintiff cannot complain where the defendants take advantage of their own work, and, if there was any information given to them by the plaintiff that was not part of his own property, then the defendants are free to use it if they are able to extricate it;
10 the complaint is that the developed design of the plaintiff's engine, as a whole, was used. There is evidence that the defendants deliberately used the plaintiff's information as a springboard: see *Terrapin Ltd.* v. *Builders' Supply Co. (Hayes) Ltd.* per Roxburgh, J. [1960] R.P.C. 128 at 130, *Cranleigh Precision Engineering Ltd.* v. *Bryant* per Roskill, J. [1965] 1 W.L.R. 1293 at 1317, 1319, [1966] R.P.C.
15 81 at 96 and *Seager* v. *Copydex Ltd.* per Lord Denning, M.R. [1967] 1 W.L.R. 923 at 931, [1967] R.P.C. 349 at 367.

That the defendants have not acted honestly is shown by (1) the way they broke off negotiations and stopped manufacture of the plaintiff's machine; (2) their statement in a letter to the plaintiff that no part of the plaintiff's original design
20 was going to be used in their own engine, followed by an admission some months later that the piston used in their engine was of the same type as the plaintiff's. The fact that there are similarities in the two engines is not a coincidence.

It is submitted (1) that the right on which the plaintiff relies is established, i.e. confidential information was given to the defendants; (2) that that right has been
25 infringed; and (3) that in all the circumstances, the plaintiff is entitled to an interlocutory injunction. The degree of satisfaction required by the court in an application for interlocutory relief is defined by Goff, J. in *Harman Pictures N.V.* v. *Osborne* [1967] 1 W.L.R. 723 at 738. There must be a strong prima facie case as to the existence of the right but, for infringement, it is necessary to show simply
30 a prima facie case and a reasonable likelihood of success at the trial. The governing consideration for the court, subject to the balance of convenience, is the preservation of the status quo as it was before the infringement. The defendants have put forward a case of hardship but it is not a very strong one. If they should be put to some inconvenience and expense by the injunction, it has been brought on by
35 themselves because, if they had acted honestly, the present situation would not have arisen. The issues to be determined at this stage are whether the information given to the defendants was confidential, and whether that information was made use of by them: see *Terrapin Ltd.* v. *Builders' Supply Co. (Hayes) Ltd.* (supra) per Lord Evershed, M.R. at 134 line 50 and per Sellers, L.J. at 144 line 39. The court does
40 not have to examine issues of fact which should properly be left for the trial: see the *Terrapin Ltd.* case (supra) per Sellers, L.J. at 143, line 32.

*Alexander*—It is accepted that at this stage, the issues are the rights of the plaintiff and the merits of his case. If the plaintiff does not establish a strong prima facie case that he possesses the right of confidential information and that he has a
45 reasonable prospect of showing at the trial that the defendants have infringed that right, then no further consideration arises. If on the other hand, he satisfies the court on these issues, then before granting any injunction the court would need to consider the offer by the defendants—which they made from the first—to pay the plaintiff a royalty in order to continue with the manufacture of their Scamp
50 machines. Also, the defendants would be prepared to start a fund at the bank for the royalty and to provide the court with an account showing the number of Scamp machines manufactured.

44

Megarry, J.    Coco v. A. N. Clark (Engineers) Ltd.    [1969] R.P.C.

On the issue of confidence, there are two separate considerations: (1) what is the right that has to be established, i.e. confidential information; (2) was the information given in confidence, and was it information of a character susceptible of being confidential? Quite often, these two merge but, in *Seager* v. *Copydex Ltd.* [1967] R.P.C. 349 at 367 Lord Denning, M.R. referred to the difficulty of separating public information from confidential information. The defendants can only have received information in confidence if it was given in confidential circumstances, and if the information was capable of being confidential, but the defendants say the information was not so capable and further, that there was no agreement that the information should be confidential.

Both the plaintiff and the managing director of the defendant company have a common experience and a common knowledge of these types of machines, and therefore anything within the managing director's knowledge would to a large degree be known also to the plaintiff. That they knew a lot is shown by the way the correspondence went between them. Normally, confidential communication would arise out of an implied contract but such cases are rare, and spring from some special nexus in the relationship. Two cases dealing with what happened during negotiations when information was communicated confidentially are *Mechanical and General Inventions Co. Ltd. and Lehwess* v. *Austin and the Austin Motor Co. Ltd.* [1935] A.C. 346 and *Seager* v. *Copydex Ltd.* (supra). In those cases, where it was held there had been a breach of confidence, there was an express admission in the evidence that information had been given in confidence. In the present case, the parties were negotiating an agreement. The defendants disclosed their means for manufacture expecting that such an agreement would be finalised. The parties had not applied their minds to what would happen if the agreement never came about.

