```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In Re:  Eurasian Natural
Resources Corporation Limited
Pursuant to 28 USC 1782 For
Leave to Take Discovery for
Use in Foreign Proceedings,         20 MC 312 (ER)
                                    Telephone Conference
------------------------------x
                                    New York, N.Y.
                                    October 27, 2020
                                    11:42 a.m.

Before:

                    HON. EDGARDO RAMOS,

                                    District Judge

                         APPEARANCES

BOISE SCHILLER & FLEXNER LLP
     Attorneys for Petitioner
BY:  DUANE LOUIS LOFT
     JOSEPH ARONSOHN
     MARK WILLIAM KELLEY

DAVIS WRIGHT TREMAINE LLP
     Attorneys for Respondent HarperCollins Publishers, LLC
BY:  CHELSEA KELLY
     JEREMY ADAM CHASE
     LAURA R. HANDMAN


ALSO PRESENT:

BETH SILFIN, HarperCollins Publishers,
```

1              (The Court and all parties appearing telephonically)

2              THE COURT:  Good morning, everyone.  This is Judge

3     Ramos.

4              Jazmin, please call the case.

5              (Case called)

6              MR. LOFT:  Thank you, your Honor.  Duane Loft, from

7     Boies Schiller & Flexner, on behalf of petitioner.  I'm joined

8     by Joseph Aronsohn and Mark Kelley.  And I'd just like the

9     Court to be aware that Mark Kelley, my colleague, will be

10    handling today's argument for our side.

11             THE COURT:  Good morning.

12             MR. LOFT:  Good morning.

13             MS. HANDMAN:  Laura Handman, from Davis Wright

14    Tremaine, joined by my colleagues, Jeremy Chase and Chelsea

15    Kelly, on behalf of HarperCollins Publishers LLC.

16             We are here because we are seeking a premotion

17    conference before we move to quash the subpoena that was issued

18    pursuant to the Court's order granting the ex parte application

19    under 28, U.S.C., 1782 for foreign discovery for use in the

20    United Kingdom.

21             THE COURT:  Good morning to you all.

22             This matter is on for a premotion conference.  Before

23    we get started, I just want to note for the record that it is

24    being conducted remotely and by telephone as a result of the

25    pandemic.  We are being assisted by a court reporter, so when

1    you speak, please state your name, speak slowly and clearly.
2             This is the first time that the parties have appeared
3    before me on this matter, so let me begin with Mr. Kelley.
4    Give me a nutshell as to what this case is about.
5             MR. KELLEY:  Thank you, your Honor.
6             This case stems from a really extraordinary series of
7    events that resulted in the misappropriation of our client's
8    confidential information.  Our client has sued the parties
9    responsible for that misappropriation in the United Kingdom,
10   but that information has now made its way into a book published
11   by the respondent, HarperCollins.  So our client is seeking
12   discovery that is really critical to establishing that
13   confidential information was used in that book in order to
14   establish damages in the ongoing U.K. proceedings and support a
15   potential claim against the author, Tom Burgis, in the United
16   Kingdom.
17            THE COURT:  Has that proceeding in the United Kingdom
18   been commenced?
19            MR. KELLEY:  The proceeding against Mr. Burgis has not
20   been commenced.  There are four ongoing proceedings that are
21   underway.
22            THE COURT:  And they all relate to the same book or
23   the same set of documents?
24            MR. KELLEY:  They relate to -- it's sort of a
25   sprawling series of events, your Honor, that all relate to the

1    misappropriation of ENRC's confidential information by, among
2    other parties, one of its IT professionals and its attorneys.
3    Those proceedings are against, among other people, the Serious
4    Fraud Office in the United Kingdom, a former Kazakh prime
5    minister, and a former counsel to ENRC.
6              THE COURT:  Okay.
7              MR. KELLEY:  But to address the second part of your
8    Honor's question, the proceedings, as far as I am aware, do not
9    yet involve the publication of this book.
10             THE COURT:  Am I correct that the information that you
11   seek is to be used in a proceeding against Mr. Burgis?
12             MR. KELLEY:  Potentially, your Honor.  We seek the
13   information for use in the four ongoing proceedings and in the
14   contemplated proceeding against Mr. Burgis.  Our client
15   believes, and has good reason to believe, that the theft and
16   misappropriation of information involved in the four ongoing
17   proceedings resulted in the dissemination and publication of
18   the information in this book.  So the evidence we seek is
19   relevant to damages and perhaps other issues in those four
20   ongoing proceedings.
21             With regard to the contemplated proceeding against
22   Mr. Burgis, we would seek to establish that that same and other
23   information, misappropriated information, was used in the
24   publication of the book, to support a claim against Mr. Burgis.
25             THE COURT:  Thank you.

