# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE: EX PARTE APPLICATION OF
EURASIAN NATURAL RESOURCES
CORPORATION LIMITED PURSUANT TO 28
U.S.C. § 1782 FOR LEAVE TO TAKE
DISCOVERY FOR USE IN FOREIGN
PROCEEDINGS

Case No. 1:20-mc-00312-ER

Hon. Edgardo Ramos

## BRIEF OF AMICUS CURIAE REPORTERS COMMITTEE FOR
## FREEDOM OF THE PRESS IN SUPPORT OF RESPONDENT
## HARPERCOLLINS PUBLISHERS, LLC

## CORPORATE DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association of reporters and editors with no parent corporation and no stock.

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENTS**....................................................................ii

**TABLE OF AUTHORITIES** ......................................................................................... iv

**INTEREST OF AMICUS CURIAE** ............................................................................... 1

**INTRODUCTION**........................................................................................................ 2

**ARGUMENT** .............................................................................................................. 2

   I.  **Confidential reporter-source relationships are central to effective newsgathering.** ..... 2

   II.  **The subpoena should be quashed because of its impact on newsgathering.**.................. 6

      A.  **Section 1782 prohibits discovery that would violate the reporter's privilege.** ....... 7

      B.  **Section 1782 affords this Court discretion to deny discovery because of its impact on First Amendment rights, including reporter-source confidentiality.**.. 10

**CONCLUSION** ........................................................................................................... 13

**CERTIFICATE OF SERVICE** .................................................................................... 14

## TABLE OF AUTHORITIES

**Cases**

*Ashcraft v. Conoco, Inc.*, 218 F.3d 282 (4th Cir. 2000)........................................................ 3

*Bachchan v. India Abroad Pubs., Inc.*, 585 N.Y.S.2d 661 (N.Y. Sup. Ct. 1992)........................ 12

*Becker v. Norway*, App. No. 21272/12 (Eur. Ct. H.R. 2017), http://hudoc.echr.coe.int/eng?i=001-177349 ........................................................................................................................ 9, 10

*Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29 (2d Cir. 1999) ...................................................... 10

*Goodwin v. United Kingdom*, App. No. 17488/90, 22 Eur. H.R. Rep. 123 (Eur. Ct. H.R. 1996) .. 9

*Holmes v. Winter*, 3 N.E.3d 694 (2013).................................................................................. 8, 12

*\* In re Application of Shervin Pishevar for an Order to Take Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290 (S.D.N.Y. 2020) ...... 1, 7, 8, 9

*In re Eurasian Nat. Res. Corp.*, No. 18-mc-80041, 2018 WL 1557167 (N.D. Cal. Mar. 30, 2018) ........................................................................................................................................ 8, 11

*In re Green Dev. Corp. S.A. de C.V.*, No. WDQ-15-29852015, WL 10319091 (D. Md. Oct. 1, 2015), *aff'd* No. CCB-15-2985, 2016 WL 640791 (D. Md. Feb. 18, 2016)........................ 8, 11

*In re Lazaridis*, 865 F. Supp. 2d 521 (D.N.J. 2011) ................................................................ 11

*In re Petroleum Products Antitrust Litigation*, 680 F.2d 5 (2d Cir. 1982) (per curiam) ............... 8

*\* Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) ................................ 7, 10, 11

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238 (2d Cir. 2018) ........ 10, 12

*Mangouras v. Squire Patton Boggs*, Nos. 17-3633, 19-100, 19-186, 2020 WL 6554050 (2d Cir. Nov. 9, 2020) ................................................................................................................. 9

*McKevitt v. Palasch*, 339 F.3d 530 (7th Cir. 2003) .................................................................. 8

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) .................................................. 3

*Tillack v. Belgium*, App. No. 20477/05 (Eur. Ct. H.R. 2007), http://hudoc.echr.coe.int/eng?i=001-83527 .......................................................................... 9

*United States v. Treacy*, 639 F.3d 32 (2d Cir. 2011) ................................................................ 8

*von Bulow v. von Bulow*, 811 F.2d 136 (2d Cir. 1987).......................................................... 8, 12

