UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>*EX PARTE* APPLICATION PURSUANT TO 28 U.S.C. § 1782 FOR LEAVE TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS,<br><br>Applicant. | Case No. 20-mc-00312-ER |

### SUPPLEMENTAL DECLARATION OF NIRANJAN SHANMUGANATHAN

Pursuant to 28 U.S.C. § 1746, I, Niranjan Shanmuganathan, declare under penalty of perjury under the laws of the United States as follows:

1. I am a partner at Taylor Wessing LLP ("Taylor Wessing"), which is one of the law firms representing Eurasian Natural Resources Corporation, Ltd. ("ENRC") in the United Kingdom. I am admitted to the roll of solicitors in England & Wales and I specialize in intellectual property and media law.

2. I submit this supplemental declaration in further support of ENRC's request for an order pursuant to 28 U.S.C. § 1782 authorizing it to take discovery from Respondent HarperCollins Publishers, LLC ("HarperCollins") in the Southern District of New York.

### Update Since My First Declaration

3. Paragraphs 16–19 of my previous declaration summarize the immediate position prior to publication of Tom Burgis's book. After I signed my affidavit, the Financial Times (the "FT") published an article written by Tom Burgis on September 2 entitled "*FBI investigates deaths of mining executives in UK corruption probe: James Bethel and Gerrit Strydom were seen as witnesses in SFO inquiry into ENRC*," (the "First FT Article"), which makes allegations of serious criminality, with a highly defamatory meaning, against ENRC (the "Allegations"). The

Allegations purportedly derived from Tom Burgis's book. A true and correct copy of the First FT Article is attached as Exhibit 1 to this Declaration.

4. Later on September 2, Taylor Wessing wrote to HarperCollins Publishers Ltd ("HarperCollins UK") about the Allegations published in the First FT Article, warning them against publishing the Allegations in Tom Burgis's book because doing so would expose them to liability. Taylor Wessing also warned HarperCollins UK against any reliance upon Mr. Burgis due to the lack of credibility of his sources, including those now referred to in Requests Nos. 2–5 of the Amended Subpoena in this case (i.e., those that are defendants in the Ongoing Proceedings described in paragraph 5 of my First Declaration ("the Ongoing Proceedings")). A true and correct copy of this letter is attached as Exhibit 2 to this Declaration.

5. On September 3, 2020, Tom Burgis's book, "Kleptopia - How Dirty Money Is Conquering the World" (the "Book") was published in the UK by William Collins, an imprint of HarperCollins UK. My firm obtained a copy of the Book and commenced an analysis of its contents and the causes of action available to ENRC, including breach of confidence and defamation. The Book was also published in the United States on September 7, 2020, by Harper, an imprint of HarperCollins. The Book also contains the Allegations.

6. On September 4, HarperCollins UK responded to our letter of September 2, stating "We acknowledge receipt of your letter dated 2nd September. It is not for us to comment on the article published by the Financial Times. We note that you will be reviewing the contents of the Book, as we had anticipated you would. Our position is fully reserved." HarperCollins UK failed to confirm that they would stop publishing the Allegations. A true and correct copy of this email is attached as Exhibit 3 to this Declaration.

7. On September 23, Taylor Wessing sent a letter to the FT complaining about publication of the Allegations in the First FT Article and setting out the defamatory meaning attributed to it. In this letter, Taylor Wessing also put the FT on notice of the confidential and privileged sources of Mr. Burgis's information, the unreliability of those sources, and the distortion of that information by those who are clearly running a negative PR campaign against ENRC. We put the FT on notice for the purposes of malice and cautioned against further publications by Mr. Burgis.

8. On September 25, the FT responded by disputing the meaning we had attributed to the First FT Article, defending Mr. Burgis, and indicating that it intended to rely on a public interest defense to any claim of defamation. I understood that the FT were referring to section 4 of the Defamation Act (2013) (the "Act") which sets out the following:

> Publication on matter of public interest
> (1) It is a defense to an action for defamation for the defendant to show that—
>     (a) the statement complained of was, or formed part of, a statement on a matter of public interest; and
>     (b) the defendant reasonably believed that publishing the statement complained of was in the public interest (the "Public Interest Defense").

A copy of the FT's response is attached as Exhibit 4 to this Declaration.

9. Without any further warning or pre-publication enquiries, on October 1 the FT published another article written by Tom Burgis, approximately 5000 words in length, entitled "*Silent witnesses: what do three corpses have to do with a corruption case?*" (the "Second FT Article"), which also contains the Allegations. A true and correct copy of the Second FT Article is attached as Exhibit 5 to this Declaration.