The facts are against inferring a confidence between the parties. The Scamp engine components can be purchased on the open market in the same way as the piston designed by the plaintiff. That there are a number of similarities between the two machines is not enough: what the plaintiff has to show is how many of these similarities are the result of confidential information supplied by the plaintiff.

It cannot be said that the defendants did not act honestly following the break-off in the negotiations with the plaintiff since they offered the royalty to him on the first lot of machines produced. Further, the defendants were in fact referring to the plaintiff's original design for a piston when they said that no part of it was going to be used.

The law advanced by the plaintiff on the question of interlocutory relief is agreed, but this is not a proper case for the grant of an injunction: the required conditions have not been satisfied. Further, the *Terrapin* case (supra) relied on by the plaintiff can be distinguished, not only because the circumstances surrounding the production of the machines are different, but also because, although there is a conflict of evidence here, there has been no examination of witnesses. Also, accusations of dishonesty were not present in the *Terrapin* case.

**Megarry, J.**—In this case, questions of some interest arise in relation to the equitable doctrine of confidential communication. The subject-matter of the dispute is a two-stroke engine for a moped, or motor-assisted cycle. Mr. Mowbray, for the plaintiff, moves for an interlocutory injunction against the defendant company. The relief claimed on the motion is an order that the defendants do not until after trial of this action or until further order in the meantime, without the previous

consent of the plaintiff, " make or sell by any director, employee, servant or agent any Scamp moped or any other machine in the design, development or manufacture of which the defendant has used directly or indirectly any confidential information the property of the plaintiff."

5   In essence, the plaintiff's case is as follows. In 1965 he began market research into the possibility of producing and selling a new moped: and, being skilled in such matters, he proceeded to design such a machine. By March 1967 the first batch of pistons to his design had been made for him in Italy and sent to him in England. In April 1967 there was the first contact between him and the defendant
10  company about the proposed moped, and the company expressed interest in making it. By a letter dated 24th April 1967 the company suggested to the plaintiff that he should bring the prototype that he had built down to the works of the company with him; and this was done. Over the next three months there were many discussions between the parties, and the plaintiff supplied the company with
15  information, drawings and other aids towards the production of the moped, such as a list of possible suppliers of parts for the machine ; and this came to be known by the plaintiff's name as the Coco moped. The company in its turn did work on the plaintiff's ideas, and also put forward for the plaintiff's consideration certain draft documents to regulate the financial and other arrangements between them ;
20  but these documents were never signed, nor were terms ever agreed in any other way.

    On 20th July 1967 there came the breach between the parties. Mr. A. N. Clark, the managing director of the defendant company, told the plaintiff that the method of transmission in the Coco moped was creating a very big problem and that the
25  company had decided to make its own moped to a design different from that of the plaintiff. The transmission of the Coco was by means of roller friction on to the rear tyre, and this was said to create serious problems of wear in that tyre. The plaintiff says that he was given no opportunity of finding a source of supply of suitable tyres, and that within a fortnight he in fact had found two such sources on
30  the Continent. The defendant company has exhibited certain correspondence with eight tyre companies to show that such tyres could not be obtained ; but, with one exception, that of Michelin of Clermont-Ferrand, these letters do not go outside the United Kingdom. A letter of the defendants dated 17th April 1968 states: " We had investigated tyre sources in England, Holland, France, Denmark, Sweden
35  and Germany and had not been able to find a manufacturer who would even consider producing the special tyre required even if an order for 20,000 tyres was offered." At present there is before me, however, nothing in evidence which relates to any search in Holland, Denmark, Sweden or Germany.

    The plaintiff's belief, stated in his first affidavit, is that " at some time before
40  20th July 1967 Mr. Clark made up his mind to get my engine for the defendant without paying for it "; and he regards the abrupt termination of negotiations on the professed ground of problems about the tyres as being a mere excuse. This, as Mr. Mowbray accepted during the argument, is in substance a charge of fraud. Mr. Mowbray has also been critical of the statement made by the defendant
45  company in a letter to the plaintiff dated 24th July 1967 that no part of the plaintiff's original design would be used in the engine to be made by the defendant company.