1        Ms. Handman, what is it that you want to do?

2        MS. HANDMAN:  Well, there is a subpoena that was
served seeking testimony and documents on October 30th.  We
served objections, and we anticipate moving to quash, as we
have advised the petitioner.  And pursuant to your Court's
rules, we are doing a premotion conference before we move to
quash.

         It does involve the book *Kleptopia:  How Dirty Money
Is Conquering The World*.  It was published in the U.K. on
September 2nd and later in the U.S. on September 8th.  The book
is 339 pages, with 80 pages of footnotes, and covers four
stories of a global web of corruption.

         The subpoena asks for all drafts, all communications,
all documents, all fact-checking regarding what we'll call
ENRC, the applicant, the petitioner here, ENRC group, its
owners, which we'll call the trio, and 11 other people.  And
this is classic news-gathering material, both with regard to
confidential sources and nonconfidential, that is covered by
the reporter's privilege.  And I don't believe there's really
any dispute that the reporter's privilege applies to this
material.

         The privilege has possible different sources.  One is
the federal common-law privilege that derives from the First
Amendment, recognized by the Second Circuit in *Gonzalez v. NBC*,
and it sets a very high bar for finding out about confidential

sources.  And then there's the New York Shield Law, which has absolute protection for confidential sources.  And there's also a U.K. protection under the Article 10 of the Contempt of Court Act.  The privilege requires, also, that the materials sought be highly material, critical, and not available from other sources.  And it's that that I would like to focus on right now, because there is nowhere -- the reporter is meant to be, under the federal common-law privilege, under the Shield Law, the last resort, and there is nowhere in the lengthy application that the petitioner has made or in their reply to our premotion letter where they say that they have done the things they need to do to exhaust all other available sources of information.  They don't say they've taken depositions, they don't say they've done interrogatories, they don't say they've done document requests.  So all the people who they claim are identified as sources and whether they're suing them or they're listed in the subpoena, they don't say one single thing.  They've had four suits going on, some dating back to 2017, and they don't say that they have done one single thing to exhaust.

And it does require a petroleum products case - that's the circuit we referenced.  It could be up to a hundred depositions before they will have exhausted.  And, indeed, the case they cite, it was decided just a few days ago by Judge Polk Failla - the Milo Yiannopoulos case - she denied a motion to compel, found the motion to quash moot as a result, because

1  they had not exhausted the other available sources of
2  information.
3      And, obviously, the plaintiff, the petitioner here,
4  says they know who the sources are, and so they should ask them
5  and not ask Tom Burgis.
6      THE COURT: Let me ask -- before you go on, let me ask
7  you this: I believe you said that you filed objections. Are
8  there any categories of documents listed in the subpoena that
9  you are going to turn over, or is this a whole-cloth attack on
10 the subpoena?
11     MS. HANDMAN: Well, all the documents and testimony
12 sought are privileged under either the reporter's privilege or
13 attorney-client privilege because they also seek communications
14 with counsel for HarperCollins vetting the book. The only
15 thing that doesn't come within either of those privileges is
16 the request for the amount of money paid to Mr. Burgis under
17 his contract for the book. And as to that, it is trade secret,
18 proprietary information, and it is marginally relevant. As
19 your Honor has already discovered, they have not brought a
20 lawsuit against Mr. Burgis, and they don't argue anything
21 defamatory. They argue that this would be a breach of
22 confidence lawsuit, which, frankly, given all the lawsuits they
23 have brought, as the 80 pages of footnotes make clear, much of
24 the information that Mr. Burgis reports comes from the claims
25 and then the defenses that were raised in the pending lawsuit,

  1    as well as the many articles, some of which were attached by
  2    petitioner in their application, that have circulated for years
  3    about the practices of the ENRC. You only need to look at the
  4    defense of Dechert, the law firm that the ENRC had hired. The
  5    first paragraph of the 177-page, 444-paragraphs of the amended
  6    defense is ENRC's real complaint is that defendants were too
  7    successful uncovering wrongdoing by certain of ENRC's senior
  8    officers and executives.
  9            All of this is part of the public record, and so a
 10    claim for public confidence -- breach of confidence against a
 11    reporter who gets information, obviously in the U.S., that
 12    would go nowhere under the *Bartnicki* case, where even though if
 13    the source gives it to you, even if they're not supposed to,
 14    you, the reporter, can publish that without any liability. But
 15    even in the U.K., it is similar, and there, if it's public, by
 16    virtue of the lawsuits, by virtue of the previous articles, it
 17    can't be a breach of confidence and if it's a matter of public
 18    interest. And here we have an ongoing investigation by U.K.
 19    Serious Fraud Office, and it's hard to imagine anything more in
 20    the public interest than what is reported in Mr. Burgis' book.
 21            So the amount paid under contract is not privileged,
 22    but it is proprietary information, and it has marginal
 23    relevance at this point, but that is the one thing that's not
 24    privileged that they've asked for.
 25            In their letter, they say, well, you needed to do a