*Voskuil v. The Netherlands*, App. No. 64752/01 (Eur. Ct. H.R. 2007), http://hudoc.echr.coe.int/eng?i=001-83413 ........................................................................ 10

*Yahoo!, Inc. v. La Ligue Contre le Racisme et L'Antisemitisme*, 169 F. Supp. 2d 1181 (N.D. Cal. 2001) ................................................................................................................................ 12

*Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) ........................................................................ 2

**Statutes**

28 U.S.C. § 1782(a) .................................................................................................................. 7

Securing the Protection of our Enduring and Established Constitutional Heritage Act, Pub L. No. 111-223, 124 Stat. 2380 (2010) ................................................................................................ 13

**Legislative History**

S. Rep. No. 88-1580 (1964), *as reprinted in* 1964 U.S.C.C.A.N. 3782 .................................. 7, 13

**Other Authorities**

Alexander M. Bickel, *The Morality of Consent* (1975) .................................................................. 3

Alexandra Berzon et al., *Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn*, Wall S.J. (Jan. 27, 2018, 1:02 AM), https://perma.cc/AVC5-FZ2X .......... 5

Austin Ramzy & Chris Buckley, *'Absolutely No Mercy': Leaked Files Expose How China Organized Mass Detentions of Muslims*, N.Y. Times (Nov. 16, 2019), https://perma.cc/K2AG-2RP6................................................................................................................................................. 4

Bethany Allen-Ebrahimian, *Exposed: China's Operating Manuals for Mass Internment and Arrest by Algorithm*, Int'l Consortium of Investigative Journalists (Nov. 24, 2019), https://perma.cc/ZK3P-Y2Y5 ...................................................................................................... 4

Daisuke Wakabayashi & Katie Benner, *How Google Protected Andy Rubin, the 'Father of Android'*, N.Y. Times (Oct. 25, 2018), https://perma.cc/2YYQ-CQF4 ..................................... 5

David Kaye, Special Rapporteur on the Promotion and the Protection of the Right to Freedom of Opinion and Expression, *Report on the Promotion and Protection of the Right to Freedom of Opinion and Expression*, U.N. Doc. A/70/361 (Sept. 8, 2015) ................................................ 10

David Kravets, *Reporters Challenge Bonds' Leak Subpoena,* The Associated Press (May 31, 2006), https://perma.cc/2JS6-5N7C .............................................................................................. 3

Douglas Dalby & Amy Wilson-Chapman, *Panama Papers Helps Recover More Than $1.2 Billion Around the World*, Int'l Consortium of Investigative Journalists (Apr. 3, 2019), https://perma.cc/5XY5-AMKM................................................................................................... 6

Frederik Obermaier et al., *About the Panama Papers*, Süddeutsche Zeitung, https://perma.cc/9NW2-Y2KZ (last visited June 6, 2019) ......................................................... 6

*Introduction to the Reporter's Privilege Compendium*, Reporters Committee for Freedom of the Press, https://perma.cc/X4BV-49JH .............................................................................................. 2

Jason Leopold et al., *The FinCEN Files*, BuzzFeed News (Sept. 20, 2020), https://perma.cc/49H3-GP7U ...................................................................................................... 6

Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times (Oct. 5, 2017), https://perma.cc/QFP7-C4CV ........................................ 5

*Reporter's Privilege Compendium*, 2nd Circuit. Part III.A, Reporters Comm. for Freedom of the Press, https://perma.cc/TZ65-YMAL ........................................................................................... 11

*Reporter's Privilege Compendium*, Map, Reporters Comm. for Freedom of the Press, https://perma.cc/6VDS-LKZJ ...................................................................................................... 12

Rodney A. Smolla, *The First Amendment, Journalists, and Sources: A Curious Study in "Reverse Federalism,"* 29 Cardozo L. Rev. 1423 (2008) ........................................................... 12

Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, The New Yorker (Oct. 10, 2017, 10:47 AM), https://perma.cc/KL3G-YJ98 ...... 5

Tim Arango et al., *The Iran Cables: Secret Documents Show How Tehran Wields Power in Iraq*, N.Y. Times (Nov. 19, 2019), https://perma.cc/ZUU7-WV7X .................................................... 4

Uyghur Human Rights Policy Act of 2019, S. 178, 116th Cong. (2019) ....................................... 4

## INTEREST OF AMICUS CURIAE[1]

Amicus curiae the Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated nonprofit association, founded by leading journalists and media lawyers in 1970, when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources in order to protect First Amendment freedoms and the newsgathering rights of journalists.