10. Also on October 1, 2020, Tom Burgis published a series of 11 linked tweets making a defamatory allegation against ENRC, published simultaneously at 7:31 a.m. that publicize and link to the Second FT article and to a publicity video for the book ("the Tweets"). A true and

3

correct copy of the Tweets is attached as Exhibit 6 to this Declaration. This publication includes the head of Tom Burgis's Twitter profile, where the Book is referred to, and the depiction of the Book cover used as his Twitter profile picture

11. On October 8, as part of its News Briefing series, the FT broadcast a podcast entitled "*Lilly Covid drug, Vatican derivatives, UK mining corruption probe*," which contains a 7-minute interview with Mr. Burgis about the Book (the **"Podcast"**).  The podcast was published via the FT's website and is available at https://www.ft.com/ft-news-briefing, and via various other online platforms such as Spotify. The Podcast also contained the Allegations.  A true and correct copy of the transcript of this interview is attached as Exhibit 7 to this Declaration.

12. The First FT Article, the Second FT Article, and the Podcast (together, the **"FT Publications"**) and the Book all contain highly defamatory allegations against ENRC, including the Allegations, as well as confidential information. All of these publications/broadcasts remain published and/or accessible.

13. In addition to all the publications above, Tom Burgis has continued to repeat the Allegations during the course of these proceedings, and has done so in approximately 8 further online interviews:

- A September 8, 2020 interview with NPR;
- A September 15, 2020 interview with Africa Report;
- A September 17, 2020 interview with Newstalk;
- An October 7, 2020 interview with Leading Britain's Conversation;
- An October 10, 2020 interview with Hidden Forces;
- A November 29, 2020 interview with The Chartcast;
- A November 30, 2020 interview with ACAMS Today; and

4

- A November 2020 interview with RiskScreen.

A schedule of these interviews with links is attached as Exhibit 8 to this declaration

### Pending Litigation Against Tom Burgis, HarperCollins UK, and FT

14.  Since the date of my first declaration, Taylor Wessing has had the opportunity to read and review the information contained in the Book and the FT Publications and analyze these publications together with Queens Counsel and Junior Counsel to establish causes of action for breach of confidence and defamation. Taylor Wessing is gathering evidence of the serious harm caused to ENRC by publication of the Allegations in the Book and the FT Publications.

15.  Because of the ongoing harm caused to ENRC by the further publication of the Allegations, ENRC has decided to act now without waiting for the outcome of these 1782 proceedings.  Therefore, ENRC has instructed Taylor Wessing to immediately prepare draft letters before action for claims in defamation against Tom Burgis, HarperCollins UK, and FT, while also reserving its rights to bring an action for breach of confidence in the future.  Letters before action must be sent to prospective defendants before a claim can be issued, as required in England and Wales under the Pre-Action Protocol for Media and Communications Claims.  Taylor Wessing has been gathering the facts and putting together the necessary requirements for the defamation claims.

16.  ENRC's Application pursuant to Section 1782 remains highly relevant to the contemplated proceedings for defamation against Mr. Burgis (the "Contemplated Proceedings").

17.  Additionally, if the urgency of ENRC's defamation claim requires that claim to be filed first, the claim can be amended to add a breach of confidence claim.

18.  The discovery ENRC seeks through its Section 1782 application is extremely relevant to the Contemplated Proceedings.  The FT stated in its September 25 letter that it intends to rely on the Public Interest Defense, and we expect Mr. Burgis and HarperCollins UK to do the

same. To rely on the Public Interest Defense, the prospective defendants would need to show that (1) the statement complained of was, or formed part of, a statement on a matter of public interest; and (2) the defendant reasonably believed that publishing the statement complained of was in the public interest. In the recent case of *Serafin v Malkiewicz & Ors [2020] UKSC 23*, the English Supreme Court endorsed the approach taken by Mr. Justice Warby in the case of *Economou v De Freitas [2016] EWHC 1853 (QB)* when considering the ability of a defendant to rely on the Public Interest Defense where he stated a defendant must

> **[C]onduct such enquiries and checks as it is reasonable to expect of the particular defendant in all the circumstances of the case.** Among the circumstances relevant to the question of what enquiries and checks are needed, the subject-matter needs consideration, as do the particular words used, the range of meanings the defendant ought reasonably to have considered they might convey, and the particular role of the defendant in question.

(emphasis added).