    After the breach, the plaintiff at first accepted the defendant company's assurance that the moped which the company was going to produce, known as the Scamp
50  moped, would be to a different design. However, as more and more details of this

46

Megarry, J.          Coco v. A. N. Clark (Engineers) Ltd.          [1969] R.P.C.

machine became available through advertisements in trade papers in February and March 1968 the plaintiff became more and more suspicious that the engine would in substance be the same as his engine, and that the defendant company was making use of the information which he had provided for the purposes of the proposed Coco moped. In a letter dated 17th April 1968 the defendant company admitted that the piston and carburetter were of the same type, and this confirmed the plaintiff's suspicions. He relies strongly upon the piston being one that he had designed, obtained from the Italian company that had manufactured samples for him to his design. Mr. Clark says that he does not believe that there is any element of significant originality in the piston and that the defendant company had no difficulty in ordering it; but, subject to a saving for any further evidence that might emerge, the defendant company accepts that the piston used in the Scamp is in fact that designed by the plaintiff.

The writ in this case was issued on 14th May 1968 and the notice of motion was served on the same day. In the meantime, the Scamp moped had gone into production, and about 200 a week are now being sold. The Coco moped is not in production and there is no suggestion of any plans for putting it into production. The plaintiff's evidence includes that of a consultant engineer, demonstrating many resemblances between the two engines: but of course at this stage of the proceedings there has been no cross-examination. I should make it clear that there is no issue between the parties on anything save the engine, and that no question of patents arises.

Mr. Mowbray bases himself on the defendant company's misuse of information given to the company under circumstances of confidence. The essence of his case is breach of confidence. He expressly disclaims any contention that he could enjoin mere copying such as might have occurred if the Coco had been manufactured and put on the market by the plaintiff, and the defendant company had then bought one of them, dismantled it and slavishly copied it. Mr. Mowbray says that what happened here was that the plaintiff supplied confidential information to the defendant company for one particular purpose, namely, a joint venture in producing the Coco, and that for the defendant company to use this information for its own purposes without the plaintiff's consent is a breach of confidence. The argument before me has fallen under two main heads: first, whether there has been any breach of the obligation of confidence, and, secondly, whether the case is one where an injunction ought to be granted. I will consider these two heads in turn.

The equitable jurisdiction in cases of breach of confidence is ancient; confidence is the cousin of trust. The Statute of Uses, 1535, is framed in terms of "use, confidence or trust;" and a couplet, attributed to Sir Thomas More, Lord Chancellor avers that

> "Three things are to be helpt in Conscience;
> Fraud, Accident and things of Confidence."

(See 1 Rolle's Abridgement 374). In the middle of the last century, the great case of *Prince Albert* v. *Strange* (1849) 1 Mac. & G. 25 reasserted the doctrine. In the case before me, it is common ground that there is no question of any breach of contract, for no contract ever came into existence. Accordingly, what I have to consider is the pure equitable doctrine of confidence, unaffected by contract. Furthermore, I am here in the realms of commerce, and there is no question of any marital relationship such as arose in *Duchess of Argyll* v. *Duke of Argyll* [1967] Ch. 302. Thus limited, what are the essentials of the doctrine?

Of the various authorities cited to me, I have found *Saltman Engineering Co. Ltd.* v. *Campbell Engineering Co. Ltd.* (1948) 65 R.P.C. 203 ; *Terrapin Ltd.* v. *Builders' Supply Co. (Hayes) Ltd.* [1960] R.P.C. 128 and *Seager* v. *Copydex Ltd.* [1967] 1 W.L.R. 923 ; [1967] R.P.C. 349 of the most assistance. All are decisions
5 of the Court of Appeal. I think it is quite plain from the *Saltman* case that the obligation of confidence may exist where, as in this case, there is no contractual relationship between the parties. In cases of contract, the primary question is no doubt that of construing the contract and any terms implied in it. Where there is no contract, however, the question must be one of what it is that suffices to bring
10 the obligation into being ; and there is the further question of what amounts to a breach of that obligation.

In my judgment, three elements are normally required if, apart from contract, a case of breach of confidence is to succeed. First, the information itself, in the words of Lord Greene, M.R. in the *Saltman* case on page 215, must " have the
15 necessary quality of confidence about it." Secondly, that information must have been imparted in circumstances importing an obligation of confidence. Thirdly, there must be an unauthorised use of that information to the detriment of the party communicating it. I must briefly examine each of these requirements in turn.