1   privilege log.  But the fact is that case after case grants
2   motions to quash on reporter's privilege grounds without a
3   privilege log, and, here, where, as I said, the threshold
4   matter, that they have not done a single thing to -- or at
5   least have not said that they've done anything to exhaust all
6   the available sources of information makes it a nonstarter
7   right there, not even to mention confidential sources, which
8   are protected by the highest level.
9            With regard to a privilege log, I would like to quote,
10  if I might, the late Judge Sweet in 2014.  He excused the
11  failure to do a privilege log and said it was not a waiver.
12  And when he said that, he said that "The requests were without
13  particularity, they seek widespread access to all files,
14  wholesale exposure of press files to litigation scrutiny is an
15  impermissible burden.  The privilege log is a heavy burden on
16  the press and would inhibit its ability to perform its duty."
17           And, here, they had Mr. Burgis, before he published
18  the book, sent them in April a 33-page document outlining what
19  were the items he intended to publish.  They never identified
20  what was, in particular, confidential there.  And then the book
21  has been out for nearly two months.  The 80 pages of
22  footnotes -- we're happy to provide your Honor with the book --
23  the 80 pages of footnotes detail the sources of information.
24  Most of them are the lawsuits and prior articles, and it's
25  incumbent upon the plaintiff, the petitioner, to go through the

10
KARKEURM

book, say what is confidential, what is still confidential, take a look at those footnotes.  If it comes from an article, if it comes from the legal documents filed, it can't be something that they need to know, have any discovery on, and they have not done that at all either.

THE COURT:  Let me turn to Mr. Kelley.

Mr. Kelley, the argument is made that you're coming here prematurely, you need to do some groundwork first.  Why haven't you done it?

MR. KELLEY:  Well, your Honor, the argument is that we haven't done groundwork to prove that the documents are not obtainable from another source.  But, first of all, we don't yet know what the standard for obtainability is at the moment because we have to know more about the documents that we purportedly have not endeavored to obtain.  The standard for obtainability varies based on whether the materials of the sources are confidential or nonconfidential.

And I think much of the nonobtainability argument misses the point because much of the documents we seek, we expect to be our own documents.  So we have a sense, for example, that at least three of the documents that we expect the respondent, or at least Mr. Burgis, possesses are ENRC's confidential own information, and we cited to those three documents in our letter.  One of them was a privileged and confidential report from ENRC's former counsel.  The point is

1  not what is in that document – our client has read it — the
2  point is that it is in Mr. Burgis' possession.  Courts have
3  held that when the fact of possession is relevant, as it is
4  here, then availability from other sources doesn't cause the
5  privilege to be overcome.  In other words, when it's a fact of
6  possession that matters, obtainability does not matter.  That's
7  the *Aequitron* decision from Judge Chin, 1995 WL 406157.
8       And Ms. Handman quoted the Sines case from Judge
9  Failla, which was decided just two weeks ago.  That case, by
10 the way, clearly states that the New York Shield Law does not
11 apply in this case; rather, the federal common law of the
12 reporter's privilege applies.  And as a side note, that's
13 important because the federal privilege is qualified and is
14 routinely found to be overcome, both under the higher standard
15 for confidential information and under the lower standard, for
16 nonconfidential information.
17      But Ms. Handman quoted -- cited that case for the
18 proposition that a motion to quash was granted, I believe — I
19 believe she said that --
20      MS. HANDMAN:  No, I said it was moot.  I said it was
21 moot.
22      MR. KELLEY:  Thank you.
23      MS. HANDMAN:  And that the motion to compel was
24 denied.
25      MR. KELLEY:  Right, the motion to compel was not