The Reporters Committee respectfully submits this brief in support of respondent HarperCollins Publishers, LLC's ("HarperCollins US") motion to quash a subpoena issued pursuant to 28 U.S.C. § 1782 ("Section 1782") that seeks confidential newsgathering materials in its possession.  Journalists routinely rely on relationships with confidential sources to investigate and report on important issues of public interest.  They therefore depend upon constitutional, statutory, and other protections afforded under federal, state, and international law to maintain these relationships, and to shield their work product from compelled disclosure.  The Reporters Committee seeks to highlight the importance of confidentiality to newsgathering and to explain how the misuse of Section 1782 can chill investigative reporting, as the Reporters Committee has explained in other proceedings in this district.  *See In re Application of Shervin Pishevar for an Order to Take Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290, 306 (S.D.N.Y. 2020) ("As stated by the amici curiae, a journalist's ability to foster and maintain confidential relationships with sources is essential to effective reporting.").

---

[1]     No party's counsel authored this brief in whole or in part, and no party, party's counsel, or any person other than amicus curiae or its counsel contributed money that was intended to fund preparing or submitting this brief.  Both parties consent to the filing of this brief.

## INTRODUCTION

The compelled disclosure of a confidential source has a particularly damaging effect on the integrity of the newsgathering process.  Journalists necessarily rely on well-placed sources for information about sensitive issues; many such sources require confidentiality before coming forward because they reasonably fear retribution if their identities are revealed, whether that threat comes in the form of loss of employment, risk of physical harm, or criminal prosecution. *See Introduction to the Reporter's Privilege Compendium*, Reporters Comm. for Freedom of the Press, https://perma.cc/X4BV-49JH.  Indeed, much journalism in the public interest would not have been possible without reporters' ability to give sources reliable assurances of confidentiality or anonymity.  Recent examples include reporting in the United States based on secret documents from China and Iran, investigative reporting that led to the #MeToo movement, and groundbreaking coverage of offshore financial havens made possible by an anonymous leak of the "Panama Papers."  Permitting Eurasian Natural Resources Corporation ("ENRC") to obtain confidential newsgathering materials in this case—in circumvention of well-established protections for reporters' sources and work product—would have a severe effect on the ability of the news media to investigate matters of public concern, now and into the future.  Given the broad discretion afforded courts under Section 1782, we urge the Court to quash the subpoena.

## ARGUMENT

### I.     Confidential reporter-source relationships are central to effective newsgathering.

A journalist's ability to foster and maintain confidential relationships with sources is essential to effective reporting.  *See Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981) ("[J]ournalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant."); *see also Introduction to the Reporter's Privilege Compendium*, *supra*.  When sources stop talking to the news media because

they fear their identities cannot be protected, the public loses out.  Courts have recognized that discouraging sources from speaking to the press stifles the exchange of vital information, undermining the electorate's ability to make informed political, social, and economic decisions. *See, e.g.*, *Ashcraft v. Conoco, Inc.*, 218 F.3d 282, 287 (4th Cir. 2000) ("If reporters were routinely required to divulge the identities of their sources, the free flow of newsworthy information would be restrained and the public's understanding of important issues and events would be hampered in ways inconsistent with a healthy republic.").  Or as Alexander Bickel— who argued the *Pentagon Papers* case, *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)— once put the point, "Forcing reporters to divulge such confidences would dam the flow to the press, and through it to the people, of the most valuable sort of information: not the press release, not the handout, but the firsthand story based on the candid talk of a primary news source." Alexander M. Bickel, *The Morality of Consent* 84 (1975).