19. The Supreme Court also endorsed Lady Justice Sharp in the Court of Appeal decision in *Economou v De Freitas* when she said that one or more of the points previously taken into consideration under the old (now abolished) *Reynolds* defense of privilege may well be relevant to whether the defendant's belief was reasonable within the meaning of section 4(1)(b) of the Act and the Public Interest Defense. In this regard, one of the key points of the old Reynolds defense was whether the defendant's sources were credible, or whether they "had an axe to grind" against the claimant. Given the circumstances in this case, whereby the amended subpoena requests discovery from Tom Burgis's public sources, sources which ENRC is (in most cases) already suing, the question of whether these sources provided information to Tom Burgis is very important given they are clearly sources who would have "axes to grind" against ENRC.

20. In addition, whether or not sufficient fact checking was conducted prior to the publication of the Book and the FT Publications will be an important aspect of whether the

6

defamation claims against these prospective defendants can succeed. Further, Mr. Burgis's compensation and who he received it from is also very relevant to determining whether he had a reasonable belief that publication of the Allegations was in the public interest, particularly if those who paid him also had axes to grind against ENRC.

21.     ENRC does not intend to name HarperCollins as a defendant in the pending defamation proceedings.

## The Ongoing / Foreign Proceedings

22.     I refer to the Ongoing Proceedings described in paragraph 5 of my First Declaration and respond to the point being made by the Respondent that the discovery sought in this application can be obtained via the Ongoing Proceedings. This is not accurate due to the collateral undertaking rule (now codified under rule 31.22 of the Civil Procedure Rules (1998)) whereby "a party to whom a document has been disclosed may use the document only for the purpose of the proceedings in which it is disclosed" ("the Collateral Undertaking"). This means that even if disclosure obtained in the Ongoing Proceedings was similar in nature to the discovery sought in these proceedings, it could not be used in the Contemplated Proceedings. This is unless one of the exemptions under the rule applies as follows: "the document has been read to or by the court, or referred to, at a hearing which has been held in public or the court gives permission or the party who disclosed the document and the person to whom the document belongs agree" (see rule CPR31.22(1)(a)–(c) and Practice Direction 51U. Having reviewed the Statements of Cases in the Ongoing Proceedings and having spoken to the Partners with conduct of the Ongoing Proceedings, as far as I am aware, none of these exemptions appear to be available to the Collateral Undertaking in those cases. In addition, Tom Burgis and HarperCollins are not parties to the Ongoing Proceedings, and nor are they referred to in the pleadings of those cases.

23. For the same reason, I cannot opine on what disclosure ENRC may or may not have obtained in the Ongoing Proceedings because the documents disclosed cannot be reviewed or used outside of those proceedings due to the Collateral Undertaking. For the purpose of this rule, an Electronic Documents Questionnaire which has been completed and served by another party pursuant to Practice Direction 31B, i.e. the document which describes which documents have been disclosed, is to be treated as if it is a document which has been disclosed, see CPR 31.22(4) which means it can also only be used for the purpose of the proceedings in which it is disclosed.

24. Specifically, in relation to the DSFO Proceedings and Dechert Proceedings, they are primarily focused on leaks of ENRC's confidential information which took place between 2011 and 2013, and well before Tom Burgis started writing the Book. Accordingly, it is highly unlikely that the Courts in those proceedings would grant requests for evidence relating to disclosures of ENRC's information occurring from January 1, 2018, to the present, which is the period of time requested in ENRC's subpoena of HarperCollins in its 1782 petition.

25. Further, ENRC requested leave from the Court to expand the scope of the DSFO Proceedings to include leaks of information during the period of time from 2016 to 2019, but the court denied that request and made an order to that effect (see paragraph 41 of the judgment of Mr. Justice Waksman, a true and correct copy of which is attached as Exhibit 9 to this declaration, and the Order dated 3 July 2020 (the "Order"), a true and correct copy of which is attached as Exhibit 10 to this declaration). Thus, while ENRC attempted to obtain evidence relating to leaks occurring in 2018 through to 2019, that attempt has failed and the Order, which I have read, prevents ENRC from successfully requesting disclosure in this regard. Accordingly, ENRC has made no requests for disclosure in either the DSFO Proceedings or the Dechert Proceedings which relate to the categories of discovery in the subpoena.

### The Contemplated Proceedings

26. As to whether the discovery sought from the Respondent is also disclosure which ENRC would be entitled to in the Contemplated Proceedings, I do not believe that the discovery sought will also be disclosable in those proceedings, but we do not know for sure what defenses Tom Burgis, Harper Collins UK and the FT will run, other than the matters stated in paragraph 18. In any event, HarperCollins are not a party to the Contemplated Proceedings and, therefore, ENRC will not be entitled to any documents from them.