First, the information must be of a confidential nature. As Lord Greene said in the
20 *Saltman* case at page 215, "something which is public property and public knowledge" cannot per se provide any foundation for proceedings for breach of confidence. However confidential the circumstances of communication, there can be no breach of confidence in revealing to others something which is already common knowledge. But this must not be taken too far. Something that has been constructed solely
25 from materials in the public domain may possess the necessary quality of confidentiality: for something new and confidential may have been brought into being by the application of the skill and ingenunity of the human brain. Novelty depends on the thing itself, and not upon the quality of its constituent parts. Indeed, often the more striking the novelty, the more commonplace its components.
30 Mr. Mowbray demurs to the concept that some degree of originality is requisite. But whether it is described as originality or novelty or ingenuity or otherwise, I think there must be some product of the human brain which suffices to confer a confidential nature upon the information: and, expressed in those terms, I think that Mr. Mowbray accepts the concept.

35 The difficulty comes, as Lord Denning, M.R. pointed out in the *Seager* case on page 931, when the information used is partly public and partly private ; for then the recipient must somehow segregate the two and, although free to use the former, must take no advantage of the communication of the latter. To this subject I must in due course return. I must also return to a further point, namely, that where
40 confidential information is communicated in circumstances of confidence the obligation thus created endures, perhaps in a modified form, even after all the information has been published or is ascertainable by the public; for the recipient must not use the communication as a spring-board (see the *Seager* case, pages 931 and 933). I should add that, as shown by *Cranleigh Precision Engineering Ltd.* v.
45 *Bryant* [1965] 1 W.L.R. 1293 ; [1966] R.P.C. 81, the mere simplicity of an idea does not prevent it being confidential (see pages 1309 and 1310). Indeed, the simpler an idea, the more likely it is to need protection.

The second requirement is that the information must have been communicated in circumstances importing an obligation of confidence. However secret and
50 confidential the information, there can be no binding obligation of confidence if

48

Megarry, J.          Coco v. A. N. Clark (Engineers) Ltd.          [1969] R.P.C.

that information is blurted out in public or is communicated in other circumstances which negative any duty of holding it confidential. From the authorities cited to me, I have not been able to derive any very precise idea of what test is to be applied in determining whether the circumstances import an obligation of confidence. In the *Argyll* case at page 330, Ungoed-Thomas, J. concluded his discussion of the circumstances in which the publication of marital communications should be restrained as being confidential by saying, " If this was a well-developed jurisdiction doubtless there would be guides and tests to aid in exercising it." In the absence of such guides or tests he then in effect concluded that part of the communications there in question would on any reasonable test emerge as confidential. It may be that that hard-worked creature, the reasonable man, may be pressed into service once more ; for I do not see why he should not labour in equity as well as at law. It seems to me that if the circumstances are such that any reasonable man standing in the shoes of the recipient of the information would have realised that upon reasonable grounds the information was being given to him in confidence, then this should suffice to impose upon him the equitable obligation of confidence. In particular, where information of commercial or industrial value is given on a business-like basis and with some avowed common object in mind, such as a joint venture or the manufacture of articles by one party for the other, I would regard the recipient as carrying a heavy burden if he seeks to repel a contention that he was bound by an obligation of confidence: see the *Saltman* case at page 216. On that footing, for reasons that will appear, I do not think I need explore this head further. I merely add that I doubt whether equity would intervene unless the circumstances are of sufficient gravity ; equity ought not to be invoked merely to protect trivial tittle-tattle, however confidential.

Thirdly, there must be an unauthorised use of the information to the detriment of the person communicating it. Some of the statements of principle in the cases omit any mention of detriment; other include it. At first sight, it seems that detriment ought to be present if equity is to be induced to intervene ; but I can conceive of cases where a plaintiff might have substantial motives for seeking the aid of equity and yet suffer nothing which could fairly be called detriment to him, as when the confidential information shows him in a favourable light but gravely injures some relation or friend of his whom he wishes to protect. The point does not arise for decision in this case, for detriment to the plaintiff plainly exists. I need therefore say no more than that although for the purposes of this case I have stated the propositions in the stricter form, I wish to keep open the possibility of the true proposition being that in the wider form.