1  denied. Judge Failla -- or, sorry, it was denied with leave
2  for counsel to prove that the documents were not obtainable
3  from another source. And that just goes to show our point that
4  this is an extremely document-and circumstance-intensive
5  activity here. The fact that many of the documents and much of
6  the information at issue here is likely ENRC's own information
7  makes the assertion of reporter's privilege quite complex
8  because it is HarperCollins' burden, not ENRC's burden, to show
9  that the information, and the sources, and the material at
10 issue here is confidential, and ENRC's own material cannot be
11 confidential as to ENRC. So we expect that in many cases, the
12 lower standard will apply. In some cases, a higher standard
13 may apply, for example, a confidential source forwarding a
14 nonconfidential memorandum that belongs to ENRC, in that
15 instance, it may be the case — it may — that the sender of that
16 email needs to be redacted, but the fact of the email, and the
17 fact of the receipt of the memorandum, and the use of that
18 memorandum in the book should not be redacted and must be
19 produced. And if that's the case, your Honor, we absolutely
20 need a series of meet-and-confers informed by a privilege log,
21 so that we can develop the facts needed to properly litigate
22 all of these thorny fact-intensive issues relating to the
23 assertion of the privilege log.
24         And the burden of producing that privilege log on
25 HarperCollins is apparently not great in light of their

premotion letter, which indicates that their involvement, though it exists and though they had a contract, was not substantial, and it shouldn't be the case that the parties can make a conclusory assertion of burden and quash entirely a subpoena without making some demonstration of what that burden entails.

THE COURT: What about -- I'm sorry, Mr. Kelley, do you want to finish?

MR. KELLEY: No. Go ahead, your Honor. Thank you.

THE COURT: What about that? I'd hate to be in a position where three months, or four months, or six months down the line, I've got papers, and I say, you know what, you have to turn over a privilege log in order for us to get through this. What say you to that?

MS. HANDMAN: If this is directed to me, your Honor, first of all, this is -- as I said, the requirements are that if they say they know who the sources are, and they have a requirement — for example, they say, okay, the reports from the outside counsel at Dechert. Okay, what discovery have they taken of Dechert and Dechert's people to find out did you give over any documents to Tom Burgis? That's what the privilege requires them to do. And they have to -- to each and all of the people that they've listed in the subpoena, that's what they have to do, before they can come to Tom Burgis and before they can require HarperCollins to go through the materials they

1    have and do a privilege log because -- and that applies whether
2    or not the source is confidential or not.  And the source
3    doesn't have the privilege, it's the publisher and the author
4    that has the privilege.
5            So if they go to potential sources at Dechert, who
6    they've had a lawsuit ongoing -- I think it's heading to
7    trial -- so did you ask, did you give it to Mr. Burgis,
8    anything?  Did you give that report to Mr. Burgis?  That's the
9    question that has to come first before you can entertain any
10   discovery of the reporter.  You don't need a privilege log to
11   know that's what you have to do in each of these instances.
12           And, as I said, if you went through the footnotes, 80
13   pages of footnotes, you'd see, oh, this was from an article
14   that appeared in the Times of London, and that's exactly the
15   kind of thing that they need to do first before they say, oh,
16   where did you get it?  Well, oh, yeah, you said it comes from
17   the Times of London.
18           So it's all there, available for them, and they have
19   to narrow it first and exhaust first before they can come to
20   us.  And then, if there's anything left, then we can see if --
21   such as, for example, what I said, the contracts with
22   Mr. Burgis for his book, subject to a protective order, it
23   might be possible if they do intend to pursue this claim
24   against Mr. Burgis, but the chilling effect of all this is what
25   I think is really of concern, and whether, you know, it raises

    1    questions of bad faith, because so much of what is reported is

    2    out there, thanks, in large part, to all the lawsuits that ENRC

    3    has started.  And I don't know why if, within the confines of

    4    those lawsuits or not, these questions can't be asked of the

    5    people that they say they know who the sources are.

    6            THE COURT:  Okay.

    7            MR. KELLEY:  Your Honor, may I respond to

    8    Ms. Handman's claims?

    9            THE COURT:  Okay.

   10            MR. KELLEY:  Thank you.

   11            I think Ms. Handman has it precisely wrong.  We cannot

   12    know what documents Mr. Burgis has of our client without asking

   13    him.  We can't go to Dechert and say, could you please tell us

   14    every document that you've ever given to Tom Burgis.  We

   15    wouldn't know what to ask Dechert.