History-altering news stories about government and private activity would not have been possible without journalists' ability to credibly promise confidentiality.  Perhaps the most well-known example, as well as one of the more consequential, is the reporting of *The Washington Post* journalists Carl Bernstein and Bob Woodward on the Nixon Administration's involvement in the Watergate break-in.  As Mr. Bernstein would later recall, "Almost all of the articles I co-authored with Mr. Woodward on Watergate could not have been reported or published without the assistance of our confidential sources and without the ability to grant them anonymity, including the individual known as Deep Throat."  David Kravets, *Reporters Challenge Bonds' Leak Subpoena*, The Associated Press (May 31, 2006), https://perma.cc/2JS6-5N7C.

As newsgathering has become increasingly international, journalists have continued to rely on information provided by confidential sources, whether located overseas or in the United

3

States, to report on stories of global significance.  In tandem, the protection of reporter-source

confidentiality in the United States has become ever more crucial to the free flow of information

across borders, in service of reporting in the international public interest.  Both *The New York*

*Times* and the International Consortium of Investigative Journalists (ICIJ), for instance, relied on

confidential sources to obtain separate troves of Chinese Communist Party documents detailing

the Chinese government's planning and operation of internment camps for Uyghurs and other

ethnic minorities.  Austin Ramzy & Chris Buckley, *'Absolutely No Mercy': Leaked Files Expose*

*How China Organized Mass Detentions of Muslims*, N.Y. Times (Nov. 16, 2019),

https://perma.cc/K2AG-2RP6; Bethany Allen-Ebrahimian, *Exposed: China's Operating Manuals*

*for Mass Internment and Arrest by Algorithm*, Int'l Consortium of Investigative Journalists (Nov.

24, 2019), https://perma.cc/ZK3P-Y2Y5.  Shortly after those stories broke, the U.S. House of

Representatives passed legislation to sanction Chinese officials responsible for the detention

camps.  *See* Uyghur Human Rights Policy Act of 2019, S. 178, 116th Cong. § 7 (2019).

The very same month, drawing on a leaked archive of secret Iranian cables, *The Intercept*

and *The New York Times* produced a collaborative report that demonstrated how Iran has

extended its influence in Iraq in the years since the United States' invasion and the subsequent

withdrawal of American troops.  Tim Arango et al., *The Iran Cables: Secret Documents Show*

*How Tehran Wields Power in Iraq*, N.Y. Times (Nov. 19, 2019), https://perma.cc/ZUU7-WV7X.

Confidential sources have also been instrumental in investigative journalism that exposes

private wrongdoing by the powerful.  In the initial exposé revealing decades of sexual

harassment and assault allegations against entertainment executive Harvey Weinstein—one of

the stories that sparked the #MeToo movement—journalists at *The New York Times* obtained at

least one settlement record and learned the details of several more from undisclosed sources.  *See*

Jodi Kantor & Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, N.Y. Times (Oct. 5, 2017), https://perma.cc/QFP7-C4CV.  Ronan Farrow, a journalist who has broken multiple celebrity sexual assault stories for *The New Yorker*, also relied on a then-unnamed source to gain access to a secret recording in which Mr. Weinstein is heard apologizing to one of his alleged victims.  *See* Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, The New Yorker (Oct. 10, 2017, 10:47 AM), https://perma.cc/KL3G-YJ98.  Numerous other stories from the past several years have relied on maintaining the confidentiality of victims, as well as those sources who provide corroborating testimonial and documentary evidence.  Of the over 150 sources *The Wall Street Journal* contacted and interviewed in detailing sexual misconduct allegations against casino magnate Steve Wynn—"none [of whom] reached out to the Journal on their own"—most preferred anonymity because "they worried that [speaking out] could hurt their ability to work elsewhere."  Alexandra Berzon et al., *Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn*, Wall St. J. (Jan. 27, 2018, 1:02 AM), https://perma.cc/AVC5-FZ2X.  Similarly, most of the more than three dozen current and former Google employees who revealed alleged sexual misconduct by top executives asked that their identities not be disclosed "because they were bound by confidentiality agreements or feared retribution for speaking out."  Daisuke Wakabayashi & Katie Benner, *How Google Protected Andy Rubin, the 'Father of Android'*, N.Y. Times (Oct. 25, 2018), https://perma.cc/2YYQ-CQF4.  Absent a journalist's ability to guarantee confidentiality, many of these accounts might never have been written.