### Article 10 of the European Convention of Human Rights

27. I have reviewed the Amicus brief submitted in ENRC's Section 1782 proceedings by the Reporters Committee for Freedom of the Press. Article 10 ("Article 10") of the European Convention of Human Rights ("the Convention") would not prevent the discovery of materials responsive to the Amended Subpoena for the following reasons:

   a. The disclosure must be necessary for one of the purposes in s. 10 of the Contempt of Court Act 1981 or Article 10. "'Necessary' has a meaning that lies somewhere between 'indispensable' on the one hand, and 'useful' or 'expedient' on the other . . . the nearest paraphrase I can suggest is 'really needed'": *Arcadia Group Limited and others v Telegraph Media Group Limited* [2019] EWHC 96 (QB) at [15]. In this case the disclosure is necessary in the interests of justice.

   b. While a journalist has a presumptive entitlement, deriving from section 10 and Article 10 to source protection, ENRC has a competing and unqualified right under Article 6 of the Convention to a fair trial, itself a matter of public interest: *Richard v British Broadcasting Corporation* [2017] EMLR 22 at [43]; *Malik v Manchester Crown Court* [2008] EMLR 19 at [58]. In cases involving conflicting Convention

      rights, Article 10 rights have no precedence over the competing right; it is a question of balancing the two rights: *Re S (a child)* [2005] 1 AC 593 at [17]. In both *Richard* and *Malik* the article 10 right was overridden. A true and correct copy of *Richard v British Broadcasting Corporation* is attached hereto as Exhibit 11. A true and correct copy of *Malik v Manchester Crown Court* is attached hereto as Exhibit 12.

c. While not of itself a matter necessarily requiring disclosure (*Goodwin*), the identity of the sources, and the information provided by them, may be vital matters in the fair trial of the proposed defamation proceedings, which Mr Burgis, the Financial Times and HarperCollins UK have suggested will be defended on the basis of section 4 of the Defamation Act 2013, which requires a defendant to prove, *inter alia*, that it reasonably believed publication was in the public interest. Their reasonable belief will depend heavily on who the sources were and the information provided by them.

d. However, this is not the sole matter going to the issue of necessity. The allegation made by Mr Burgis against ENRC is a very serious one of criminality. It is difficult to think of a graver and more shocking allegation about a prominent corporation or business. ENRC can have no assurance that these allegations will not continue to surface and be made by those originally responsible for them, even if the proposed defendants are prevented by successful proceedings from continuing to assert them. This case is easily distinguishable from *Financial Times Ltd v United Kingdom* [2010] EMLR 21, where the potential future exposures involved merely commercial information confidential to the applicant corporation, Interbrew. It is

no answer to say that such information may be disclosed in the UK proceedings; that is uncertain, and in any event there is the issue of collateral use referred to above. There is no clear alternative means of securing the information. In the language of the authorities, there is indeed a "pressing need" for the Article 10 rights to be overridden. A true and correct copy of *Financial Times Ltd v United Kingdom* is attached hereto as Exhibit 13.

e. ENRC alleges that persons in the Serious Fraud Office of the United Kingdom conspired with named individuals to leak information about ENRC for financial gain and for the purpose of damaging ENRC. Bad faith on the part of the source is a relevant factor in the decision whether to disclose: *Financial Times v UK* (2010) 50 EHRR 46 at [66]; as is financial gain: *Ashworth Hospital Authority v MGN Ltd* [2002] EMLR 36 at [64].

f. Finally, the quoted statements from *Tillack v Belgium and Becker v Norway*, relied on by RCFP at page 9 of its brief, are not unqualified propositions of English law. As to *Tillack*, the legality or otherwise of the acquisition of the information is indeed a factor to be taken into account in the balancing exercise, and may in fact work in favor of disclosure: *Ashworth*, supra. As to *Becker*, the quoted statement appears to be an opinion of a UN rapporteur on article 19 of the International Covenant on Civil and Political Rights. It has not been approved as a statement of principle referring to Article 10 in English case law. In this regard, it should be pointed out that UK Courts are required by the Human Rights Act 1998 to "take account" of decisions of the European Court of Human Rights, but they are not necessarily required to follow them, in particular if the UK Court considers "that

the Strasbourg Court has not sufficiently appreciated or accommodated particular aspects of our domestic constitutional position": statement by the Supreme Court of the United Kingdom at https://www.supremecourt.uk/about/the-supreme-court-and-europe.html

\* \* \* \* \*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Dated: January 18, 2021
London, England

_____
Niranjan Shanmuganathan