Before I turn to the second main head, that of interlocutory relief, I should mention one point on the substantive law that caused me some difficulty during the argument. This is what may be called the " spring board " doctrine. In the *Seager* case at page 931, Lord Denning quoted a sentence from the judgment of Roxburgh, J. in the *Terrapin* case, which was quoted and adopted as correct by Roskill, J. in the *Cranleigh* case. It runs as follows:

" As I understand it, the essence of this branch of the law, whatever the origin of it may be, is that a person who has obtained information in confidence is not allowed to use it as a spring-board for activities detrimental to the person who made the confidential communication, and spring-board it remains even when all the features have been published or can be ascertained by actual inspection by any member of the public."

Salmon, L.J. in the *Seager* case on page 933 also states: " The law does not allow the use of such information even as a spring-board for activities detrimental to the plaintiff."

Quite apart from authority, I would recognise the principle enshrined in those words as being salutary. Nevertheless, I am not entirely clear how it is to be put into practical effect in every case. Suppose a case where there is a confidential communication of information which is partly public and partly private; suppose
5 that the recipient of the information adds in confidence ideas of his own, improving the initial scheme; and suppose that the parties then part, with no agreement concluded between them. How is a conscientious recipient of the ideas to comply with the requirements that equity lays upon him? For in the words of Lord Denning at page 931 in the *Seager* case, he

10 " must take special care to use only the material which is in the public domain. He should go to the public source and get it: or, at any rate, not be in a better position than if he had gone to the public source. He should not get a start over others by using the information which he received in confidence."

Suppose that the only confidential information communicated is that some
15 important component should be made of aluminium instead of steel and with significant variations in its design and dimensions. The recipient knows that this change will transform a failure into a success. He knows that, if he had persevered himself, he might have come upon the solution in a week or in a year. Yet he is under a duty not to use the confidential information as a spring-board or as giving
20 him a start.

What puzzles me is how, as a law-abiding citizen, he is to perform that duty. He could, I suppose, commission someone else to make the discovery anew, carefully abstaining from saying anything to him about aluminium or the design and dimensions which will achieve success; but this seems to me to be artificial in the
25 extreme. Yet until this step is taken and the discovery made anew, he cannot make use of his own added ideas for the further improvement of the design which he had already communicated in confidence to the original communicator, ideas which would perhaps make a success into a triumph. He cannot build his superstructure as long as he is forbidden to use the foundations. Nor is the original
30 communicator in a much better case. He is free to use his own original idea, which converted failure into success; but he cannot take advantage of the original recipient's further ideas, of which he knows, until such time as he or someone commissioned by him would, unaided by any confidence, have discovered them.

35 For those who are not law-abiding and conscientious citizens there is, I suppose, a simple answer: ignore the duty, use the information, and then pay damages. This may be the course which Lord Denning envisaged in the *Seager* case: for after stating that the recipient should not get a start over others by using the confidential information, he continued on page 932: " At any rate, he should not get a start
40 without paying for it. It may not be a case for injunction or even for an account, but only for damages, depending on the worth of the confidential information to him in saving him time and trouble." I also recognise that a conscientious and law-abiding citizen, having received confidential information in confidence, may accept that when negotiations break down the only honourable course is to with-
45 draw altogether from the field in question until his informant or someone else has put the information into the public domain and he can no longer be said to have any start. Communication thus imposes on him a unique disability. He alone of all men must for an uncertain time abjure this field of endeavour, however great his interest. I find this scarcely more reasonable than the artificiality and
50 uncertainty of postponing the use of the information until others would have discovered it.

The relevance of the point, I think, is this. If the duty is a duty not to use the information without consent, then it may be the proper subject of an injunction restraining its use, even if there is an offer to pay a reasonable sum for that use. If, on the other hand, the duty is merely a duty not to use the information without paying a reasonable sum for it, then no such injunction should be granted. Despite the assistance of counsel, I feel far from assured that I have got to the bottom of this matter. But I do feel considerable hesitation in expressing a doctrine of equity in terms that include a duty which law-abiding citizens cannot reasonably be expected to perform. In other words, the essence of the duty seems more likely to be that of not using without paying, rather than of not using at all. It may be that in fields other than industry and commerce (and I have in mind the *Argyll* case) the duty may exist in the more stringent form; but in the circumstances present in this case I think that the less stringent form is the more reasonable. No doubt this matter may be canvassed and resolved at the trial; but on motion, in a case where both the probabilities and the evidence support the view that the fruits of any confidential communication were to sound in monetary compensation to the communicator, I should be slow to hold that it was right to enjoin the defendant company from making any use of the information.