   16            We have found one footnote citing to a memorandum

   17    prepared by Dechert, but we obviously cannot know, from the

   18    footnotes alone, an exhaustive account of what information

   19    Mr. Burgis had access to that was improperly obtained.

   20            So it needs to go in the other direction.  Ms. Handman

   21    is putting the cart before the horse.  First, we need to know,

   22    through a privilege log, what the documents that are

   23    potentially responsive to our inquiry are, to documents that

   24    they're claiming this privilege over.  That is their burden to

   25    establish the privilege.  It then becomes -- it's a

1  burden-shifting framework. It then becomes ENRC's burden to
2  show that the privilege is overcome by showing that the
3  document is not obtainable from another source.
4        So that's just not how it works. The burden-shifting
5  framework starts with the assertion of the privilege, and it
6  then shifts to the ENRC to show that it hasn't been overcome.
7  And, in any event, Mr. Burgis could obtain these documents from
8  a number of parties because they're circulating on the black
9  market. So if we were to go to Dechert and say, did you give
10 Mr. Burgis this document, their answer wouldn't matter. What
11 matters --
12       THE COURT: Just because I'm dense, why don't you go
13 to Burgis?
14       MR. KELLEY: We don't have the power to ask Mr. Burgis
15 for documents, your Honor. And, in any event --
16       THE COURT: I'm sorry, why not?
17       MR. KELLEY: We don't have pending litigation against
18 Mr. Burgis. We don't have litigation against Mr. Burgis. And
19 there's nothing in the record supporting -- as your Honor
20 knows, discovery in Europe and in the U.K. is very different,
21 and third-party discovery isn't a matter of course.
22       In any event, if the proposition is that in order to
23 respect the reporter's privilege, we should subpoena a
24 reporter, then I'm not really sure that satisfies the
25 obtainable from another source requirement. And overcoming the

1  privilege should not require us to subpoena a reporter. Many
2  of these documents -- for much of these documents,
3  HarperCollins and Mr. Burgis, we expect, will be the only
4  parties in possession of the documents, and if we can't obtain
5  documents from either party for the same reason, then they're
6  not obtainable from another source. And --
7  THE COURT: Finish, Mr. Kelley.
8  MR. KELLEY: Thank you, your Honor.
9  Many of the parties we expect Mr. Burgis received this
10  information from - these parties being the 11 additional
11  parties Ms. Handman mentioned in our subpoena — are not parties
12  to the ongoing litigation in the U.K. So we also don't have,
13  as a matter of course, the power to seek documents from those
14  parties either.
15  MS. HANDMAN: Well, first of all, you could pursue
16  them under -- to the extent any of them are in the U.S., you
17  could pursue them under the process that you sought here.
18  The fact that you don't get the same discovery is
19  exactly why Intel says you should not be granting orders under
20  1782, where you're trying to circumvent restrictions that are
21  recognized in the foreign country, in the U.K. But you do
22  have, for example, a lawsuit against Dechert. Why not ask
23  Dechert and Mr. Gerrard, your former counsel, did you ever give
24  anything to HarperCollins or Mr. Burgis? I mean, you have the
25  ability to say you know the sources -- that's what you say in

|   |   |
|---|---|
| 1 | your footnote -- whereas the ENRC already knows the identities |
| 2 | of the sources named in the subpoena, so go to them, and the |
| 3 | fact that the process in the U.K. doesn't allow for it doesn't |
| 4 | mean you can come and overcome the privilege here. |
| 5 | You're right that, to the extent it's a confidential |
| 6 | source, it's going to be that much harder.  It's not just a |
| 7 | question of exhausting all other sources, but, in any event, |
| 8 | it's your burden to first exhaust.  That's the threshold |
| 9 | requirement.  And you don't need a privilege log to know that |
| 10 | you haven't exhausted.  You basically said it.  And that's |
| 11 | exactly the problem here. |
| 12 | THE COURT:  Okay. |
| 13 | So, Ms. Handman, I'm going to give you the opportunity |
| 14 | to make your motion.  Three weeks, three weeks to respond, one |
| 15 | week to reply.  We'll get you those dates in a minute. |
| 16 | THE DEPUTY CLERK:  The motion - this is Ms. Rivera |
| 17 | with the Court. |
| 18 | The motion is due November 17; the reply is due |
| 19 | December 8th -- or, sorry, the response is due December 8th; |
| 20 | and the reply is due December 15th. |
| 21 | THE COURT:  Okay.  Everyone have those dates? |
| 22 | MS. HANDMAN:  Yes, we do.  Thank you, your Honor. |
| 23 | THE COURT:  Okay. |
| 24 | In that event, we are adjourned.  I'm sure we'll talk |
| 25 | again.  Everyone, please stay well. |

KARKEURM

1         MS. HANDMAN: Thank you.

2         MR. KELLEY: Thank you, your Honor.

3                 * * *