Finally, confidential sources have been especially important for reporting on international corruption.  An anonymous source was critical, for instance, to the publication of the "Panama Papers," a leaked cache of data about offshore financial havens that had been transmitted

securely and anonymously to reporters.  *See* Frederik Obermaier et al., *About the Panama Papers*, Süddeutsche Zeitung, https://perma.cc/9NW2-Y2KZ (last visited June 6, 2019)(describing the nearly fifty-years' worth of data illustrating fraud, money laundering, tax evasion, and evasion of international sanctions under the shelter of Panamanian corporate service provider Mossack Fonseca).  The transnational Panama Papers reporting team announced that the global tally of fines and back-taxes resulting from the Panama Papers reporting totals more than one billion dollars.  *See* Douglas Dalby & Amy Wilson-Chapman, *Panama Papers Helps Recover More Than $1.2 Billion Around the World*, Int'l Consortium of Investigative Journalists (Apr. 3, 2019), https://perma.cc/5XY5-AMKM.  More recently, Buzzfeed and the International Consortium of Investigative Journalists published a string of exposés documenting the stark failure of banks and financial authorities to act on evidence of money laundering—the "FinCEN Files"—based on a leaked trove of government documents provided, too, by a confidential source.  Jason Leopold et al., *The FinCEN Files*, BuzzFeed News (Sept. 20, 2020), https://perma.cc/49H3-GP7U.

## II.    The subpoena should be quashed because of its impact on newsgathering.

Though applicant ENRC gives these interests short shrift, Section 1782, thankfully, weighs them differently.  As explained in more detail below, discovery under the statute should not be granted, where (as here) it is aimed at obtaining confidential newsgathering materials or used to subvert widely recognized reporter-source protections.  Indeed, the statute protects these interests in two overlapping ways.  For one, the Court straightforwardly cannot permit discovery where the reporter's privilege controls.  *See* 28 U.S.C. § 1782(a) ("A person may not be compelled . . . to produce a document or other thing in violation of any legally applicable privilege.").  Second, even where the reporter's privilege does not preclude discovery, First

Amendment interests are to be weighed in the Court's discretionary decision as to whether discovery should be permitted.  *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004) (setting out factors that should guide the exercise of discretion under Section 1782); *In re Application of Shervin Pishevar*, 439 F. Supp. 3d at 305 (incorporating consideration of the interests protected by the reporters' privilege in applying the *Intel* factors)*.  On both frames, because of the burden it imposes on newsgathering, the subpoena at issue should be quashed.

**A.      Section 1782 prohibits discovery that would violate the reporter's privilege.**

Although Congress's primary purpose in passing Section 1782 was to streamline the process for obtaining the assistance of federal courts in gathering evidence for use in foreign tribunals, *see Intel*, 542 U.S. at 248, lawmakers were careful not to run roughshod over other public policy interests in pursuit of that goal.  In particular, Congress included in the statute a broad and "flexible provision" that "provides for the recognition of *all* privileges to which the person may be entitled."  S. Rep. No. 88-1580, § 9 (1964), *as reprinted in* 1964 U.S.C.C.A.N. 3782, 3790 (emphasis added).  As the Senate Report emphasized, "[t]he absence of specific reference to any particular privilege leaves the recognition of the privileges to which the person is entitled to development by case law or separate statute or rule," *id.*, and the text of the provision reflects "judicial freedom to achieve equitable accommodation of the witness' interests," *id.* § 12, 1964 U.S.C.C.A.N. at 3792.  As passed, the statute's shield sweeps broadly: "A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."  28 U.S.C. § 1782(a).