I now turn to the second main head, namely that relating to whether this is a proper case for the grant of an interlocutory injunction. Mr. Mowbray cites *Harman Pictures N.V.* v. *Osborne* [1967] 1 W.L.R. 723 at 738 for the proposition that, although he must show a strong prima facie case for the existence of his right and at least that he is likely to succeed on this issue, as regards the infringement of that right, he need show only a prima facie case which is reasonably capable of succeeding. Even then, the remedy is still discretionary, with the preservation of the status quo as the governing principle. These requirements, he said, are satisfied in this case. Without controverting this proposition of law, Mr. Alexander asserted that the test had not been satisfied; and it was thus that the parties joined issue under this head. In addition, Mr. Mowbray relied strongly on the *Terrapin* case as carrying him far towards victory, whereas Mr. Alexander distinguished that case. I shall have to return to this later.

Having now considered the law, I can attempt to apply it to the facts of this case. With regard to the first main head, that of the substantive law, I feel no difficulty about the second condition. I think that the circumstances under which the information was given were plainly circumstances which imported an obligation of confidence. From the first, the whole object of the discussions was that the defendant company should manufacture a moped based on the plaintiff's design, and the plaintiff imparted his information with that object alone. I cannot think that the information was given under any circumstances save those of an implied obligation to preserve any trade secrets that emerged. If the reasonable man is overworked, so is the officious bystander; but just as he provides a convenient touchstone for implied terms in contracts, so I think he may perform some useful function in relation to the implied obligation of confidence. If he had said to the parties at the outset, "Do you not think that you ought to have an express agreement that everything you are discussing is confidential?", I think the parties would have testily suppressed him with a common "But it obviously is."

It will be observed that I have departed a little from the usual phrase used in relation to implied terms, namely, "Oh, of course" (see *Shirlaw* v. *Southern Foundries* (1926) *Ltd.* [1939] 2 K.B. 206 at 221, per MacKinnon, L.J.). I do this in view of what Cross, J. pointed out in *Gardner* v. *Coutts & Co.* [1968] 1 W.L.R. 173 at 177. As I observed in an unreported case, *re Griffiths and Hine's Contract*

on 8th February 1968, when the hypothetical bystander executes his office and suggests to the parties the inclusion of some express provision in the agreement which they are drafting, what the parties answer in unison may be, " Obviously, we shall include it," or it may be, " Oh, of course, that is already included "; and
5 it is only in the latter case that the test will be satisfied and the term accordingly prima facie implied into the contract.

In relation to the obligation of confidence the corresponding proposition would be that I must be satisfied not merely that, if asked, the parties would have thereupon made an express agreement that the discussion was to be confidential, but
10 that, if asked, the parties would have said that it was obviously already a confidential discussion. Even applying that more stringent test, I feel no doubt on the evidence before me that there was here an implied obligation of confidence. The circumstances of the disclosure in this case seem to me to be redolent of trust and confidence. Business men naturally concentrate on their business, and very
15 sensibly do not constantly take legal advice before opening their mouths or writing a letter, so that business may flow and not stagnate. I think the court, despite the caution which must be exercised before implying any obligation, must be ready to make those implications upon which the sane and fair conduct of business is likely to depend. Certainly where the circumstances are such that in the case of a
20 contract the offices of the officious bystander would produce an implied term, in other cases equity would, I think, be at least as ready to imply the equitable obligation. For as Mr. Mowbray pointed out, in equity the question is not one of inserting terms into a contract which is presumed to have expressed all that the parties intended, but is merely one of imposing an obligation based on good
25 conscience in a field unoccupied by any contract. In the case before me I would imply a term if there were a contract, and so, a fortiori, I imply the equitable obligation. This fortunately makes it unnecessary for me to attempt to resolve the degree of less compelling circumstances which would suffice to establish that obligation.