Cases in which discovery is sought from a reporter under Section 1782 are rare.[2]  Yet there can be no serious dispute that the reporter's privilege is a "legally applicable privilege" for purposes of the statute.  *See, e.g.*, *In re Green Dev. Corp. S.A. de C.V.*, No. WDQ-15-2985, 2015 WL 10319091, at *4 (D. Md. Oct. 1, 2015), *aff'd*, No. CCB-15-2985, 2016 WL 640791 (D. Md. Feb. 18, 2016); *In re Application of Shervin Pishevar*, 439 F. Supp. 3d at 305; *In re Eurasian Nat. Res. Corp.*, 2018 WL 1557167, at *3; *cf. McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003)  (permitting discovery of work product under Section 1782, sought by the source himself, only after detailed consideration of whether the reporter's privilege applied on those facts).

In the Second Circuit, as HarperCollins US explains in greater detail, *see* Resp't's Mot. to Quash at 10–21 (Nov. 24, 2020), ECF No. 24, the privilege is a powerful one:

> The law in this Circuit is clear that to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources.

*In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982) (per curiam).  Even where only non-confidential information is at stake, the party seeking discovery must show at a minimum that "the materials at issue are of likely relevance to a significant issue in the case" and "not reasonably obtainable from other available sources."  *United States v. Treacy*, 639 F.3d 32, 42 (2d Cir. 2011) (citation omitted).  And precedent counsels courts to weigh, too, "New York's policy of giving protection to professional journalists," *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987), a policy reflected in the New York Shield Law, which "has been recognized as the strongest in the nation," *Holmes v. Winter*, 3 N.E.3d 694, 700 (N.Y. 2013).  ENRC bears a

---

[2]      ENRC, though, is no stranger to them.  *See In re Eurasian Nat. Res. Corp.*, No. 18-mc-80041, 2018 WL 1557167, at *1 (N.D. Cal. Mar. 30, 2018) (seeking discovery from a reporter for the U.K.-based *The Sunday Times*).

heavy burden, then, in showing that its discovery request violates no "legally applicable" privilege" under Section 1782.

Further, Section 1782 sweeps in "privileges recognized by foreign law." *In re Application of Shervin Pishevar*, 439 F. Supp. 3d at 301.[3]  And, as relevant here, Article 10 of the European Convention on Human Rights requires that any compelled disclosure of a journalist's source be "justified by an overriding requirement in the public interest." *Goodwin v. United Kingdom*, App. No. 17488/90, 22 Eur. H.R. Rep. 123, 143 (Eur. Ct. H.R. 1996).  The European Court of Human Rights has stressed in that vein that "the right of journalists not to disclose their sources cannot be considered a mere privilege to be granted or taken away depending on the lawfulness or unlawfulness of their sources." *Tillack v. Belgium*, App. No. 20477/05, ¶ 65 (Eur. Ct. H.R. 2007), http://hudoc.echr.coe.int/eng?i=001-83527.  Rather, as the UN Special Rapporteur for Freedom of Expression has explained, "any restrictions must be genuinely exceptional and subject to the highest standards." *Becker v. Norway*, App. No. 21272/12, ¶ 40 (Eur. Ct. H.R. 2017), http://hudoc.echr.coe.int/eng?i=001-177349 (quoting David Kaye, Special Rapporteur on the Promotion and the Protection of the Right to Freedom of

---

[3]     The Second Circuit recently concluded that, at least where the parties dispute whether a given forum's law is implicated, determining which privileges are "legally applicable" requires a choice-of-law analysis, and the court should apply "the law of the country that has the predominant or the most direct and compelling interest in whether . . . communications should remain confidential, unless that foreign law is contrary to the public policy of this forum." *Mangouras v. Squire Patton Boggs*, Nos. 17-3633, 19-100, 19-186, 2020 WL 6554050, at *8 (2d Cir. Nov. 9, 2020) (internal quotation marks and citation omitted).  As the Reporters Committee understands it, the parties agree that this case is governed in the first instance by federal law, *see* Resp't's Mot. to Quash at 10; Applicant's Letter in Opp'n at 2 n.2 (Oct. 21, 2020), ECF No. 18, though English law may remain relevant to this Court's subsequent discretionary analysis, *see Mangouras*, 2020 WL 6554050, at *8.  In any event, the choice-of-law question will typically be academic in cases involving the reporter's privilege.  Where foreign law is less protective of reporter-source confidentiality than the First Amendment would be, applying that law would be "contrary to the public policy" of the United States in favor of press freedom.  *Mangouras*, 2020 WL 6554050, at *8; *see infra* Part II.B (explaining the strength of that policy).