30 I turn to the first and third conditions. It is far less clear whether they are satisfied. How far is the information confidential in nature, and how far has the defendant company made an unauthorised use of any information that was confidential in nature ? If there has been any such use, it clearly has been an unauthorised use to the detriment of the plaintiff ; but the plaintiff's claim must fail
35 if what the defendant company has without authority used to his detriment was not confidential in nature. The plaintiff founds his case on what during the argument was described as a complex of confidential similarities between the two engines. The defendant company points to the fact that the components of the Scamp engine are available to anyone on the open market. Even the piston, designed by
40 the plaintiff, is obtainable thus. The plaintiff's engineering expert deposes to many resemblances between the two engines, under the heads of cylinder dimensions, combustion chamber, pistons, connecting rods, inlet and exhaust ports, flywheel magneto, carburettor, silencers and speed ratio. It will be seen that some of these items relate to design and others to the components used ; and plainly the two
45 engines enjoy a number of close and important similarities. But, as Mr. Alexander pointed out with force, that is not enough. What matters is how far the Scamp achieves these similarities by drawing on confidential information imparted by the plaintiff in confidence, and how far these factors had produced in the Coco an engine which had any originality or other qualities that could provide information
50 of a confidential nature. I remain in almost complete darkness as to the extent to which the ideas were common to the moped world. I have read the last paragraph of the expert's affidavit many times, and on each occasion it has conveyed to me

52

Megarry, J.          Coco v. A. N. Clark (Engineers) Ltd.          [1969] R.P.C.

doubt rather than conviction. When at the trial he gives evidence viva voce and is cross-examined, this matter may well be resolved one way or the other. I can only say that, on this motion, that evidence and the evidence of the plaintiff have in my judgment fallen well short of what is requisite for interlocutory relief. Subject to one matter, I do not think that the plaintiff has shown either a strong prima facie case for the existence of his right which is likely to succeed, or a prima facie case of infringement which is reasonably capable of succeeding.

The one matter that I have in mind is the *Terrapin* case; and on the issue of interlocutory relief I think that this was Mr. Mowbray's strongest authority. That case concerned a certain new type of portable building which was manufactured and marketed both by the plaintiff company and by two of the defendant companies. The plaintiff company alleged that the defendant companies had been enabled to manufacture these new buildings by making use of information communicated to them in confidence by the plaintiff company during a five year contract by one of the defendant companies for the manufacture of an earlier type of building for the plaintiff company, and as part of the negotiations for a new contract; and when the five years expired the defendant company proceeded to manufacture and market on its own account the new type of building. The plaintiffs moved for an interlocutory injunction to restrain the defendants from selling any buildings made with the aid of this information, and Roxburgh, J. heard the cross-examination of certain witnesses in an attempt to resolve a sharp conflict of evidence. The upshot was that he accepted the evidence of the plaintiff company rather than that of the defendants, and granted the injunction.

The Court of Appeal, with Sellers, L.J. dissenting, dismissed an appeal. Mr. Mowbray relied strongly on a passage in the judgment of Lord Evershed, M.R., on page 134. Lord Evershed said:

"The issues, therefore, involved were three: first, was the information given at all by Major Bolt to Mr. Van Moere; second, if it was given, was it in the circumstances confidential, and third, if an affirmative answer be given to the first two questions, was it used by the defendants? If all three questions are answered in the affirmative, there is no doubt that the defendants were doing something which they were disentitled to do. Moreover, as I conceive, if a prima facie case (and I avoid adding epithets such as strong, medium, weak or otherwise) were shown on the motion for the view that the three questions I have indicated should be answered favourably to the plaintiffs, then prima facie again, it would appear to me clear that the plaintiffs were entitled to interlocutory relief."

The approach of Romer, L.J. was similar, whereas Sellers, L.J. dissented in essence on the way in which the decision on the motion would prejudge the case and preclude a fair trial.

There is indeed much force in Mr. Mowbray's argument based on this case; but there are important differences between that case and this. First and perhaps most important, as Mr. Alexander pointed out, there is the fact that in that case there had been cross-examination of witnesses on the hearing of the motion, whereas there has been no such cross-examination here. Where the affidavit evidence is in conflict, as it was in that case and in this, the difference which such cross-examination may produce is indeed significant; for it will often make it possible to resolve many of the conflicts of evidence for the purposes of the motion. Two passages in Lord Evershed's judgment seem to me to be consistent with making

this distinction. On page 132 he says: "I of course agree that if the true position is that the real issue of fact is one which the judge on the motion could not properly resolve, then prima facie his duty would be to adjourn the matter to the trial."

On page 133 he says:

"If on the material which was before him the learned judge was able, however limited that material was, to reach a clear conclusion of fact, then I conceive he was entitled to act accordingly, and none the less so because upon a final analysis with a lot more material a different conclusion might be or may be reached—though of course a judge will obviously be chary of acting on disputed issues of fact if there is ground for supposing that the final conclusion might make the earlier view unjustified."