Opinion and Expression, *Report on the Promotion and Protection of the Right to Freedom of Opinion and Expression*, ¶ 21, U.N. Doc. A/70/361 (Sept. 8, 2015)).  As a result, much as the reporter's privilege recognized in this Circuit bars pursuit of information "reasonably obtainable from other available sources," *Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29, 36 (2d Cir. 1999), efforts to compel the disclosure of information from a journalist that could have been obtained elsewhere have been found to violate Article 10, *see, e.g.*, *Voskuil v. The Netherlands*, App. No. 64752/01, ¶ 67 (Eur. Ct. H.R. 2007), http://hudoc.echr.coe.int/eng?i=001-83413; *Becker*, ¶ 80.

As HarperCollins US has ably explained, ENRC cannot overcome the reporter's privilege with respect to the newsgathering materials to which the subpoena is addressed.  *See* Resp't's Mot. to Quash at 10–21.  As a result, Section 1782 does not permit the discovery ENRC seeks.

**B.**     **Section 1782 affords this Court discretion to deny discovery because of its impact on First Amendment rights, including reporter-source confidentiality.**

As the Supreme Court has explained, "a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so."  *Intel*, 542 U.S. at 264.  And in exercising that discretion, the Court elaborated, a district court should weigh "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States," as well as whether the request is "unduly intrusive or burdensome."  *Id.* at 264–65.  The Second Circuit, for its part, has emphasized that the *Intel* factors are "non-exclusive" and "not to be applied mechanically."  *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244–245 (2d Cir. 2018).  Rather, "[a] district court should also take into account any other pertinent issues arising from the facts of the particular dispute."  *Id.*  That broad discretion affords this Court yet another basis on which to quash the subpoena, enforcement of which would undermine the strong U.S. public policy in favor of press freedom.

10

Courts routinely weigh First Amendment interests when exercising their discretion under Section 1782, whether under the heading of "policies of . . . the United States" that may be at stake, or in judging "whether the request . . . [is] unduly intrusive." *Intel*, 542 U.S. at 264–65. They do so when parties seek discovery that would burden an individual's right to speak anonymously, *see In re Lazaridis*, 865 F. Supp. 2d 521, 528 (D.N.J. 2011), and they do so, of course, where discovery is sought from a reporter, *see In re Application of Shervin Pishevar*, 439 F. Supp. 3d at 305; *In re Green Dev. Corp. S.A. de C.V.*, 2015 WL 10319091, at *4; *In re Eurasian Nat. Res. Corp.*, 2018 WL 1557167, at *3. This inquiry is broader and more flexible than the question of whether a valid privilege governs. For instance, contrary to ENRC's suggestion that the Court must await a maximally specific description of the information that HarperCollins US believes is beyond the scope of discovery, courts have exercised their discretion under the *Intel* factors to deny discovery even where the reporter in question had not yet claimed—and might never claim—the privilege. *See In re Green Dev. Corp. S.A. de C.V.*, 2015 WL 10319091, at *1.