Secondly, it seems plain that, although there was a conflict of evidence in that case, the plaintiff did not charge fraud; fraud was not in issue. On page 138 Lord Evershed rejected in very firm language any suggestion of deliberate perjury on the part of the defendant company's witnesses. Nor can I find any suggestion of initial fraud anywhere in that case. In the case now before me, on the other hand, although the word "fraud" does not in terms appear in the affidavit evidence, it is quite clear that the plaintiff charges fraud; and when I put this to Mr. Mowbray he made no bones about it. How this charge of fraud will fare at the trial I cannot say. I have already referred to the passage in the plaintiff's first affidavit where he expresses the belief "that at some time before 20th July 1967 Mr. Clark made up his mind to get my engine for the defendant without paying for it." Mr. Alexander's comment on this passage is that the charge simply could not stand in the face of the defendant company's letter dated 21st July 1967, the day after the breach between the parties, when the defendant offered the plaintiff a royalty of 5s. 0d. per engine on the first 50,000 engines made. An offer which might amount to £12,500, made in a letter exhibited to the plaintiff's first affidavit, was plainly wholly irreconcilable with the words "without paying for it" in that affidavit. Mr. Mowbray, while reserving all rights on this matter for the trial of action, no longer relies upon this charge on the motion as showing any dishonesty. Be that as it may, it seems to me that it would be an exceptional case in which it would be possible to make a finding of fraud on affidavit evidence on motion when there is a marked conflict of evidence on the point; and I am quite clear that this case is not exceptional in that sense. Nor am I prepared to find fraud on the defendant company's letter of 24th July, where much turns on the meaning of the protean word "original." Further, to find on motion a non-fraudulent case of misappropriation of confidential information when what is charged is fraudulent misappropriation requires a fine balance and considerable conviction, which I do not feel. In my judgment (and I borrow Lord Evershed's words) the true position is that the real issue of fact is one which on this motion I cannot properly resolve, so that prima facie my duty is to adjourn the matter to the trial. If I had felt that certitude which Roxburgh, J. evidently felt and had reached "a clear conclusion of fact" (I again quote), then I would act as he did; but I do not, and so I will not.

Thirdly, the *Terrapin* case was a contest between two companies which were both producing their rival products. Here I have a case where the defendant company is in production, but the plaintiff is not; and although the plaintiff has a marketable product, as Mr. Mowbray points out, there is no evidence before me to suggest whether the plaintiff ever intends to attempt to produce Coco engines and, if so, when. It seems to me that one factor which should be considered in

the granting or refusing of interlocutory relief is what the suppliant is trying to protect. A product on the market may need protection against rivals in cases where a mere idea for a product, neither on the market now nor planned to be put on the market at any forseeable date, may not. Furthermore, I must bear in mind the effect on the defendant company of granting the injunction sought: for it would halt their production and throw idle some 35 or 40 of their staff, as well as removing from the British market the only moped with a British-made engine and leaving its place vacant for a rival moped with a British engine which, it is said, is now being developed.

It may be that what I have said presages a simple refusal of interlocutory relief; but I do not think that this would be right. Mr. Alexander has offered to undertake that the defendant company will keep an account of a royalty of 5s. 0d. per Scamp engine manufactured, this being the amount offered by the defendant company when the negotiations broke down. He has also assented to Mr. Mowbray's suggestion that arrangements should be made to pay this royalty into a special joint bank account on trusts which would protect the plaintiff in the event of any financial disaster to the defendant company. In addition, the defendant company offers an undertaking to provide the plaintiff's solicitors by the seventh day of every month with a true account of the total number of Scamp engines made in the previous months, the plaintiff's solicitors undertaking not to divulge these numbers to the plaintiff or anyone else without the consent of the defendant company or the leave of the court. These seem to me to be entirely proper arrangements. A royalty at the rate of 5s. 0d. per engine on the first 50,000 made was in large degree agreed to by the plaintiff in his letter of 22nd July, although he there sought a mode of payment of the same total sum, namely £12,500, which did not depend upon the rate of manufacture. If the defendant company is right, of course, there will be no obligation to pay the plaintiff anything. If the defendant company is wrong it must make a payment which may be more than 5s. 0d. per engine or may be less. But, doing the best I can on the material now before me, it seems to me that this rate of payment is a sensible figure to adopt for the interim period until the trial of the action. Accordingly, subject to undertakings being given by the defendant company on the basis that I have mentioned, I dismiss the motion.

K.N.B.