Amicus the Reporters Committee urges this Court to consider the strength of the national policy favoring reporter-source confidentiality in exercising its discretion here. The vast majority of state and federal jurisdictions provide journalists with legal protection against subpoenas targeting the identities of their sources. At the federal level, ten of the twelve federal courts of appeals—including the Second Circuit—have recognized some form of qualified privilege rooted in the First Amendment or common law. *See Reporter's Privilege Compendium*, 2nd Circuit. Part III.A, Reporters Comm. for Freedom of the Press, https://perma.cc/TZ65-YMAL. And, with the exception of Hawaii and Wyoming, every state has adopted or recognized some form of legal protection for a journalist's confidential sources,

11

providing a critical safeguard for the integrity of the newsgathering process.  *Reporter's Privilege Compendium*, Map, Reporters Comm. for Freedom of the Press, https://perma.cc/6VDS-LKZJ.  Together, these protections reflect a "'national referendum' attesting to [the United States'] sense of the critical role that a vibrant press plays in a free society."  Rodney A. Smolla, *The First Amendment, Journalists, and Sources: A Curious Study in "Reverse Federalism,"* 29 Cardozo L. Rev. 1423, 1429 (2008).  While the laws may vary in their details, they stand for one proposition:  protection for journalists' sources is "essential to [the] maintenance of our free and democratic society."  *Holmes*, 3 N.E.3d at 695–700.

These First Amendment concerns are at their apex where a party not only seeks information that the Constitution may privilege, but also seeks it for use in an action that might itself be barred by the First Amendment if it were brought in the United States.  *See* Resp't's Mot. to Quash at 23 n.10 (noting that ENRC's theory of liability appears to be inconsistent with *Bartnicki v. Vopper*, 532 U.S. 514 (2001)).  Intuitively, Section 1782's purpose—"encouraging foreign countries by example to provide similar means of assistance to our courts," *Kiobel*, 895 F.3d at 244 (citation omitted)—is not served by encouraging foreign countries to provide assistance our courts would not accept.  Consistent with the nation's "strong public policy" protective of press freedom, *von Bulow*, 811 F.2d at 142, U.S. courts have refused to recognize foreign judgments deemed violative of the First Amendment and domestic public policies, *see, e.g.*, *Bachchan v. India Abroad Pubs., Inc.*, 585 N.Y.S.2d 661 (N.Y. Sup. Ct. 1992) (British libel judgment); *Yahoo!, Inc. v. La Ligue Contre le Racisme et L'Antisemitisme*, 169 F. Supp. 2d 1181, 1192 (N.D. Cal. 2001) (French court order requiring censorship of Nazi paraphernalia online), *rev'd and remanded on other grounds*, 433 F.3d 1199 (9th Cir. 2006).  The "SPEECH" Act, passed to combat "libel tourism" in which individuals seek out "foreign jurisdictions that do

not provide the full extent of free-speech protections to authors and publishers that are available in the United States," reflects the same insight.  Securing the Protection of our Enduring and Established Constitutional Heritage Act, Pub L. No. 111-223, § 2, 124 Stat. 2380, 2380–81 (2010).  There is no national interest in aiding litigants who would use foreign proceedings to dodge, or abridge, the U.S. policy favoring robust protections for free speech and a free press.

In light of this Court's broad "judicial freedom" to determine the appropriateness of a Section 1782 request, S. Rep. No. 88-1580, § 12, 1964 U.S.C.C.A.N. at 3791–92, the Reporters Committee respectfully urges that these First Amendment interests be given due weight.  Given the critical importance of the reporter-source relationship to effective newsgathering, along with the widely recognized public benefit of strong protections for confidentiality, this Court should affirm that the judiciary will not allow the subjects of unflattering reporting to use this statute as a sword against journalists.

## CONCLUSION

For these reasons, the Reporters Committee urges the Court to grant the motion to quash.

Dated: December 1, 2020

Respectfully submitted,

*/s/ Katie Townsend*

Katie Townsend
THE REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th St. NW, Suite 1020
Washington, DC 20005
Phone: (202) 795.9300
Facsimile: (202) 795.9310
ktownsend@rcfp.org

*Counsel of Record for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I, Katie Townsend, do hereby certify that I have filed the foregoing Brief of Amicus

Curiae electronically with the Clerk of Court for the United States District Court for the Southern

District of New York using the CM/ECF system on December 1, 2020.

I certify that all participants in this case are registered CM/ECF users and that service

will be accomplished by the CM/ECF system.


*/s/ Katie Townsend*
Katie Townsend
*Counsel of Record for Amicus Curiae*

14